UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RISKIFIED LTD. SECURITIES LITIGATION | Case No. 1:22-cv-03545-DLC<br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br>CLASS ACTION<br>JURY TRIAL DEMANDED |

Lead Plaintiff Craig Black and named plaintiff Diva Joshi ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel, which included a review of, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings by Riskified Ltd. ("Riskified" or the "Company"), press releases and other public statements by Defendants, public conference calls and announcements made by Defendants, media and analyst reports and analysis about the Company, interviews with confidential witnesses including former Company employees, other public reports and information about the Company, and information readily available on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons or entities who purchased Riskified Class A ordinary shares pursuant and/or traceable to the Company's Registration Statement (defined below), issued in connection with the Company's July 2021 initial public offering ("IPO"), and were damaged thereby ("Class").[1] Plaintiffs, individually and on behalf of the Class, bring claims to recover damages and other remedies caused by Defendants' violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act").

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant or any other excluded person has or had a majority ownership interest at any time.

2. On July 1, 2021, the Company filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on July 28, 2021 ("Registration Statement"). On July 30, 2021, the Company filed with the SEC a final prospectus for the IPO on Form 424B4 ("Prospectus"), which was incorporated into and formed part of the Registration Statement.

3. Riskified's core product, the "Chargeback Guarantee," offers fraud-protection service to its merchant clients. When online merchants receive orders from customers, they must decide whether to approve or reject the transaction. If an order is approved and the sale is completed, but the customer later successfully disputes that charge through their credit card bank, funds in the amount of the order payment are deducted from the merchant's bank account, resulting in a loss equal to the amount received by the consumer. This is called a "chargeback."

4. Chargebacks can help consumers to combat fraudulent transactions, but they are also a risk and expense borne by merchants. Merchants want to maximize their sale approvals (and thus revenues) while minimizing chargebacks for fraudulent transactions.

5. To that end, Riskified offers merchants its "Chargeback Guarantee" product, where Riskified seamlessly reviews pending transactions and uses its proprietary, machine learning-based platform to more precisely determine which transactions to approve and which to reject. Merchants pay Riskified an agreed-upon percentage of the gross merchandise value ("GMV") of transactions that Riskified approves. In turn, Riskified reimburses the merchants for any transactions it approves that result in chargebacks.

6. When Riskified reimburses a merchant for a chargeback, it records a chargeback guarantee expense in its cost of revenue. These chargeback expenses comprise the bulk (roughly

83%) of Riskified's cost of revenue. Factors affecting chargeback expenses thus have a corresponding effect on the Company's gross profit margins.

7. In the months leading up to the IPO, the Company pushed to maximize their top-line GMV. Unbeknownst to investors, Defendants accomplished this revenue growth by expanding the Company's exposure to "riskier" industries, including taking on more new clients in new industries. Companies in "riskier" industries had higher chargeback rates and Riskified earned lower profit margins on those transaction volumes.

8. At the time of Riskified's IPO, Defendants were aware of material adverse trends that they knew were likely to materially impact the Company's financial prospects. The Registration Statement failed to disclose these trends. These omissions violated Defendants' duty to disclose and rendered certain statements in the Registration Statement misleading.

9. Specifically, the Registration Statement failed to disclose that: (A) the Company's clients in the travel, payments and remittance, and cryptocurrency industries had higher chargeback rates and earned lower margins for Riskified; (B) the Company typically saw higher chargeback rates and lower margins from new clients in new industries; and (C) these lower-margin clients and industries represented an increasing share of Riskified's business leading up to and continuing beyond the IPO. Defendants knew that these undisclosed trends were likely to have materially adverse impacts on the Company's gross profit margins and the Company's overall financial results.

10. Investors did not learn of these undisclosed trends until months after the IPO, when the Company announced a series of disappointing quarterly and annual results, highlighted by sagging gross profit margins. The Company's executives explained during earnings calls the reasons for these margin shortcomings: the Company's expanding exposure to industries with

higher chargebacks and lower margins. These announcements were accompanied by analyst reports calling attention to the gross profit margin shortcomings and reducing the analysts' ratings and price targets for Riskified's stock, which were based in part on those margins.

11. During the Company's earnings call for the second quarter of 2021, Riskified's executives revealed for the first time that they expected the Company's performance would fall off in the second half of the year, and explained that this was due to depressed margins caused by the previously undisclosed trends. In the wake of these revelations, the Company's stock price fell nearly $11, over 30%, over the following trading days.

12. The Company's third quarter earnings release and earnings call showed that the negative trends had already begun to materialize with significant year-over-year decreases in the Company's gross profit margins. Analysts recognized the importance of these revelations, downgrading the Company and lowering their price targets and valuations, due in part to the lower margins. Following these reports, the Company's stock price fell once again by $6.70, nearly 38%, over the following trading days. Less than four months after the IPO (priced at $21 per share), the Company's stock price had already lost nearly half its value.

13. The same trends continued through the Company's fourth quarter and year-end results. The Company's stock price fell again the next day by $0.62, over 9%, to close at $6.03.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

17. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1391(b). Defendants conducted the IPO in this District, drafted the Registration Statement in substantial part in this District, disseminated the statements alleged to be false and misleading herein into this District, and solicited purchasers of Riskified shares in this District. The Riskified shares issued in the IPO also trade in this District.

19. In connection with the acts, omissions, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## PARTIES

20. Lead Plaintiff Craig Black, as set forth in his certification on file with the Court (Dkt. No. 27-2) and incorporated by reference herein, purchased Riskified Class A ordinary shares pursuant and/or traceable to Company's Registration Statement and was damaged thereby.

21. Named Plaintiff Diva Joshi, as set forth in her certification on file with the Court (Dkt. No. 65-1) and incorporated by reference herein, purchased Riskified Class A ordinary shares pursuant and/or traceable to the Company's Registration Statement and was damaged thereby.

22. Defendant Riskified is an eCommerce risk management platform that purports to use machine learning to identify fraud. The Company is incorporated in Israel and headquartered in Tel Aviv, Israel. Riskified Class A ordinary shares were issued and trade in New York on the New York Stock Exchange ("NYSE") under ticker symbol "RSKD."

23. Defendant Eido Gal co-founded Riskified and served as Riskified's Chief Executive Officer ("CEO") and a director since the Company's inception, including at the time of the IPO.

24. Defendant Assaf Feldman co-founded Riskified and served as Riskified's Chief Technology Officer ("CTO") and a director since the Company's inception, including at the time of the IPO.

25. Defendant Aglika Dotcheva served as Riskified's Chief Financial Officer ("CFO") since 2015, including at the time of the IPO. Dotcheva previously as the Company's Vice President of Finance from October 2014 to 2015.

26. Defendant Erez Shachar served as a Riskified director since July 2015, including at the time of the IPO.

27. Defendant Eyal Kishon served as a Riskified director since February 2013, including at the time of the IPO.

28. Defendant Aaron Mankovski served as a Riskified director since September 2017, including at the time of the IPO.

29. Defendant Tanzeen Syed served as a Riskified director since October 2019, including at the time of the IPO.

30. Defendant Jennifer Ceran served as a Riskified director since February 2021, including at the time of the IPO.

31. The defendants identified in ¶¶23-33 are sometimes collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement. In addition, the Individual Defendants each participated in the solicitation and sale of Riskified Class A ordinary shares to investors in the IPO for their own benefit and the benefit of Riskified as directors, executive officers and/or major shareholders of the Company.

32. Riskified is liable for the acts of the Individual Defendants and the Company's employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a financial services company located in New York, New York. Goldman Sachs served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

34. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial services company located in New York, New York. J.P. Morgan served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

35. Defendant Barclays Capital Inc. ("Barclays") is a financial services company located in New York, New York. Barclays served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

36. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company located in New York, New York. Credit Suisse served as an underwriter for

the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

37. Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is a financial services company located in Cleveland, Ohio. KeyBanc served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

38. Defendant Piper Sandler & Co. ("Piper Sandler") is a financial services company located in Minneapolis, Minnesota. Piper Sandler served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

39. Defendant Truist Securities, Inc. ("Truist") is a financial services company located in Atlanta, Georgia. Truist served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

40. Defendant William Blair & Company L.L.C. ("William Blair") is a financial services company located in Chicago, Illinois. William Blair served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

41. Defendant Loop Capital Markets LLC ("Loop Capital") is a financial services company located in New York, New York. Loop Capital served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

42. Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") is a financial services company located in New York, New York. Ramirez served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

43. Defendant Siebert Williams Shank & Co., LLC ("Siebert Williams") is a financial services company located in New York, New York. Siebert Williams served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

44. Defendant Stern Brothers & Co. ("Stern") is a financial services company located in St. Louis, Missouri. Stern served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Riskified Class A ordinary shares issued pursuant thereto.

45. Defendants Goldman Sachs, J.P. Morgan, Credit Suisse, Barclays, KeyBanc, Piper Sandler, Truist, William Blair, Loop Capital, Ramirez, Siebert Williams, and Stern are sometimes collectively referred to herein as the "Underwriters."

46. Riskified, the Individual Defendants, and the Underwriters are sometimes collectively referred to herein as "Defendants."

47. Goldman Sachs, J.P. Morgan, and Credit Suisse acted as representatives for the Underwriters.

48. Pursuant to the Securities Act, the Underwriters are liable for the false and misleading statements and omissions of material fact in the Registration Statement as follows:

(a) The Underwriters are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the

IPO and shared over $26 million in fees collectively for their services. The Underwriters determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Riskified Class A ordinary shares in the IPO. Each of the Underwriters designated personnel to the IPO working group, including investment bankers, analysts, associates and counsel, to market Riskified Class A ordinary shares, and those personnel worked on and approved the content of Riskified's Registration Statement and other offering materials.

(b) The Underwriters demanded and obtained an agreement from Riskified that Riskified would indemnify and hold the Underwriters harmless from any liability under the federal securities laws. They also made certain that Riskified had purchased millions of dollars in directors' and officers' liability insurance.

(c) Representatives of the Underwriters also assisted Riskified and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Riskified, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriters in order to engage in the IPO. During the course of their "due diligence," the Underwriters had continual access to confidential corporate information concerning Riskified's operations and financial prospects.

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriters met with Riskified's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which

Riskified Class A ordinary shares would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Riskified would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriters' representatives and Riskified's management and top executives, such as the Individual Defendants, the Underwriters knew, or should have known, of Riskified's existing problems as detailed herein.

(e) The Underwriters solicited and sold in the IPO Riskified Class A ordinary shares to plaintiff and other members of the Class. The Underwriters' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**FORMER EMPLOYEE WITNESSES**

49. Plaintiffs' investigators spoke with former Riskified employees who have personal knowledge of the facts alleged and attributed to them in this Complaint.

50. Former Employee 1 ("FE1") served as an account manager for Riskified from August 2021 to December 2022. In this role, FE1 managed relationships with roughly a dozen enterprise-level customers, providing them fraud-related data on detection rates and chargebacks.

51. Former Employee 2 ("FE2") served as an enterprise account manager for Riskified from June 2021 to October 2021. In this role, FE2 worked with clients to review their performance prior to working with Riskified, analyzing authorization rates and fraud captures.

52. Former Employee 3 ("FE3") worked for Riskified from November 2019 to April 2022, helping to lead strategic partnerships with a focus on banks and financial institutions. FE3 reported to the Company's Vice President of Sales, Eyal Raab, who reported to the Company's

CEO, Defendant Gal, when FE3 started, and then to the Company's Chief Revenue Officer ("CRO"), Peter Elmgren.

53. Former Employee 4 ("FE4") worked in business development for Riskified from October 2019 to November 2021. FE4's role at Riskified was to sign and onboard new large enterprise customers (those with between $100 million to $5 billion in annual revenue). FE4 reported to a team lead, Simon O'Keefe, who reported to the Company's Vice President of Sales, Eyal Raab.

54. Former Employee 5 ("FE5") served as a business intelligence team leader for Riskified from October 2019 to February 2022. FE5's role at Riskified was to oversee the production of internal reports and analytics for the Company's New York office, working with other departments in the Company such as artificial intelligence, account management, and others in both the New York and Tel Aviv offices, to produce reports for them. FE5 reported to the Company's head of business intelligence, Ran Salmona, who was based in Tel Aviv. Salmona reported to the Company's Chief Information Officer, who in turn reported to the Company's Chief Technology Officer, Defendant Feldman.

55. Former Employee 6 ("FE6") served as a data integration engineer at Riskified in 2020 and 2021, including during the time of the IPO in July 2021.

56. Former Employee 7 ("FE7") served as a data analytics team lead at Riskified from February 2020 to March 2021, working on onboarding new customers and pitching new customers.

57. Former Employee 8 ("FE8") served as Director of Revenue Operations for Riskified from March 2021 to February 2022. FE8 reported to Eric Johnson, who reported to Riskified's CRO Peter Elmgren.

58. Former Employee 9 ("FE9") served as a strategic account executive for Riskified from January 2020 to February 2021.

59. Former Employee 10 ("FE10") served as a Vice President of Sales, Americas, for Riskified from January 2020 to May 2021. FE10 reported to Riskified's Vice President of Sales, Eyal Raab, who reported to the CEO (Defendant Gal) and later to the CRO, Peter Elmgren.

## SUBSTANTIVE ALLEGATIONS

### Riskified's Core Product – The Chargeback Guarantee

60. When a consumer buys something from an online merchant using a credit card, the merchant must decide first whether to accept/approve the transaction and realize the sales revenue, or to reject the transaction and forgo the sale. Sometimes, an approved sale may result in a chargeback.

61. Chargebacks are forced payment reversals that occur when a cardholder disputes a transaction with their bank and the cardholder's bank rules in favor of the cardholder. In the event of a chargeback, funds associated with the payment are withdrawn from the merchant's bank account resulting in a loss for the merchant equal to the value of the item that was received by the consumer. This mechanism can be a helpful tool for consumers to combat the risk of fraudulent transactions.

62. However, chargebacks can also be fraudulent or abusive, where consumers dispute a legitimate purchase in an attempt to avoid paying for the item they purchased. The risk of fraudulent chargebacks is borne by merchants.

63. Naturally, merchants want to maximize their approval rate (and thus, their sales revenue) while minimizing fraudulent orders and chargebacks – they want to approve legitimate transactions and reject fraudulent ones. Riskified purports to help its merchant clients to more

precisely identify which transactions to approve and which to properly reject as fraudulent with its proprietary eCommerce risk management platform.

64. Riskified uses a machine learning platform, powered by data from the Company's global merchant network. Riskified purports to have "differentiated access to our merchant's transaction data through deep integrations into their mission-critical infrastructure, including their eCommerce, order management, and customer relationship management systems." The Company "continuously feed[s] this real-time training data into our sophisticated machine learning models."

65. Using these data sets, Riskified's software purports to identify the individual (and that individual's fraud risk) behind each online interaction, helping merchants eliminate risk and uncertainty from their business. Riskified claims to drive higher sales and reduce fraud and other operating costs for its clients, as compared with legacy systems that merchants previously used to filter out fraudulent transactions.

66. The Company's self-described "core product" is its Chargeback Guarantee, which uses software driven by machine learning technology to automatically approve or deny online orders, with guaranteed performance levels specific to each merchant/client. The Company was essentially a one-product company at the time of the IPO, with the Chargeback Guarantee product accounting for approximately 99% of the Company's annual revenue.

67. With the Chargeback Guarantee, Riskified charges an agreed-upon percentage of the merchant's Gross Merchandise Value ("GMV") for each transaction that Riskified's fraud-detection software reviews and approves. The merchant pays nothing for rejected transactions.

68. If a transaction approved by Riskified results in a chargeback, Riskified reimburses the merchant for the amount of the lost sale. When Riskified reimburses a merchant for a chargeback, it records a chargeback guarantee expense in its cost of revenue.

69. Riskified's cost of revenue primarily consists of chargeback guarantee expenses. In 2019 and 2020, chargeback expenses accounted for 84% and 82%, respectively, of the Company's total cost of revenues. Based on the Company's 2021 annual report, that figure was roughly 83% in 2021.

**Riskified's Key Performance Indicators Included Chargebacks and Gross Margins**

70. Some of Riskified's key internal metrics are GMV, take rate, and billings:

- GMV: Total eCommerce volume submitted by merchants for review
- Approval Rate (%): GMV approved / GMV reviewed
- Risk-Adjusted Fee (%): Negotiated percentage of the value of each approved transaction charged to merchant
- Take Rate (%) = (Approval Rate) x (Risk-Adjusted Fee)
- Billings = (GMV) x (Take Rate)
- Chargeback-to-Billings ("CTB") Ratio = total chargeback expenses incurred / total Billings

71. Riskified uses a risk-adjusted pricing model which varies for each client based on the end market, geography, volume guaranteed, and approval rates. The Company's take rate varies for each merchant and is based on a variety of different considerations, including the sales volume, industry-specific risk, and the guaranteed approval rates that Riskified provides. For example, if a merchant just submits a small portion of its total volume (*e.g.*, volume it deems to carry a particularly high risk of fraud or chargebacks) the take rate would likely be higher than if the same merchant submitted 100% of its volume.

72. As the Company detailed in its Registration Statement:

> Our CTB Ratio represents the total amount of chargeback expenses incurred during the period indicated divided by the total amount of Billings to all of our merchants over the same period. Chargeback expenses include (1) actual chargeback expenses and estimates for chargeback expenses we expect to incur for transactions approved in the period indicated plus (2) changes in estimates of chargeback expenses for transactions approved in prior periods. Billings represent (1) gross amounts invoiced to our merchants and estimates for cancellations and service level agreements for transactions approved during the period plus (2) changes in estimates for cancellations and service level agreements for orders approved in prior periods. Billings excludes credits issued for chargebacks.

73. In its Registration Statement, the Company explained that the year-over-year decreases in CTB Ratios that the Company experienced in the first quarter of 2021 and year-end 2020 were caused in part by "a shift in the merchant mix of our revenues." Thus, the Company was aware that shifts in the Company's merchant mix could, and indeed did, cause changes in the Company's CTB Ratio.

74. Riskified acknowledged that it "use[s] the CTB Ratio to evaluate the performance of our business operations and the effectiveness of our model." FE1 reported that the CTB Ratio was one of the metrics most commonly discussed by management. FE3 corroborated that the chargeback ratio was one of the most important metrics to Riskified's management.

75. According to FE4, FE9, and FE10, chargeback rates and ratios (*i.e.*, the CTB Ratio) were one of the most commonly used internal metrics at Riskified. FE5 and FE7 also reported that chargeback rates and ratios were among the internal metrics most commonly discussed by management. FE10 corroborated that Riskified's executive management team was well-attuned to the Company's chargeback rates.

76. As FE10 reported, chargeback rates were "pretty tightly managed," and that when onboarding new clients, the operations team—up to and including the Company's Chief

Operating Officer (“COO”)—performed the risk analysis based on the chargeback metrics they had available to them.

77. The Registration Statement defined Adjusted Gross Profit Margin as a key performance indicator for the Company, noting that this metric “represents Adjusted Gross Profit expressed as a percentage of revenue.” The Registration Statement described “gross profit margin” as “the most directly comparable U.S GAAP measure” to the Company’s Adjusted Gross Profit Margin metric. The two figures were the same in every period for which the Company provided data in the Registration Statement, as well as in the Company’s annual report for 2021 filed with the SEC on February 25, 2022.

**Riskified’s Exposure to Riskier Clients Was Growing**

78. Riskified’s client base covered a wide swath of industries. Certain of these industries were riskier than others, meaning they had higher chargeback rates. A higher chargeback rate meant a higher cost of revenue for Riskified, and often, lower gross profit margins.

***More and Less Risky Industries***

79. FE4 confirmed that within the Company, chargeback rates were the greatest indicator or metric of risk, such that an industry’s relative “riskiness” generally meant its chargeback rates.

80. FE1 explained that internally, Riskified had different tiers for its clients indicating the client’s relative fraud risk level, and thus the risk of the Company incurring chargeback expenses. FE3 corroborated that the Company grouped clients by industry and sector, specifically identifying each client’s chargeback rate.

81. FE7 and FE9 also reported that Riskified viewed certain industries as riskier. According to FE7, the Company set targets for chargeback rates and margins for each vertical, or industry, at the beginning of the year.

82. By way of example, in FE1's experience, retail clients were generally in the lower, less risky tiers, and clients in the travel, gift card, or cryptocurrency industries fell into the higher risk tiers within the Company.

83. The travel industry in particular was widely known (within the Company) to be riskier, with higher chargeback rates and lower margins.

84. FE3 recalled that the travel industry was "definitely important" to the Company, estimating that it accounted for roughly 20% of Riskified's business. FE9 also estimated that approximately 20% of Riskified's business came from the travel industry, and FE10 estimated the figure was roughly 25%. According to an analyst report by J.P. Morgan published on August 23, 2021, the travel and tickets industries represented over 20% of the Company's total billings in 2019, prior to the COVID-19 pandemic, but was down to 6% in 2020 before the industry began to rebound in 2021.

85. According to FE1 and FE4, Riskified regarded the travel industry as a riskier industry. As FE4 explained, the higher risk comes from the industry practice of focusing on speed to beat out competitors with the same access to the same pool of available seats or rooms.

86. FE8 also reported that the Company's travel industry clients typically had higher chargeback rates, and that the Company's data scientists and executive team were likely aware of these higher rates.

87. The higher rate of chargebacks in the travel industry was widely known and not a new development, as the Company already had years of transaction data from working with

major travel industry clients. FE4 stated that Riskified had years of experience working with clients in the travel industry prior to the IPO, including some of the Company's largest clients. FE5 noted that two of the company's biggest clients were travel websites, and FE8 noted that the Company had worked with its travel sector clients for a long time.

88. According to FE4, the Company's management was aware of higher chargeback rates in the travel industry, which had been further exacerbated during the COVID-19 pandemic. FE4 described this as common knowledge Company-wide, as chargeback rates were one of the central, key metrics to the Company's business. FE10 also reported that management paid close attention to chargebacks in the travel industry.

89. According to FE5, the Company's management paid close attention to travel chargebacks, including chargeback ratio metrics. FE5 knew that the Company's CEO (Defendant Gal) and CFO (Defendant Dotcheva) watched these metrics in particular because FE5's manager had worked directly on those figures, and "chargeback metrics were always talked about." As FE5 explained, chargeback metrics such as CTB Ratio were core metrics for the entire Company. According to FE5 "everyone looked at that number," and that "for the whole of the company, specific customers, trends, [these] numbers [were] talked about all the time."

90. According to FE7, the fact that Riskified usually saw higher chargeback rates in the travel industry, and it was seen as a riskier industry at Riskified, was known all the way up to Riskified's COO.

91. Certain other industries were also widely known to be higher risk – meaning higher rates of chargebacks and lower margins. Those industries included cryptocurrency, payments and remittance, and new clients in industries that were new to Riskified.

92. FE3 reported that Riskified's clients in the money remittance and cryptocurrency industries had even higher chargeback rates than travel industry clients. Indeed, FE2 confirmed that cryptocurrency was considered a riskier industry for the Company, and FE4 corroborated that the remittance/payment industry was also considered higher risk.

93. As FE7 and FE8 reported, when Riskified was onboarding new clients in a new industry, the Company could expect to see higher chargeback rates. FE10 also confirmed that chargeback rates were generally high when onboarding a new client.

94. FE6 reported that the Company had begun onboarding a large cryptocurrency client, Binance, six months prior to the IPO. That meant that the Company had begun to review Binance's historical chargeback data six months prior to the IPO. Binance is considered the largest cryptocurrency exchange in the world by volume, generating roughly $20 billion in revenues in 2021.

95. As FE6 explained, the cryptocurrency industry was riskier not because of the nature of the cryptocurrencies themselves, but because a large proportion of the cryptocurrency company's customers came from riskier regions such as Brazil or Eastern Europe, which generally saw higher chargeback rates.

***New Client Onboarding Was Based on the Company's Review of Months of Client Data***

96. According to FE7, onboarding new clients from riskier industries was a point of discussions with management on the operations side of the Company, up to and including the Company's COO.

97. FE1 reported that Riskified had "tons of data" from its automated processes, and that the Company's data team would report its analyses to management.

98. As FE3 explained, Riskified developed its knowledge of a new client's chargeback rates as part of a due diligence process that it would conduct before onboarding a new client. In this process, Riskified conducted back-tests of a client's historical transactions (*i.e.*, the client's rates of approvals, rejections, and chargebacks).

99. According to FE4, when Riskified was onboarding a new client, the client would typically provide Riskified with six months of the client's historical transaction data.

100. FE1 corroborated that before prospective new customers were onboarded with Riskified, the Company reviewed the customer's historical transaction data. The Company would input these data into its model to analyze and aim to improve on the results vis-à-vis chargebacks and transaction approvals.

101. According to FE1, this data analysis was all part of the pre-sales process to set customer-specific benchmarks and margins and was required of new customers.

102. FE3 confirmed that Riskified's management would understand the relative riskiness of any client's industry prior to and while onboarding the client.

103. FE3 explained that as a way to gather even more data about a new client, after the initial onboarding period Riskified would run a "shadow period" in which the client's legacy system remained the primary mode to identify fraud, and Riskified would be used as a backup for deciding whether to approve or deny a transaction. These back-tests and shadow periods provided Riskified with important information about chargeback rates before "going live" with a client.

104. FE3 explained that Riskified used these back-tests and shadow periods, in addition to real-time data on chargeback rates, to help the Company determine its expectations for chargeback rates for a given client.

105. According to FE3, numerous people at Riskified had access to this data on chargebacks from back-tests, the shadow period, and real-time data collection, from account managers and data scientists to the C-suite. This data was how Riskified determined which industries were higher or lower risk.

***The Company Took on More Risk Leading Into the IPO to Showcase Its Growth***

106. FE2 explained that the Company was willing to take on more risk as a way of developing business/customers and to claw at market share held by larger competitors.

107. FE3 also reported that Riskified had embraced some riskier clients as a way to differentiate itself and gain market share. FE3 explained that Riskified was also willing to charge lower fees to grow market share and beat competitors, including in new industries and geographic regions that it knew were riskier.

108. FE6 also reported that the Company added new, riskier clients at a higher rate than usual leading up to the IPO, in order to show growth and attract investors.

**Defendants Raise over $422 Million in Riskified's IPO**

109. Defendants used the Registration Statement to sell a total of 20.125 million Riskified Class A ordinary shares at $21 per share, generating over $422 million in gross proceeds. These sales included 200,000 shares sold by Defendant Feldman, Riskified's co-founder and its Chief Technology Officer and director at the time of the IPO, generating $4.2 million in gross proceeds for himself.

110. In connection with the IPO, the Underwriters agreed to purchase and sell shares of Riskified Class A ordinary shares to the public as follows:

| **Underwriter** | **Number of Class A Ordinary Shares** |
|---|---:|
| Goldman Sachs & Co. LLC | 6,070,546 |
| J.P. Morgan Securities LLC | 4,894,084 |
| Credit Suisse Securities (USA) LLC | 2,258,808 |

| | |
|---|---|
| Barclays Capital Inc. | 1,150,000 |
| KeyBanc Capital Markets Inc. | 790,624 |
| Piper Sandler & Co. | 790,624 |
| Truist Securities, Inc. | 610,938 |
| William Blair & Company, L.L.C. | 790,624 |
| Loop Capital Markets LLC | 35,938 |
| Samuel A. Ramirez & Company, Inc. | 35,938 |
| Siebert Williams Shank & Co., LLC | 35,938 |
| Stern Brothers & Co. | 35,938 |
| **Total:** | 17,500,000 |

111. The Underwriters had an option to purchase and sell in the IPO an additional 2.625 million Riskified shares, which they exercised in full. The Underwriters collectively received over $26 million in underwriting discounts and fees for underwriting the IPO.

112. The Prospectus contained the following statement, on page (i):

> We, the selling shareholder, and the underwriters have not authorized anyone to provide additional information or information different from that contained in this prospectus, any amendment or supplement to this prospectus or in any free writing prospectus prepared by us or on our behalf or to which we may have referred you. We, the selling shareholder, and the underwriters do not take any responsibility for, and can provide no assurance as to the reliability of, any information other than the information in this prospectus and any free writing prospectus prepared by us or on our behalf.

## DEFENDANTS MISLEADINGLY OMITTED MATERIAL FACTS FROM THE COMPANY'S IPO REGISTRATION STATEMENT

113. The Registration Statement was negligently prepared and as a result: (1) it failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents; and (2) it omitted material facts necessary to make the statements contained therein not misleading.

**The Registration Statement Failed to Disclose Known Material Trends**

114. The Registration Statement was materially false and misleading in that it failed to "discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition," as required under Item 5(D) of Form 20-F ("Item 5"). Item 5 also requires the registrant provide "such other information that is necessary for an investor's understanding of the company's financial condition, changes in financial condition and results of operations."

115. The SEC's Instructions to Item 5 also require that the discussion and analysis by the registrant's management "must also focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

116. The SEC interprets Item 5 of Form 20-F as "calling for the same disclosure as Item 303 of Regulation S-K." *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations,* SEC Release Nos. 33-8350; 34-38960; FR-72, *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

117. Item 303 of Regulation S-K (17 C.F.R. §229.303) ("Item 303") and the SEC's related interpretive releases thereto mandate that the registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

118. As with Item 5, the SEC's Instructions to Item 303 require that the Management's Discussion and Analysis of Financial Condition and Results of Operations "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

119. In particular, the SEC has clarified that "companies should identify and discuss key performance indicators, including non-financial performance indicators, that their management uses to manage the business and that would be material to investors."[2]

120. The Registration Statement identified the CTB Ratio and the Company's Adjusted Gross Profit Margin as "key performance indicators." The Registration Statement further explained that "[w]e use non-GAAP financial measures, such as Adjusted Gross Profit, Adjusted Gross Profit Margin, Adjusted EBITDA, and Free Cash Flow because they are key metrics used by management and our board of directors to assess our financial performance and for financial and operational decision-making and as a means to evaluate period-to-period comparisons. These non-GAAP measures are frequently used by analysts, investors and other interested parties to evaluate companies in our industry." Accordingly, the Company itself recognized that material facts about the Company's chargeback rates and margins were important to investors' ability to assess the Company and the value of its stock.

121. Item 3(D) of SEC Form 20-F ("Item 3") requires that the registrant, in the "Risk Factors" section of the registration statement, "prominently disclose risk factors that are specific

---

[2] *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities and Exchange Commission Release Nos. 33-8350; 34-38960; FR-72, *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

to the company or its industry and make an offering speculative or one of high risk." The SEC's Instructions to Item 3 clarify that these risk factor disclosures should "explain clearly how the risk affects the issuer or the securities."

122. These requirements are essentially the same as Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), which requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

123. In violation of the requirements under Item 5, the Registration Statement failed to disclose that (A) the Company's clients in the travel, payment/remittance, and cryptocurrency industries had higher chargeback rates and produced lower profit margins for Riskified; (B) the Company typically saw higher chargeback rates and lower margins as it onboarded new clients in new industries, such as payments/remittance and cryptocurrency; and (C) these riskier, lower-margin industries represented an increasing share of Riskified's business leading up to and continuing beyond the IPO. These undisclosed facts were likely to, and ultimately did, contribute materially to adverse impacts on the Company's gross profit margins (and/or Adjusted Gross Profit Margins) and overall financial results.

124. These omissions violated Item 5 because these undisclosed facts were known to Defendants, as was the high likelihood (which later came to fruition) that they would have a material impact on the Company's gross profit margins, key performance indicators, and overall financial results, including for the third quarter of 2021 which was already one third complete at the time of the IPO.

125. These omissions also violated Item 3, because these adverse, undisclosed facts created significant risks that were not adequately disclosed even though they were material factors that made an investment in Riskified shares speculative or risky.

126. Specifically, the Registration Statement failed to adequately disclose the risks that the Company's gross profit margins were likely to shrink as the Company increased its exposure in the travel, payment/remittance, and cryptocurrency industries, and when it entered new industries, each of which carried higher chargeback rates, higher costs of revenue, and lower gross profit margins for the Company.

127. The risk factors disclosed in the Registration Statement were inadequate to describe the risks and to explain clearly how the risks affected the Company in light of these known but undisclosed trends. For example, the Registration Statement stated that Riskified's "CTB Ratio ***may fluctuate*** in future periods due to a number of factors, including changes in the mix of our merchant industry base, the risk profile of orders approved in the period, and technological improvements in the performance of our models." (Emphasis added).

128. This statement was inadequate and did not satisfy the requirements of Item 5 because it omitted that there was actually a strong likelihood that the CTB Ratio would increase materially in the periods following the IPO because of the increasing proportion of the Company's revenues coming from travel, payment and remittance, and cryptocurrency industries, which carried higher chargeback expenses and CTB Ratios than the Company's current mix of clients.

129. The Registration Statement touted that at the time of the IPO, Riskified had "grown and scaled our business rapidly in recent periods." The Registration Statement also touted that as the Company had grown and scaled, its revenues, gross profits, and gross profit

margins had increased over the prior few years, including year-over-year increases in gross profit margin in the first quarter of 2021, due to improvements in the Company's CTB Ratio.

130. The Registration Statement claimed that these trends were continuing at the time of the IPO, providing the following update:

> For the three months ended June 30, 2021, … [w]e expect our gross profit margin to improve due to improvements in our chargebacks-to-billings ratio, or CTB Ratio, due to a shift in the merchant mix of our revenues and fraud trends.

131. The Registration Statement also stated that the Company's ability to reduce its CTB Ratio by 5% from 2019 to 2020 "has helped drive gross profit margin expansion."

132. Thus, Defendants were well-aware that changes in the "merchant mix of our revenues" (*i.e.*, the proportions of Riskified's revenues coming from clients in different industries) were likely to materially impact the Company's gross profit margins as the undisclosed trends continued.

**The Registration Statement Misleadingly Omitted Material Facts**

133. In addition to failing to disclose the known adverse trends in violation of Item 5, the omission of these material facts also rendered certain parts of the Registration Statement misleading.

134. The Registration Statement stated that Riskified had "established strict processes that allow us to manage our overall chargeback exposure and control realized chargeback expenses within predetermined budget levels." Similarly, the Registration Statement claimed that "we [Riskified] constantly adjust our merchants' approval and chargeback rates to rebalance exposure and our expected expenses during any given period." Likewise, the Registration Statement claimed that "[u]sing our proprietary eCommerce risk management platform, data assets, and scaled merchant network, we are able to control the chargeback expense we incur."

135. These statements were misleading because they gave the false impression that the Company could strictly control its chargeback expenses simply by adjusting its clients' approval rates, but Defendants omitted the material facts that certain industries like travel, payments and remittance, and cryptocurrency, as well as new industries that Riskified was entering generally, carried higher chargeback expenses that the Company was not able to "rebalance," resulting in depressed gross profit margins as the proportion of Riskified's revenues coming from those industries increased.

136. The Registration Statement stated that Riskified's "chargeback expenses become less volatile over time as we scale."

137. This statement was misleading because it gave the false impression that as Riskified expanded its client base, chargeback expenses would only decrease and become less volatile, but it omitted that when Riskified added clients in new industries, which it was doing at atypically high levels at the time of the IPO, it typically saw higher chargeback expenses and positive volatility in that metric.

138. The Registration Statement further represented that the Company had diversified its risk and stated that, with respect to the diversity of industries in which Riskified's clients operate, "[w]e believe this diversity significantly reduces the likelihood of material unexpected chargeback expenses."

139. This statement was misleading because it gave the false impression that working with clients from a wider range of industries would reduce Riskified's chargeback expenses, but it omitted that certain industries like travel, payments and remittance, and cryptocurrency, as well as new industries that Riskified was entering generally, carried higher chargeback expenses. To the extent this statement reflects an opinion, Defendants either did not truly hold this opinion,

or they misleadingly omitted that they did not have a factual basis to support their opinion or that they were aware of facts directly contradicting their opinion.

140. The Registration Statement stated that "[a]s our business continues to grow, we expect our gross profit will increase in absolute dollars while our gross profit margin ***may fluctuate*** from period to period." (Emphasis added).

141. This statement was misleading because it grossly understated the risk of falling margins, as it omitted that there was actually a strong likelihood that the Company's gross profit margins would decrease materially in the periods following the IPO, as the Company continued to grow (in top-line GMV), due to the increasing proportion of the Company's revenues coming from travel, payment and remittance, and cryptocurrency industries, as well as new clients in new industries generally, each of which carried higher chargeback expenses and lower margins than the Company's current mix of clients.

142. The Registration Statement also stated that:

> Our gross profit margin is highly dependent on our risk-based pricing model which determines the fee we charge our merchants, our approval rate thresholds, the merchant mix of our revenue, and new geographies and industries into which we may enter. We control the decision to approve a particular transaction and continuously monitor our approval rate thresholds to ensure we are not exposed to higher amounts of chargeback risk, and we structure our pricing in a way to mitigate this risk.

143. The second sentence in this statement was misleading because it gave the false impression that the Company was able to mitigate the risk of higher chargebacks by adapting its pricing model, but it omitted that certain industries like travel, payments and remittance, and cryptocurrency, as well as new industries that Riskified was entering generally, carried higher chargeback expenses that the Company was not able to consistently mitigate with its pricing model, resulting in depressed gross profit margins.

144. The Registration Statement also stated that "there are certain sectors, including travel and ticketing, from which we have historically derived significant revenues, that continue to be negatively impacted by COVID-19 related measures and restrictions. … There continues to be significant uncertainty regarding … the timeframe for recovery of negatively affected sectors, in particular travel and ticketing."

145. These statements were misleading because they gave the false impression that as the Company's travel clients recovered from COVID-19 related restrictions it would only have a positive impact on the Company's revenues, but it omitted that the travel industry historically saw higher chargebacks and lower margins, such that as the Company's travel clients recovered and their revenues grew, the Company's profit margins would decrease.

146. The Registration Statement also stated that, in the context of trends in the impact of COVID-19, "Volatility in global travel and events reopening may lead to fluctuations in revenue from merchants in these industries in the near-term, but we believe we are well-positioned to continue to benefit from the macroeconomic shift to eCommerce that COVID-19 has accelerated."

147. This statement was misleading because it gave the false impression that as the Company's travel clients experienced COVID-19 related volatility, that would only lead to fluctuations in the Company's revenues from those clients, but it omitted that the travel industry historically saw higher chargebacks and lower margins, so that as the Company's travel clients' revenues increased, the Company's profit margins would decrease.

## EVENTS FOLLOWING THE IPO

### The Company Announces Its Second Quarter 2021 Results, Partially Revealing the Undisclosed Trends and Warning of Lowered Expectations for Future Periods

148. In the months following Riskified's IPO the Company's stock price fell as it began to announce a series of disappointing quarterly and annual results, including weaker-than-expected profit margins.

149. The Company's gross margin shortfalls and the explanations Defendants provided for those disappointing results were highlighted by securities analysts following the Company's stock. This analyst coverage further underlines the importance of those issues to investors, and that the information had not previously been fully disclosed to the market.

150. Through the Company's earnings releases, its officers' statements during investor conference calls, and analyst reports, the market gradually learned of pre-existing material facts impairing the Company's margins and financial results, which were not disclosed in the Registration Statement.

151. On August 23, 2021, various securities analysts issued reports initiating coverage of Riskified's common stock. These reports showed that analysts, and thus the market, viewed the Company's gross profit margins as important to the valuation of the Company and its stock.

152. An analyst report issued by J.P. Morgan on August 23, 2021 stated that "[o]ur valuation and price target framework is based on relative valuation vis-à-vis other high-growth fintech and digital/eCommerce payment/software names. There are no perfect comps for Riskified, but ***we tried to bias transaction-based names with similar revenue growth and gross margin profiles*** focused on enterprise clients."

153. An analyst report issued by William Blair on August 23, 2021 included under "Model Highlights" its projections that the Company's adjusted gross profit margin would increase each year for 2021-2023.

154. An analyst report issued by Truist on August 23, 2021 projected "an improving CTB ratio and [] adjusted gross margin expansion over a long-term basis." The Truist report also stated, under a section titled "Strong Compounding Growth, ***Investing for Growth NT [near term] and LT [long term] Margin Targets***," that "[w]e assume steady adjusted gross margin expansion over time to a level of at least 55% - 60%."

155. On September 9, 2021, before markets opened, Riskified issued a press release announcing the Company's financial results for the second quarter of 2021 (ended June 30, 2021) – *i.e.*, the quarter that ended prior to the IPO. On a conference call to discuss the results, which was also held before markets opened that day, Defendant Dotcheva revealed that while the Company had enjoyed strong gross profit margins in the second quarter of 2021:

> … we do not expect to maintain the same level of gross profit margin in the back half [of 2021], and this is primarily the result of merchant mix and seasonality. More specifically and as is customary, we tend to experience higher chargebacks when we first enter a new industry. These levels trend lower over time as our platform learns from more industry-specific performance data. In addition we expect a pick-up in higher risk profile travel industry-related volume due to summer and holiday related seasonality.

156. During the same call, Defendant Gal touted that the Company had, during the second quarter, "started reviewing orders for several new large merchants, who completed the platform onboarding process during the quarter." Gal stated that "several of these merchants also operate in online payment categories that Riskified has not previously served, including cryptocurrency brokerage."

157. During the same call, Dotcheva added that Riskified's management was "constantly monitoring macro trends such as the COVID involvement on travel," but that the impacts of the pandemic did not differ significantly from "where we thought it will be."

158. The market learned several critical facts about Riskified from these new disclosures. First, investors learned for the first time that Riskified had lower expectations for gross profit margins in the second half of 2021. Second, investors learned that the dampened margin expectations were "primarily" caused by three important trends that were previously undisclosed: (1) that it was "customary" for Riskified to experience higher chargebacks upon entering a new industry; (2) that Riskified had entered "several" new industries during the already-completed quarter, having already completed the onboarding process (of six months or more of data review plus the shadow period) for "several new large merchants" including a cryptocurrency brokerage; and (3) that travel industry-related volume had a higher risk profile, meaning higher chargebacks and lower margins.

159. These newly revealed facts were material, as demonstrated by analyst coverage following the earnings disclosures, which picked up on those specific facts.

160. An analyst report by Credit Suisse on September 9, 2021 took note of the fact that "management noted the high Q2 level [of gross margin] is not expected to sustain given Q3 seasonality and recovery in travel as well as higher chargebacks as RSKD enters new verticals."

161. Likewise, an analyst report from Barclays issued on the same date observed that "management does not expect this [higher] level of chargebacks [from the second quarter] to persist as volume mix changes, new clients ramp (which typically means higher initial chargebacks), and greater travel volume comes back into the model." The Barclays report noted

that "the company also announced that a number of new merchants went live in the quarter in new verticals including a cryptocurrency brokerage."

162. On September 9, 2021, the Company's share price fell $3.80, or approximately 10.6%, from its closing price the prior day to close at $31.93 on unusually heavy trading volume. On September 10, 2021, the Company's share price continued its decline as the market continued to digest the revelations from the earnings call and the analyst reports that were issued after the call, falling another $3.05, or approximately 9.6%, to close at $28.88 on unusually heavy trading volume. The next trading day the Company's share price continued to fall, as the market continued to digest the new information from the earnings call and the analyst reports, falling another $3.98, or approximately 13.8%, to close at $24.90 on unusually heavy trading volume.

**The Company Announces Its Third Quarter 2021 Results, Partially Revealing the Impact of the Undisclosed Adverse Trends and Lowering Analyst Valuations**

163. On November 16, 2021, before markets opened, the Company issued a press release announcing its financial results for the third quarter (ended September 30, 2021) – *i.e.*, the quarter during which the IPO was conducted. The press release revealed that Riskified's gross profit margins had plummeted to just 46% during the quarter, compared to 56% and 60% in the first and second quarter of 2021 respectively, and representing a significant ***year-over-year decrease*** from 53% in the third quarter of 2020. The press release also disclosed that Riskified's cost of revenue had jumped to $28.3 million in the third quarter of 2021, representing a 44% ***increase year-over-year***.

164. Also on November 16, 2021, before markets opened, Riskified hosted an earnings call to discuss the Company's quarterly results. During the call, Dotcheva attributed the Company's decreased margins and increased cost of revenue ("which primarily consists of chargeback expenses") to:

> … shifts in our verticals' contribution to the overall industry portfolio mix. First, Q3 naturally carries higher risk volumes due to peak travel trends and summer vacations. This dynamic was of course less pronounced last year due to covid, and is much more significant now due to ongoing easing of the COVID related restrictions and general travel recovery. Second, we have onboarded several new large merchants as well as merchants from new industries to us, such as Payments, which changed our merchant portfolio mix and overall risk levels.

165. During the same call, in response to analyst questions Dotcheva stated that from the Company's vantage point these increased chargeback expenses were "expected" and "definitely aligned to our expectations" (despite the fact they had not been disclosed to investors in the Registration Statement), and that they were expected to "continue to affect us in the future" as the Company grew with "new merchants, … new industries, [and] new geographic trends."

166. During the same call, in response to an analyst's question about what drove the increase in chargeback expenses despite a decrease in revenues, Defendant Gal stated that during the third quarter:

> [Riskified] had a much higher prevalence of travel and ticketing merchants relative to last year, due to COVID. And in this quarter, we had a more pronounced impact from new categories like remittance and crypto, which we anticipate will kind of normalize over time as our machine learning models get better.

167. Defendants' comments during the November 16, 2021 earnings call were the first time the market learned that the Company was in fact experiencing significantly decreased margins (a decrease of over 13% year-over-year) as a result of the travel sector's recovery and continuing to onboard significant clients in new, riskier industries including payments, remittance, and cryptocurrency, and that the Company expected those trends to continue to affect the Company going forward. While the market had learned in September that these factors could

impact Riskified's margins, investors learned in November the likelihood (now realized) and magnitude of this impact.

168. On November 18, 2021, Riskified presented at the J.P. Morgan 2021 Ultimate Services Investor Conference. During the call, Gal stated that the factors contributing to lower gross margins for the quarter were that the Company "had higher amounts of travel. We entered new categories around payments and remittance, so a lower gross margin quarter."

169. Analysts once again took heed of these new disclosures, highlighting their importance to the market.

170. In a report issued on November 18, 2021, recapping Riskified's conference presentation earlier that day, J.P. Morgan noted that one of the "key takeaways" was that the Company's disappointing gross margin results for the third quarter were caused in part by "increased travel spend and early crypto currency volume having lower initial [gross margin]."

171. On November 16, 2021, Credit Suisse issued an analyst report observing that "[a]s to the Q3 2021 results, … gross margins were disappointing (driven by new categories [remittances & crypto] and merchants, travel & ticketing, quarterly fluctuations, etc.)." Credit Suisse reduced its target price for the Company's stock from $34 to $22, based in part on "reduced near-term visibility and gross margins." The Credit Suisse report also took note of the fact that the Company's "Q3 gross margin of ~46% (vs. ~53% in Q3 2020) …[was] driven by the recovery (albeit still below pre-COVID levels) of lower margin Travel & Ticketing vertical and the onboarding of new merchants/verticals," adding that "Riskified is currently developing capabilities for the remittances and crypto verticals."

172. Similarly, William Blair issued an analyst report on November 16, 2021, which recognized the significance and causes of the gross margin shortfall: "Adjusted gross margin

came in at roughly 47% (versus our 48% estimate). While the third quarter is a seasonally lower period, gross margin declined roughly 600 basis points year-over-year, driven by changing merchant mix (onboarded large merchants in new industries like payments) and the rebound in volumes for the higher-risk tickets and travel vertical, which were less pronounced in the prior year period due to COVID."

173. On the same day, Piper Sandler issued an analyst report lowering its rating on Riskified from Neutral to Overweight based in part on "a rising chargeback expense ratio," and noting that "[t]he estimated chargeback expense ratio rose to 44.6% during Q3 (vs. 39% one year ago) and was the highest in two years, impacted by an anticipated seasonal mix shift to travel and ticketing. That said, the continuation of a return to travel and reopening activities could remain a temporary drag on the gross margin into 1H22." In explaining its decision to lower its rating, Piper Sandler noted that the "overhang [is] likely to persist until 2H22," and that "we think it is prudent to lower estimates to better reflect increasing execution risks entering 2022 given supply chain disruption uncertainty, increasing travel and ticketing mix, and rising chargeback expense ratio."

174. Barclays also issued an analyst report on November 16, 2021, which noted that "gross margin came in light in Q3, largely driven by the mix of volume in the quarter and ramping clients in new verticals such as remittance and crypto." The following day, Barclays reduced its price target for Riskified from $33 to $15.

175. On November 17, 2021, J.P. Morgan issued an analyst report reducing its price target from $29 to $18, noting that "[Riskified] has recently begun targeting the cryptocurrency and remittance verticals, and as they continue to sign merchants in these verticals, GMV growth should benefit, but the newer nature of this volume likely comes with it lower initial gross

margin as the model learns." In light of the third quarter trends, including lower gross profit margins, the J.P. Morgan report stated that "[i]n the near-term, we will be paying close attention to gross margin trends given the ramp of tickets/travel and new verticals."

176. On November 16, 2021, the Company's share price fell $4.78, or approximately 27.0%, from its closing price the prior day to close at $12.90 on unusually heavy trading volume. The following day the Company's share price continued its decline as the market continued to digest the revelations from the earnings call and analyst reports, falling another $0.82, or approximately 6.4%, to close at $12.08 on unusually heavy trading volume. The next day the Company's share price continued to fall, as the market continued to digest the new information from the earnings call, Riskified's presentation at the J.P. Morgan Conference, and the analyst reports, falling another $1.10, or approximately 9.1%, to close at $10.98 on unusually heavy trading volume.

177. By this point, once the market had digested the Company's post-IPO revelations about the structural reasons for depressed margins, the Company's share price had lost nearly half its value since the IPO.

**The Company Announces Its Fourth Quarter and Year-End 2021 Results, Revealing Further Impact of the Undisclosed Trends and Lowering Analyst Valuations**

178. On February 23, 2022, before markets opened, Riskified issued a press release announcing the Company's quarterly financial results for the fourth quarter and year-end results for 2021. The release revealed that Riskified's gross profit margins had significantly decreased once again year-over-year, both for the fourth quarter (from 58% to 53%) and for the full year (from 55% to 54%), despite year-over-year increases in revenues of 22% for the quarter and 35% for the year. As the press release disclosed, the disappointing margins were chiefly due to

significant year-over-year increases in the cost of revenues (comprised primarily of chargeback expenses), which jumped 39% for the quarter and 38% for the year.

179. Also on February 23, 2022, before markets opened, Riskified hosted an earnings call to discuss the results. During the call, Dotcheva explained that:

> Tickets and travel recovered and more than double compared to prior year. Payments, money transfer and crypto is a new emerging industry in 2021, where we added a number of merchants, including a global money movement remittance and payments company with more than $5 billion in annual revenues; and Binance, one of the world's largest leading blockchain ecosystems and cryptocurrency infrastructure providers.

180. During the same call, Dotcheva explained that the year-over-year decline in gross profit margin during the fourth quarter (from 58% to 53%) "was driven primarily by [Riskified's] expansion into new industries and regions, increase of the tickets in travel industry as a percentage of total billings as well as the onboarding of new merchants."

181. During the same call, Dotcheva also revealed that the Company's expected gross margin for 2022 would be "at or above 51%," significantly lower than the two preceding years (55% in 2020, and 54% in 2021). She explained that the decrease was driven in part by "an industry mix shift from an increase in lower-margin industries such as tickets and travel." As Gal confirmed during the same call, "as we go into new geographies and brand-new categories, there can be a drag on margins."

182. The February 23, 2022 press release and earnings call were the first time investors learned that the issues plaguing Riskified's profit margins had affected the results for the entire year, and that their effects would persist into future years, painting a substantially less rosy picture of the Company's profitability prospects than was disclosed at the time of the IPO.

183. On February 23, 2022, Credit Suisse issued an analyst report which noted that Riskified's gross margins for 2022 were expected to be "~300bps lower [year-over-year] driven

[in part] by an industry mix shift to lower margin industries (e.g., notable recovery in tickets and travel).” Credit Suisse lowered its price target for Riskified shares from $18 to $12, based in part on the Company’s “lower-than-expected gross margins.”

184. William Blair also issued an analyst report on February 23, 2022, noting that the Company’s “[g]ross margin declined by more than 500 basis points year-over-year, driven by changing merchant mix (onboarded larger merchants in new industries) and the rebound in volumes for the higher-risk tickets and travel vertical, which were less pronounced in the prior-year period due to COVID.” The William Blair report also noted that the Company’s “[g]ross margin is expected to decline roughly 300 basis points year-over-year,” driven in part by “mix shifts driven by a return of higher-risk tickets and travel volumes.”

185. Piper Sandler also issued an analyst report on February 23, 2022, which lowered its price target from $14 to $10. The Piper Sandler report noted that in the fourth quarter, Riskified’s “[n]otable customer additions included: Binance, a global remittance and payments company with $5B+ in annual revenue, one of the five largest global omnichannel retailers, and one of the five largest global travel retailers.”

186. Truist also issued an analyst report on February 23, 2022, which decreased its price target from $14 to $10. The Truis report also decreased its model growth rates for Riskified for 2022, noting that “gross margin headwinds from a mix shift towards lower margin travel spend were not appropriately reflected in our model.” The Trust Securities report also highlighted that “[t]icketing and travel appears to be regaining traction as a key customer category after COVID-related woes, evidenced by a top five global travel retailer win in the quarter. Additionally, the company highlighted two new vertical wins from crypto-currency and

digital asset infrastructure company Binance, as well as a global remittance company with over $5 billion in revenue."

187. On February 23, 2022, Barclays issued an analyst report which noted that "the [Company's] lower EBITDA guidance may have come as a surprise to investors, with the company indicating merchant mix (such as recovery of travel volumes) is set to drive gross margin down ~3 ppts y/y to 51% for the full-year." The Barclays report highlighted that "[g]ross margin in Q4 was up ~6 ppts quarter-over-quarter, driven by the lower risk profile of merchandise volume, but was down [year-over-year] due to business expansion into new geographies and an increase in lower margin verticals such as travel & ticketing. The company also announced new wins in the quarter including Binance, a large remittance provider, and a Top 5 travel retailer." The Barclays report also noted that Riskified "expects gross margin to decline ~3 ppts in [2022] to about 51% for the full-year, driven [in part] by the recovery of lower margin verticals such as Travel."

188. On February 23, 2022, the Company's share price fell $0.62, or approximately 9.3%, from its closing price the prior day to close at $6.03, on unusually heavy trading volume.

189. By May 2, 2022, the price of Riskified's Class A ordinary shares had fallen to $5.40, more than ***70% below*** its IPO price.

## CLASS ACTION ALLEGATIONS

190. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of a Class consisting of all persons and entities who purchased Riskified's Class A ordinary shares pursuant and/or traceable to the IPO. Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant

times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

191. The members of the Class are so numerous that joinder of all members is impracticable. There were 19.925 million Riskified Class A ordinary shares sold in the IPO. Since the IPO, the Company's Class A ordinary shares have actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Riskified or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

192. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

193. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

194. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether Defendants violated the Securities Act;

b) Whether the Registration Statement issued in connection with the IPO was negligently prepared and contained false or misleading statements or omissions of material fact about the Company's business, operations, and prospects; and

c) The extent to which members of the Class have sustained damages and the proper measure of damages.

195. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

196. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

197. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violations of Section 11 of the Securities Act**
**(Against all Defendants)**

198. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

199. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

200. The Registration Statement for the IPO omitted to state material facts required to be stated therein and omitted to state material facts necessary to make the statements made not misleading.

201. Riskified is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement, and/or were directors or underwriters who are appropriate defendants as to this Count.

202. Defendants are strictly liable to Plaintiffs and the Class for the misrepresentations and omissions contained in the Registration Statement.

203. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

204. The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement. However, the Underwriters failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misrepresentations or omissions.

205. In addition, the Underwriters met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

206. Representatives of the Underwriters also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the

Underwriters had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

207. In addition to having access to internal corporate documents, the Underwriters and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which the Company's common stock would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriters' representatives and the Company's management and top executives, the Underwriters were, at a minimum, negligent in allowing dissemination of the material misrepresentations and omissions contained in the Registration Statement as detailed herein.

208. The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements and omissions in the Registration Statement.

209. By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated, Section 11 of the Securities Act.

210. Plaintiffs purchased Riskified Class A ordinary shares pursuant and/or traceable to the Registration Statement for the IPO.

211. Plaintiffs and the Class have sustained damages. The value of Riskified Class A ordinary shares has declined substantially due to Defendants' violations.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

212. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

213. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

214. The Individual Defendants, by virtue of their offices, directorship, and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Riskified within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Riskified to engage in the acts described herein.

215. The Individual Defendants were in positions to control and did control, the issuance of the false and misleading statements and omissions contained in the Registration Statement.

216. None of the Individual Defendants or the Company made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misrepresentations and omissions alleged herein.

217. The defendants named herein each were culpable participants in the violations of § 11 of the Securities Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, selling Riskified Class A ordinary shares in

the IPO and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

218. Plaintiffs and the Class have sustained damages. The value of Riskified Class A ordinary shares has declined substantially due to the Securities Act violations alleged herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, demand relief and judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and Lead Counsel as Class Counsel;

B. Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other costs; and

D. Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury.

Dated: November 28, 2022

**THE ROSEN LAW FIRM, P.A.**

By: *<u>/s/Joshua Baker</u>*
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com
jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this on the 28th day of November, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/Joshua Baker*