**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE RISKIFIED LTD. SECURITIES LITIGATION | Case No. 1:22-cv-03545-DLC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Defendants Riskified Ltd., Eido
Gal, Assaf Feldman, Aglika Dotcheva, Erez
Shachar, Eyal Kishon, Aaron Mankovski,
Tanzeen Syed, and Jennifer Ceran*

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000

*Counsel for Defendants Goldman Sachs &
Co. LLC, J.P. Morgan Securities LLC,
Barclays Capital Inc., Credit Suisse Securities
(USA) LLC, Keybanc Capital Markets Inc.,
Piper Sandler & Co., Truist Securities, Inc.,
William Blair & Company, L.L.C., Loop
Capital Markets LLC, Samuel A. Ramirez &
Company, Inc., Siebert Williams Shank &
Co., LLC, and Stern Brothers & Co.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

RELEVANT BACKGROUND .................................................................................................. 4

Argument .................................................................................................................................. 9

I.      Plaintiffs Fail to State a Claim For an Actionable Omission Under Section 11 ............... 10

        A.      Under Well-Settled Second Circuit Law, Defendants Were Not Required
                to Disclose the Purportedly Omitted Information ................................................. 10

        B.      The Complaint Fails to Identify Pre-IPO Facts That Were Omitted .................... 14

        C.      Plaintiffs Fail to Plead an Actionable Omission Under Item 5 ............................ 19

        D.      Plaintiffs Fail to Plead an Actionable Omission Under Item 3 ............................ 21

II.     Plaintiffs Fail to Adequately Plead Any Material Misstatement ..................................... 21

III.    Plaintiffs Fail to Plead a Control Person Claim Under Section 15 .................................. 25

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arfa* v. *Mecox Lane Ltd.*,
 2012 WL 697155 (S.D.N.Y. Mar 5. 2012) ................................................................12

*Asay* v. *Pinduoduo Inc.*,
 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ..............................................................12

*Ashcroft* v. *Iqbal*,
 556 U.S. 662 (2009) .....................................................................................................9

*Bell Atl. Corp.* v. *Twombly*,
 550 U.S. 544 (2007) ..............................................................................................9, 10

*Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*,
 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................19, 20

*City of Miami Fire Fighters' & Police Officers' Ret. Tr.* v. *CVS Health Corp.*,
 46 F.4th 22 (1st Cir. 2022) ...............................................................................16, 17, 18

*Fed. Housing Fin. Agency* v. *Nomura Holding Am., Inc.*,
 104 F. Supp. 3d 441 (S.D.N.Y. 2015) .......................................................................25

*In re Ferrellgas Partners LP Sec. Litig.*,
 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ..........................................................23

*In re Focus Media Holding Ltd. Litig.*,
 701 F. Supp. 2d 534 (S.D.N.Y. 2010) .........................................................12, 13, 14

*Francisco* v. *Abengoa, S.A.*,
 481 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................................................18, 20

*Garnett* v. *RLX Tech. Inc.*,
 2022 WL 4632323 (S.D.N.Y. Sept. 30, 2022) .....................................................21, 23

*In re HEXO Corp. Sec. Litig.*,
 524 F. Supp. 3d 283 (S.D.N.Y. 2021) ................................................................11, 21

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016) ........................................................................................20

*Kramer* v. *Time Warner Inc.*,
 937 F.2d 767 (2d Cir. 1991) ........................................................................................4

*Martin* v. *Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) ........................................................................................25

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)..............................................................................10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)..............................................................................................10

*Nguyen* v. *MaxPoint Interactive, Inc.*,
   234 F. Supp. 3d 540 (S.D.N.Y. 2017).........................................................................14, 19

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................16, 17, 18

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ..........................................................................................19

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Industry Pension Fund*,
   575 U.S. 175 (2015)..........................................................................................................25

*In re Proshares Trust II Sec. Litig.*,
   2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ....................................................................13, 19

*In re Qudian Inc. Sec. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)......................................................16, 17, 18

*Ret. Sys.* v. *Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)...............................................................................25

*Ret. Sys.* v. *MF Glob., Ltd.*,
   620 F.3d 137 (2d. Cir. 2010)........................................................................................22, 23

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................................9

*S.C. Ret. Sys. Grp. Trust* v. *Eaton Corp. PLC*,
   791 F. App'x 230 (2d Cir. 2019) ......................................................................................10

*Schoenhaut* v. *Am. Sensors, Inc.*,
   986 F. Supp. 785 (S.D.N.Y. 1997).....................................................................................11

*Singh* v. *Schikan*,
   106 F. Supp. 3d 439 (S.D.N.Y. 2015)................................................................................14

*Stadnick* v. *Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017).................................................................................3, 12, 13, 14

*Stratte-McClure* v. *Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015).................................................................................................19

*Wandel* v. *Gao*,
   590 F. Supp. 3d 630 (S.D.N.Y. 2022)................................................................15, 19, 21, 25

*Willard* v. *UP Fintech Holding Ltd*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021).............................................................................19, 20

**Statutes**

Securities Act of 1933 Section 11,
   15 U.S.C. § 77k(a) ...................................................................................................... *passim*

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. § 78u-4(b)(1) ...................................................................................................9, 10

**Other Authorities**

17 C.F.R. § 229.303 ...................................................................................................................19, 20

Fed. R. Civ. P. 9(b) ......................................................................................................................9, 10

Defendants Riskified Ltd. ("Riskified" or the "Company"); its management Eido Gal (CEO), Assaf Feldman (CTO), Aglika Dotcheva (CFO); its directors Erez Shachar, Eyal Kishon, Aaron Mankovski, Tanzeen Syed, Jennifer Ceran (with management, the "Individual Defendants"); and its underwriters Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, KeyBanc Capital Markets Inc., Piper Sandler & Co., Truist Securities, Inc., William Blair & Company L.L.C., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc., Siebert Williams Shank & Co., LLC, and Stern Brothers & Co. (collectively, the "Underwriter Defendants," together with Riskified and the Individual Defendants, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (the "Complaint"), ECF No. 77, filed by lead plaintiff Craig Black and named plaintiff Diva Joshi (collectively, "Plaintiffs").

**PRELIMINARY STATEMENT**

Riskified is a technology company that has built an eCommerce risk management platform that provides fraud protection to merchants across a wide range of industries. These merchants pay Riskified fees to review the merchants' transactions for potential fraud using its proprietary machine-learning platform. For its services, Riskified charges a percentage of every dollar of the gross merchandise volume ("GMV") of processed transactions. If its platform fails to detect a fraudulent transaction, however, Riskified reimburses the merchant for the "chargeback," *i.e.*, the cost to the merchant of the fraudulent transaction. As Riskified has disclosed, the risk of chargebacks varies by merchant and by industry, and the fees Riskified charges its customers are risk-adjusted to try to account for this variable risk. Riskified's machine-learning technology also becomes more accurate over time, as it absorbs transaction data and "learns" about the client.

The shareholder Plaintiffs in this case assert that Riskified, its directors and officers, and the underwriters of its July 2021 initial public offering ("IPO") violated Section 11 of the Securities

1

Act of 1933, and that the Individual Defendants also violated Section 15, by making omissions and misrepresentations in the IPO Registration Statement. The thrust of Plaintiffs' claim is that Riskified failed adequately to disclose the risks of higher chargebacks—and, as a result, lower profit margins. Plaintiffs posit that Riskified increased its exposure to customers in new and "risky" industries, such as travel, before the IPO, and therefore knew but did not disclose that its chargebacks would increase in the third quarter of 2021 relative to the previous quarter.

Plaintiffs' theory does not withstand scrutiny. Riskified's IPO took place on July 28, 2021, pursuant to a Registration Statement effective as of the same date. At that time, Riskified had, at most, four weeks of third quarter 2021 information. Further, as the Complaint admits, profit margins in the second quarter—the quarter immediately preceding the IPO—reflected historical highs for Riskified. Plaintiffs' entire theory, therefore, hangs on the proposition that Riskified knew at the time of the IPO about chargeback trends that largely had not yet happened, and had some purported intra-quarter duty to provide warning about them (beyond the risk disclosures that Riskified did transparently supply, which Plaintiffs largely ignore). This theory is not viable, either under an omission theory or a misstatements theory.

*First*, Riskified had no affirmative duty to disclose the granular, customer- and industry-specific information that Plaintiffs allege was omitted from the Registration Statement. No regulation requires Riskified in its offering documents to rank the relative "riskiness" of the different industries that make up its customer base, or predict the specific impact of purported short-term changes in merchant mix on specific financial metrics. Moreover, the Registration Statement explicitly disclosed the risks of chargebacks, and the likelihood that profit margins would fluctuate from quarter to quarter depending on risk-based pricing, merchant mix, seasonality, and the performance of Riskified's machine-learning algorithms. Investors were thus

well aware of the very risks that Plaintiffs now complain impacted margins during the third quarter.

*Second*, as numerous courts have held, there is no freestanding duty for issuers to provide intra-quarter financial information when they conduct an offering. Although there may be an exception to that rule if, looking at historical trends, a reasonable investor would have a solid basis to expect certain performance and the issuer is aware of a significant deviation, *Stadnick* v. *Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017), Plaintiffs certainly have not satisfied that standard here. The third quarter 2021 profit margins of 46% were within the historical range of 45% to 58% reported at the time of the IPO, and metrics like revenue and gross profits reflected positive growth.

*Third*, Plaintiffs' theory also fails because Plaintiffs plead no facts suggesting that Defendants were aware of a supposed increase in customers from "risky" industries, or the magnitude of third quarter chargebacks or declining profit margins, at the time of the IPO. Plaintiffs identify only *one* new customer allegedly onboarded before the IPO, and they do not allege that it experienced high chargebacks or contributed negatively to Riskified's reported margins. Plaintiffs also rely on anecdotes from low-level former employees ("FEs"), but none are alleged to have had insight into Company-wide trends or to report to senior management. Moreover, none of the FEs' vague recollections, including about the unremarkable fact that the Company tracked chargebacks, contradict any challenged statement.

*Fourth*, the Complaint cannot plead an actionable omission by relying on Items 5(d) and 3(d) of SEC Form 20-F. Among other problems, these regulations require Plaintiffs to plead actual knowledge of a trend and lack of relevant warnings. Four weeks of new chargeback information is, as a matter of law, not a "trend," and Plaintiffs do not plead that Defendants had actual knowledge of contrary information at the time of the IPO. Further, the risk disclosures were robust and clear, explaining the various factors that may impact future margins and volatility.

3

*Fifth*, the Complaint also does not plead any actionable misstatements.  Plaintiffs rely on eight statements plucked from the Registration Statement that mention chargebacks and/or the volatility of profit margins.  For example, Plaintiffs allege that Defendants misled investors by stating that "our gross profit margin may fluctuate from period to period," even though Plaintiffs *concede* that this is precisely what happened over the next several quarters.  Plaintiffs do not allege that any of these statements was false, but instead posit that, by merely mentioning chargebacks and profit margins, and notwithstanding Defendants' disclosures, Defendants somehow misled investors about the specific pressures on margins that later surfaced.  This is not the law.

For all the foregoing reasons, the Complaint should be dismissed.  Plaintiffs' amendments in response to Defendants' prior motion to dismiss do not cure any deficiencies with the pleading, and dismissal should be with prejudice.  *See* Case Management Order, ECF No. 45 at 5 ("It is unlikely that Lead Plaintiff will be granted any further opportunities to amend.").

## RELEVANT BACKGROUND

Riskified is a technology company that offers eCommerce risk management services to online merchants.  (Ex. 3 at 4.)[1]  On July 28, 2021, Riskified priced its IPO at $21 per share, selling over 20 million shares.  (*Id.* at 1; ¶ 109.)  The Form F-1 ("Registration Statement") Riskified issued in connection with its IPO transparently explained Riskified's business, its historical performance, and the risks of chargebacks.  (*See* Ex. 3.)

Riskified's platform leverages machine learning to analyze data from its global network of merchants in order to identify fraudulent transactions in real time.  (*Id.* at 7, 14.)  The platform uses anomaly detection and pattern recognition to determine which transactions are legitimate and

---

[1]  "¶ __" refers to a paragraph in the Complaint.  "Ex. __" refers to an exhibit to the Declaration of Daniel Sinnreich, dated January 20, 2023, attached hereto.  Each exhibit is incorporated by reference in the Complaint and properly subject to judicial notice.  *See Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  In quotations, all emphases are added, and all citations and quotation marks are omitted, unless otherwise noted.

4

which are fraudulent, and instantaneously determines which transactions should be rejected. (*Id.* at 14.) Riskified tracks data from its extensive merchant network, and continuously feeds that data to its machine learning platform which validates its own approval decisions, causing a "powerful flywheel effect," by which it becomes smarter and more accurate over time. (*Id.* at 9–10, 16, 120.)

**Chargeback Risks**. Riskified's chargeback guarantee is a disclosed feature of its business model. Chargebacks result when a cardholder disputes a transaction with its bank, and the bank rules in favor of the cardholder. (¶ 61.) Riskified guarantees the transactions its platform approves by assuming the cost of fraud associated with these transactions. (¶ 65.) If an approved transaction results in a chargeback, Riskified will reimburse the merchant for the amount of the lost sale. (*Id.*) In such instances, Riskified records a chargeback guarantee expense in cost of revenue.[2] (Ex. 3 at 16–17.) Because Riskified's platform becomes "smarter" over time, Riskified anticipated that its "chargeback expenses [would] become less volatile over time as [it] scale[s]." (¶ 136.) But Riskified warned that "our ability to achieve profitability will depend, in part, on our ability to effectively manage and decrease our chargeback expenses, which is dependent on our ability to improve the accuracy of our products." (Ex. 3 at 34.)

Riskified charges its customers a percentage of every dollar of GMV that it approves. (*Id.* at 16.) To the extent that Riskified is able to predict the risk associated with a particular client's transactions, Riskified uses a risk-based pricing model to account for that risk in pricing its services. (¶ 71.) A merchant's fee is established at the inception of its contract, and is based on a variety of inputs, including "the type of merchant, the risk level of the end market, the percentage of GMV [Riskified] review[s] from the merchant, and the guaranteed approval rates [Riskified] agree[s] to provide." (Ex. 3 at 16.) Riskified thus mitigates its exposure by charging higher fees

---

[2] Chargeback expenses are the primary, but not sole, input in cost of revenue. (*See* ¶ 69.) Other expenses that impact cost of revenue include compensation and benefits costs, hosting fees, and software costs. (Ex. 3 at 92.)

to customers whose transactions carry higher risks.  (*Id.*)

Riskified generally receives chargebacks within 90 days of a transaction occurring.  (*See id.* at 127.)  This means that there is a three-month delay between a new merchant going live (with an initial risk-adjusted fee) and Riskified receiving the transaction-specific feedback required to make improvements to its pricing and machine learning models.  Riskified warned investors that its ability to "accurately adjust [its] pricing structures" is a risk to its business.  (*Id.* at 33.)

**Historical Fluctuation of Margins**.  Riskified warned investors that although "profit will increase in absolute dollars" as Riskified's business continues to grow, its "gross profit margin may fluctuate from period to period" because that metric is "highly dependent on [its] risk-based pricing model which determines the fee [Riskified] charge[s] [its] merchants, [its] approval rate thresholds, the merchant mix of [its] revenue, and new geographies and industries into which [it] may enter."  (*Id.* at 92.)

With respect to merchant mix, Riskified expressly disclosed that it provides fraud protection services to merchants in a variety of sectors, including retail and marketplaces, travel, and payment methods.  (*Id.* at 9).  The Registration Statement further explained that Riskified's "growth strategy" involved "winning new merchants" in "new categories."  (*Id.* at 17.)  And, Riskified warned that its key metrics are prone to seasonal fluctuations.  (*Id.* at 39.)

Consistent with those warnings, the historical financial information in the Registration Statement also reflected fluctuations in relevant metrics over time, including in gross profit margin and CTB ratio.[3]  (*See id.* at 96.)  Gross profit margins fluctuated between 45% and 58% during the nine quarters prior to the IPO, which Riskified disclosed was due, in part, to shifts in merchant

---

[3]  Gross profit margin is calculated by dividing gross profit by revenue.  Chargeback-to-billing ratio, or "CTB ratio," is defined as the total amount of chargeback expenses incurred during the period indicated, divided by the total amount of billings to all merchants over the same period.  (Ex. 3 at 3.)

mix. (*Id.* at 96, 103.)[4]  Riskified declined to make projections about gross profit margin for as-yet unreported quarters in the Registration Statement, other than making the high-level observation that it expected "gross profit margin to improve" in 2Q21,[5] which had concluded but had not yet been reported.  (*Id.* at 18.)  The Company's prediction for 2Q21 turned out to be correct, with record-high profit margin of 60% reported after the IPO.  (*See* Ex. 4 at 5.)

**Post-IPO**.  More than a month after the IPO, on September 9, 2021, Riskified announced the results of its second quarter 2021—the last quarter completed prior to the IPO.  The Company reported significant year-over-year growth in several key metrics, including 65% growth in gross profit, 47% growth in revenue, and 55% growth in GMV.  (Ex. 5 at 1.)  Gross profit margin reached a record mark of 60%.  (Ex. 4 at 5.)  The Company reported that these results reflected that Riskified "[o]nboarded several prominent new merchants in multiple, rapidly-growing eCommerce categories, including several that Riskified has not previously served (e.g. payments platforms)" and "[c]ontinued expansion in several large international markets."  (Ex. 5 at 1.)

During the Company's earnings call, Riskified's CFO, Aglika Dotcheva, explained that gross profit margin "is a metric that is *best analyzed on an annual basis* as individual quarters can experience variability due to seasonality, the industry mix shift of our revenues and changes in the risk profile of transactions approved."  (Ex. 4 at 5.)  Ms. Dotcheva further warned that "[a]lthough [Riskified was] very pleased with this margin performance in Q2," it did "not expect to maintain the same level of gross profit margin in the back half, and this is primarily the result of merchant mix and seasonality."  (*Id.*)  Consistent with warnings in the Registration Statement, she noted that "we tend to experience higher chargebacks when we first enter a new industry" and that

---

[4]  Notably, Riskified's lowest reported profit margin (45%) occurred in 3Q19, which was the last third quarter prior to the onset of the COVID-19 pandemic.  This is comparable to the 46% gross profit margin that the Company reported in 3Q21—after the pandemic's effects on consumers began to recede.

[5]  Abbreviations are used to refer to fiscal quarters.  For example, "2Q21" refers to the second fiscal quarter of 2021.

chargebacks "trend lower over time as our platform learns from more industry-specific performance data." (*Id.*) She further cautioned that Riskified "expect[ed] a pick up in higher risk profile travel industry-related volume due to summer and holiday related seasonality." (*Id.*)

On November 16, 2021, Riskified announced the results of its third quarter 2021, and again reported year-over-year growth in key metrics, including 26% growth in revenue, 28% growth in GMV, and 10% growth in gross profit. (Ex. 6 at 1.) As the Company had previewed, gross profit margin declined from the second quarter to 46%. (*See* Ex. 7 at 6.) The Company attributed the "expected" decline to features of the particular quarter, including that the third quarter "naturally carries higher risk volumes due to big travel trends and summer vacations," and that Riskified "onboarded several new large merchants as well as merchants from new industries to us, such as Payments, which changed our merchant portfolio mix and overall risk levels." (*Id.* at 6.) The Company explained that it expected these heightened risk levels to "naturally decrease over time, as our machine learning models gather more data on the unique fraud patterns." (*Id.* at 4.) Thus, the very risks the Company warned about—the accuracy of its risk-based pricing model, changes in merchant mix, and seasonality—came to pass. *See supra* 6–7.

Riskified reported its fourth quarter 2021 results on February 23, 2022. Gross profit margin increased from 46% in the third quarter to 53%, and the Company again experienced year-over-year growth in revenue (22%) and gross profit (11%). (¶ 178.)

As reflected in the chart attached as Exhibit 1, the fluctuations in gross profit margin that the Company warned about—both prior to and following the IPO—have been borne out by the Company's actual results, which have fluctuated between 45% and 60% since 1Q19, with no more than two consecutive quarters trending in the same direction. Moreover, when viewing gross profit margin annually, as Riskified's CFO advised, gross profit margin for FY 2021 was only one

percentage point lower than for FY 2020, and was four percentage points *higher* than for FY 2019.

Plaintiffs contend that Riskified's stock price declined following the announcement of its second, third, and fourth quarter 2021 results, and cite analyst reports purportedly linking those declines to the changes in merchant mix and the Company's gross profit margin results.  (*See, e.g.*, ¶¶ 160–61, 168–75, 183–87.)  But the cited reports discuss a number of other factors impacting the Company's performance, including, principally, macro-level trends in eCommerce.[6]

## ARGUMENT

To survive a motion to dismiss, plaintiffs must allege "factual allegations" sufficient "to raise a right to relief above the speculative level."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed.  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).  Here, Plaintiffs' claims sound in fraud and must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), which require that Plaintiffs "state with particularity" the circumstances constituting the fraud, and specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.  Although Plaintiffs allege that their claims sound in negligence (*e.g.*, ¶ 113), the Complaint alleges that the Registration Statement "was materially false and misleading." (¶ 114.)  The Second Circuit has held that this language is "classically associated with fraud," and applies Rule 9(b) and the PSLRA to Section 11 claims containing such allegations.  *Rombach* v. *Chang*, 355 F.3d 164, 171–72 (2d

---

[6]  *See, e.g.*, Ex. 8 at 1 (noting "muted eCommerce trends/global supply chain issues"); Ex. 9 at 1 (citing "supply chain issues and slower eCom growth are the primary (and incremental) near term headwinds"); Ex. 10 at 1 (citing "challenged eCommerce environment amid global supply chain issues."); Ex. 11 at 1 (noting "supply-chain issues . . . , and overall pressure on underlying ecommerce volumes as the world reopens"); Ex. 12 at 1 (citing "slower eComm growth"); Ex. 13 at 1 (citing "PSD2 headwinds and supply chain constraints"); Ex. 14 at 1 (GMV slowdown due to "[m]acro-related issues, primarily muted e-commerce activity").

Cir. 2004); 15 U.S.C. § 78u-4(b)(1) (applying heightened standard to actions alleging defendants "made an untrue statement of a material fact"). But even if Rule 9(b) and the PSLRA do not apply, the Complaint still fails to state a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570.

## I.      Plaintiffs Fail to State a Claim for an Actionable Omission Under Section 11

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see* 15 U.S.C. § 77k(a). To plead a Section 11 violation based on a purported omission, Plaintiffs must allege that Riskified had a "legal obligation to disclose the allegedly omitted information." *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003).

### A.      Under Well-Settled Second Circuit Law, Defendants Were Not Required to Disclose the Purportedly Omitted Information

Plaintiffs allege that Defendants failed to disclose the relative risk levels of Riskified's different customer industries, and a purported pre-IPO increase in revenue derived from "riskier" industries. Plaintiffs further allege that Defendants failed to disclose that this increase caused a "trend" of declining gross profit margins at the time of the IPO. (¶¶ 8–11, 113–47.) The IPO occurred in late July 2021—the first month of the third quarter—and the unreleased second quarter results reported a record 60% gross profit margin. Plaintiffs acknowledge that the Company "enjoyed strong gross profit margins in the second quarter of 2021." (¶ 155.) The omission claim is thus premised upon the purported existence of "trends" impacting profit margins over the four-week period immediately preceding the IPO. This omission theory fails for numerous reasons:

***First***, there is no general duty to disclose any and all material information. *S.C. Ret. Sys. Grp. Trust* v. *Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019). "[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the

omitted facts." *Id.*  This may arise due to "a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading," none of which applies here.  *Id.*  It is not enough that "a reasonable investor would very much like to know" the purportedly omitted information.  *Id.*

Plaintiffs nonetheless allege that Defendants failed to provide detailed disclosures about the hierarchy of risk among different merchant industries, and the impact of granular, industry-specific changes in merchant mix on a single financial metric: profit margins.  Plaintiffs allege that Defendants failed to disclose that "clients in the travel, payment/remittance, and cryptocurrency industries" supposedly generated "lower profit margins for Riskified," and that the Company "typically saw higher chargeback rates and lower margins as it onboarded new clients in new industries, such as payment/remittance and cryptocurrencies."  (¶¶ 123–24.)  But Riskified *did* warn that profit margins were affected by the accuracy of its "risk-based pricing," its "merchant mix," and "new geographies and industries into which [it] may enter."  (Ex. 3 at 92.)  These disclosures were more than adequate, and the Company had no duty to rank the relative "riskiness" of the numerous industries in which its customers operate, nor predict the specific impact of specific customers on specific metrics.  *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 (S.D.N.Y. 2021) (finding disclosure that "revenues could fluctuate materially in the future and could be materially and disproportionately impacted by [customers'] purchasing decisions" was adequate and that defendant was not required to disclose risks associated with specific customers); *Schoenhaut* v. *Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (failure to disclose risk of declining sales to the defendant's largest customer "was not a material omission as a matter of law" where the defendant warned generally about the risk of changes in customer demand).

***Second***, Plaintiffs are wrong that Riskified was required to disclose interim financial

11

information supposedly reflecting "materially adverse impacts on the Company's gross profit margins and the Company's overall financial results." (¶ 9.)  There is no "obligation to disclose the results of a quarter in progress"—here, the third quarter that was in progress at the time of the IPO.  *Arfa* v. *Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539–40 (S.D.N.Y. 2010) (refusing to impose obligation "to disclose financial data for a fiscal quarter in progress" because any such requirement would be "unworkable and potentially misleading").

The limited exception to this rule under the Second Circuit's clear precedent in *Stadnick* does not apply where, as here, Plaintiffs do not plead a deviation from a historical trend that would have caused investors to harbor solid expectations about future performance.  861 F.3d at 39.  In *Stadnick*, the plaintiff alleged that the defendant failed to disclose results from the quarter that had concluded the day before the IPO, during which the company's "income available for shareholders" decreased from $5.5 million in the prior quarter to negative $35.3 million.  *Id.* at 35–36.  The Second Circuit held that the interim data was immaterial because a reasonable investor "would not have harbored any solid expectations" as to the results for the third quarter in light of the "total mix of information in the public domain."  *Id.* at 38–39.  The Second Circuit explained that the historical financials showed a "pattern of fluctuation" consistent with the purportedly omitted results, and the registration statement included "ample warnings and disclosures" to explain these fluctuations, including that "income available for shareholders would likely fluctuate from quarter to quarter."  *Id.*; *see Asay* v. *Pinduoduo Inc.*, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021) (applying *Stadnick* and affirming dismissal of omissions claim).

*Stadnick* requires dismissal here.  Plaintiffs contend that Riskified should have disclosed intra-quarter results from the then-in-progress third quarter.  Even assuming interim information

12

reflected gross profit margins of 46% (a fact not pleaded), the third quarter margins fell squarely within the range of past quarters, which had fluctuated between 45% and 58% since 1Q19. (Ex. 1.) Thus, the purported omission of the interim 3Q21 gross profit margin from the Registration Statement was not material when "examine[d] over the entire period for which [Riskified] disclosed information." *Stadnick*, 861 F.3d at 38.

**Third**, disclosure also was not required because, as in *Stadnick*, Riskified's Registration Statement "contained ample warnings and disclosures that explained . . . fluctuations" in the Company's financial metrics. *Id.* at 39. Defendants said that they expected 2Q21 gross profit margins would "improve," but *explicitly warned* that gross profit margins had historically fluctuated and would "continue to fluctuate from period to period." (Ex. 3 at 92; *see also* ¶ 140.) Defendants explained that these fluctuations reflected that gross profit margins were highly dependent on several factors, including risk-based pricing, merchant mix, and entry into new industries. (Ex. 3 at 92.) Defendants also warned that Riskified experienced seasonal fluctuations in gross profit margins. (*Id.* at 39.) In light of these warnings, Plaintiffs cannot now complain about profit margin declines caused by these very factors. (*See* ¶¶ 71, 170–80, 184.)

Nor was Riskified obligated to predict precisely how the disclosed risks would manifest for 3Q21 performance, given that the risks of volatility from these factors were disclosed. In *Focus Media*, the court held that a disclosure that "gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network" was adequate because it "explicitly flagged the possibility that its gross margin could be lower in reporting periods that experienced relatively higher contributions from lower margin and less developed components of the [c]ompany's business." 701 F. Supp. 2d at 541. The same reasoning requires dismissal here.

*See In re Proshares Trust II Sec. Litig.*, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020) (dismissing claim where registration statement "disclose[d] the primary omission alleged by plaintiffs").

***Fourth***, Plaintiffs focus only on a single metric—gross profit margin—but that one metric cannot be viewed in isolation. *See Stadnick*, 861 F.3d at 38 (finding that "the two metrics identified by [the plaintiff] are not fair indicators of [the company's] performance"); *Focus Media*, 701 F. Supp. 2d at 542–43 (declining gross margin not material in context of favorable overall revenue and income figures). Plaintiffs ignore that Riskified experienced significant growth in revenue, GMV, and gross profits in 3Q21 following the IPO. (*Supra* 8–9.) And although gross profit margin declined in 3Q21, it was "strong" in 2Q21 (the first quarter reported after the IPO), and then increased again in 4Q21. (¶¶ 155, 178.) Moreover, on an annual basis, the Company's gross profit margins of 54% in FY 2021 were at the high end of their recent annual totals (50% in FY 2019 and 55% in FY 2020). (Ex. 1.) Indeed, Riskified's CFO advised investors to consider margins annually rather than quarterly to iron out quarterly fluctuations. (*See, e.g.*, Ex. 4 at 5.)[7]

For all of these reasons, Defendants had no freestanding duty to disclose any of the allegedly omitted information, and Plaintiffs' omission theory fails.

### B.    The Complaint Fails to Identify Pre-IPO Facts That Were Omitted

Plaintiffs' omission theory also fails because the Complaint does not plead that the alleged declines in margins from customers in travel and other new industries were actually known or knowable at the time of the IPO. *Singh* v. *Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015). "Plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement." *Nguyen* v. *MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545–46 (S.D.N.Y. 2017).

---

[7]    Although the Complaint makes multiple references to CTB ratio (*e.g.*, ¶¶ 72–74, 88, 119), Plaintiffs do not connect CTB ratio to the alleged misstatements and omissions, and this metric is not alleged to have been inaccurate.

Plaintiffs appear to contend that Defendants, with only four weeks of third quarter data available at the time of the IPO, must have known that margins would decline for the third quarter because "lower-margin clients and industries represented an increasing share of Riskified's business." (¶ 9.)  The Complaint fails to plead any facts to back this up.  Although Plaintiffs allege that business from customers in the travel industry ultimately increased in 3Q21, they do not dispute that the travel industry had been "negatively impacted by COVID-19," and that "[t]here continue[d] to be significant uncertainty regarding the timeframe for recovery" at the time of the IPO. (¶ 144.)  Moreover, Plaintiffs do not identify by name *any* travel customers whose business began to grow by July 2021, and identify only *one* customer from a new industry that allegedly began to be onboarded before July 2021: Binance.  (¶¶ 94, 179.)  But although Plaintiffs make vague contentions that "cryptocurrency was considered a riskier industry for the Company," they allege no facts as to whether or when Binance actually experienced high chargeback rates that contributed to the allegedly disappointing 3Q21 margins, or any other facts about the significance of this client.  *Wandel* v. *Gao*, 590 F. Supp. 3d 630, 641 (S.D.N.Y. 2022) (Section 11 requires allegations that omitted facts transpired or were reasonably knowable at the time of IPO).

Moreover, although Plaintiffs contend that Riskified gathers "tons" of historical data from merchants during the onboarding process, access to *historical* information plainly does not give Riskified access to *future* transaction data.  Additionally, it can take months after a merchant goes live for Riskified to receive actionable chargeback data. (*Supra* 6.)  While Riskified uses historical information to determine its initial risk-based pricing, it does not (and cannot) know with certainty when it onboards a merchant the precise level of chargeback risk that will follow.  That is why it is sometimes necessary for Riskified to adjust its risk-based fee for future contract terms, to mitigate its chargeback exposure after it receives and assesses actual chargeback data.  *See supra*

15

6. Thus, allegations about the data Riskified collects during the onboarding process do not show that future chargebacks were predicted (or even predictable) at the time of the IPO.[8]

Plaintiffs rely on anecdotes from ten FEs, purportedly to support a narrative that the Company began taking on "risky" customers before the IPO. But *none* of these former employees' allegations actually support Plaintiffs' claims. The FEs are all low-level employees who were not alleged to be in positions that would afford them knowledge of company-wide trends. *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (dismissing claims premised on conclusory descriptions without facts corroborating that witnesses' impressions applied to the company overall). Plaintiffs do not allege that any FEs reported to senior management, elevated relevant issues to management's attention, or witnessed any management-level conversations about the purported facts that they allege. And, even accepting the FEs' recollections as true, they are all generalized allegations about Riskified's business and management's focus on chargebacks that are consistent with the Registration Statement, and say nothing about specific merchant risk levels at the time of the IPO:

**FE1**: FE1 worked as an account manager beginning in August 2021 (¶ 50), *after the IPO*. FE1 thus has no first-hand information about changes in merchant mix and risk profiles at the time of the IPO. *City of Miami Fire Fighters' & Police Officers' Ret. Tr.* v. *CVS Health Corp.*, 46 F.4th 22, 34–35 (1st Cir. 2022) ("[T]he complaint provides too little basis for comparing any material

---

[8] Plaintiffs suggest that that "onboarding process" for new customers takes "six months or more" (¶ 157), alleging that new clients would "typically provide Riskified with six months of the client's historical transaction data" (¶ 98). But this does not imply that the actual *onboarding process* takes six months. Plaintiffs also allege that the Company "had begun onboarding" Binance "six months prior to the IPO." (¶ 93.) But Plaintiffs do not allege that the process lasted six months for Binance, nor that such timing was common for new customers.

conclusions implied by the statements against the contemporaneous state of the [] business.").
Moreover, FE1 merely recalls that risk profiles vary by sector (¶¶ 82–83), that Riskified analyzed customer data as part of its onboarding process (¶¶ 97, 100–01), and that management generally discussed chargebacks (¶ 74). These allegations are consistent with the Registration Statement.

**FE2 and FE3**: FE2 was an account manager and FE3 worked on strategic partnerships with banks and financial institutions. (*See* ¶¶ 51–52.) Plaintiffs do not allege any facts to support that these employees had access to company-wide information, much less access to merchant mix and risk profile information. *Novak*, 216 F.3d at 314; *In re Qudian*, 2019 WL 4735376, at *6. Moreover, these FEs offer only vague and conclusory allegations that Riskified "embraced riskier clients" at some unspecified time to develop customers and gain market share (¶¶ 106–07), without identifying *any* pre-IPO conduct. *See CVS*, 46 F.4th at 34–35.

**FE4, FE5, FE8, FE9, and FE10**: FE4, FE5, FE8, FE9, and FE10 were each in positions at least two to three levels removed from senior management (¶¶ 53–54, 57, 58–59) but purport to provide information regarding management's entirely unremarkable focus on chargeback metrics. (¶¶ 75, 76–77, 79, 82, 86, 89.) FE4, FE8, and FE10 also claim that the Company was generally aware of the risks posed by travel clients, but do not identify *any* particular risk that was elevated to management or any personal interaction with senior management that would provide insight into the Company's perception of such risks. (¶¶ 85–88, 92.)[9] *Novak*, 216 F.3d at 314; *In re Qudian*, 2019 WL 4735376, at *6. Additionally, FE9 and FE10 left Riskified months before the IPO, and therefore could not have any information about the Company's views at the time of the

---

[9] Plaintiffs' conclusory allegations that "[t]he travel industry in particular was widely known (within the Company) to be riskier" (¶ 82), that "[t]he higher rate of chargebacks in the travel industry was widely known and not a new development" (¶ 86), and that "cryptocurrency, payments and remittance, and new clients in industries that were new to Riskified" were "widely known to be higher risk" (¶ 90), are not tethered to any moment in time or attributed to *any* confidential witness, and are far too vague to show what Riskified or its management knew at the time of the IPO.

IPO. *See CVS*, 46 F.4th at 31–32; ¶¶ 58–59.

**FE7**: FE7 was a "data analytics" team lead who worked on onboarding and pitching new customers and left Riskified *four months prior to the IPO*. (¶ 56.) FE7 purports to recall that "higher chargeback rates in the travel industry . . . was known all the way up to Riskified's COO," and that "onboarding clients from riskier industries was a point of discussions with management on the operations side of the Company, up to and including the Company's COO." (¶¶ 81, 90, 91, 96.) But FE7 does not recount being present for any such discussions, or recall any specific information that was discussed. Indeed, FE7 does not recount ever communicating with the COO (or any senior executive), much less about these topics, or explain how she would have this insight. *See Novak*, 216 F.3d at 314; *In re Qudian*, 2019 WL 4735376, at *6.

**FE6**: FE6 worked as a "data integration engineer," a technical role. (¶ 55.) There are no allegations to suggest that he had access to company-wide information regarding customer risk profiles. *Novak*, 216 F.3d at 314; *In re Qudian*, 2019 WL 4735376, at *6. Although FE6 contends that "the Company added new, riskier clients at a higher rate than usual leading up to the IPO" (¶ 108), this is far too vague to support Plaintiffs' theory. FE6 cites only one client by name, Binance, but does not claim that Binance had any impact on chargebacks or margins for 3Q21. *See Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 203 (S.D.N.Y. 2020) (rejecting statements by FEs who made vague allegations of accounting improprieties related to construction projects, but failed to identify any alleged project that had been affected or any false financial statement).

Plaintiffs also note that, during Riskified's 3Q21 earnings call in November 2021, Defendant Gal said that increased chargebacks during the quarter were "expected" and "aligned to our expectations." (¶ 165.) Plaintiffs then leap to the conclusion that increased chargebacks were "expected" as far back as the time of the IPO. But the statement does not say that. Plaintiffs ignore

18

the Company's post-IPO earnings announcement for 2Q21, when Defendant Gal stated in September 2021 that the Company anticipated "higher chargebacks" and did "not expect to maintain the same level of gross profit margin in the back half of 2021." (¶ 155.) Gal's statements make no "admissions" about what was known or knowable at the time of the IPO in July 2021.

Accordingly, the Complaint does not plead any undisclosed chargeback-related risks known *before* the IPO—which is another basis to reject Plaintiffs' omission theory.

### C.    Plaintiffs Fail to Plead an Actionable Omission Under Item 5[10]

Plaintiffs also allege that Riskified violated a duty to disclose under Item 5(d) of SEC Form 20-F ("Item 5"). (¶¶ 114–32.)   Item 5 requires the "same disclosure as Item 303" of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303").  *Wandel*, 590 F. Supp. 3d at 646 n.10.

Item 5 imposes a duty to disclose only (i) "trends" that are (ii) known to management, and (iii) reasonably likely to have material effects on the registrant's financial condition or results of operations.  *Proshares*, 2020 WL 71007, at *9.  Plaintiffs here fail to satisfy these requirements.

**No Trend**.  As discussed *supra,* 2Q21 results reflected strong margins and the IPO occurred only four weeks after 3Q21 began.  (¶ 155; *see* Ex. 1.)  This limited four-week period cannot, as a matter of law, establish a "trend" requiring disclosure pursuant to Item 303.  *Willard*, 527 F. Supp. 3d at 619–20 ("declines in trading volume and commissions between January and March 2019 did not last long enough to qualify as 'trends' for the purposes of Item 303"); *Nguyen*, 234 F. Supp. 3d at 546 ("events occurring within a two month period of time do not establish a 'trend'" under Item 303 (collecting cases)); *Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*, 2010

---

[10]   The circuit courts are split as to whether a violation of Regulation S-K, and by extension Form 20-F, can form the basis for a duty to disclose pursuant to Section 11.  *Compare Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015) (Item 303 may be the basis for a duty to disclose), *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) (Item 303 cannot be the source of a duty to disclose).  Defendants preserve this issue for further proceedings and appeal.

WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303.").

Moreover, the margins about which Plaintiffs complain fell within historical ranges. *Supra* 6–7. "[A]t bottom . . . the gravamen of Plaintiffs' claim is that Defendants were required to report fluctuations in [relevant metrics] in real time," but Item 5 "does not require such real-time disclosures." *Willard*, 527 F. Supp. 3d at 620. As the court in *Willard* made clear, intra-quarter fluctuations of particular metrics within historical bounds are not trends requiring disclosure pursuant to Item 303 or Item 5. *See id.* at 620–21.

**No Actual Knowledge**. Plaintiffs also fail to plead that the purported trend was "known" at the time of the IPO. "It is not enough that [the issuer] should have known of the existing trend, event, or uncertainty." *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Rather, "Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." *Blackmoss*, 2010 WL 148617, at *9. Even if Plaintiffs adequately alleged that the merchant mix that affected 3Q21 gross profit margins was an existing "trend" as of July 2021 (they do not), they fail to allege that any Defendant had "actual knowledge" of this trend at that time. Plaintiffs do not describe when or how any Defendant or senior executive learned about this purported trend. There are no allegations describing any meetings, phone calls, or internal reports where this information was discussed or shared with senior management. And none of the allegations premised on the FEs cure this defect.[11] *Supra* 16–18. This failure also requires dismissal of any omission claim based on Item 5. *See Blackmoss*, 2010 WL 148617, at *9–10.

---

[11]  Vague allegations that certain information was "common knowledge," that "management was aware" of certain issues, and that certain metrics were "always talked about," are insufficient to satisfy the actual knowledge standard. *See Francisco*, 481 F. Supp. 3d at 203.

### D.    Plaintiffs Fail to Plead an Actionable Omission Under Item 3

Item 3(d) of SEC Form 20-F ("Item 3") requires disclosure of the "most significant risk factors" associated with the offering. *Wandel*, 590 F. Supp. 3d at 646. Plaintiffs must plead that Riskified "[knew], at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." *Garnett* v. *RLX Tech. Inc.*, 2022 WL 4632323, at *16 (S.D.N.Y. Sept. 30, 2022). Thus, to state an Item 3 claim, Plaintiffs "must plausibly allege that [Riskified] *actually knew about*, but *did not disclose*" the risk that gross profit margin would decline in 3Q21. *Wandel*, 590 F. Supp. 3d at 646.

**No Actual Knowledge**. As addressed above, Plaintiffs fail to allege with particularity that the modified merchant mix impacts here were actually known to Defendants at the time of the IPO. *See HEXO*, 524 F. Supp. 3d at 302; *Wandel*, 590 F. Supp. 3d at 646 (rejecting argument that plaintiffs "need not plead actual knowledge to create an obligation under Items 105").

**Risks Were Disclosed**. As described *supra* 6–7, 11, 13, the Registration Statement provided transparent warnings about the risks of chargebacks, risk-adjusted pricing, volatility and historical fluctuations of gross profit margins, and the factors that impact these risks, including onboarding new customers, merchant mix, and seasonality. Courts have found similar disclosures warning of future fluctuations in key financial metrics to be adequate under Item 105, and thus under Item 3 as well. *See In re HEXO*, 524 F. Supp. 3d at 302–03 (defendant "did disclose known risks" where the offering documents noted that "revenues could fluctuate materially in the future").

## II.    Plaintiffs Fail to Adequately Plead Any Material Misstatement

In addition to the omission theory, Plaintiffs also contend that Riskified made eight misleading statements in the Registration Statement. Plaintiffs posit that, simply because Riskified spoke on the topics of possible fluctuations in gross profit margin, chargeback exposure, and impacts of COVID-19, it was also obligated to disclose the purportedly concealed information

21

about adverse effects on gross profit margins.  This is wrong for numerous reasons.

As an initial matter, the alleged misstatements are not misleading because Plaintiffs fail to allege that the purportedly undisclosed facts had materialized or were knowable at the time of the IPO.  *Supra* 14–18.

Additionally, the challenged statements, each of which falls within one of three categories (*see* Ex. 2), are factual statements that are not alleged to be false:

**Fluctuations in Gross Profit Margin**.  Plaintiffs challenge Riskified's warnings that gross profit margin "may fluctuate" (¶ 140), alleging that this statement "grossly understated the risk of falling margins."  (¶ 141.)  But gross profit margins *did fluctuate*, and this statement does not quantify the potential fluctuation such that it could possibly understate that risk.  The quarterly financials in the Registration Statement showed fluctuating gross profit margin since 2019 ranging from 45% to 58%.  This fluctuation continued following the IPO, with Riskified reporting "strong" gross profit margin of 60% in 2Q21 (the first quarter reported after the IPO), and then experiencing a decline to 46% in 3Q21 before increasing again to 53% in 4Q21.  This is precisely the type of fluctuation Riskified warned of, and Riskified's statement about fluctuation is entirely accurate.

These statements are also protected by the bespeaks caution doctrine, under which "forward-looking statements accompanied by sufficient cautionary language [are] not actionable because no reasonable investor could have found the statement to be materially misleading." *Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 141 (2d. Cir. 2010).  Predictions that certain metrics "may fluctuate" are clearly forward-looking.  And the Registration Statement contained multiple cautionary statements about these metrics, including the challenged disclosures themselves, historical fluctuations in the metrics, and additional disclosures about the factors that impact the metrics.  *Supra* 6–7, 13.  "In such circumstances, it cannot be supposed by a reasonable

22

investor that the future is settled, or unattended by contingency." *MF Glob.*, 620 F.3d at 141.[12]

**Chargeback Exposure**.    These statements relate to Riskified's chargeback exposure, including that Riskified "constantly adjusts [its] merchants' approval and chargeback rates to rebalance exposure and [its] expected expenses" and "structure[s] [its] pricing in a way to mitigate [higher chargeback] risk"; that "chargeback expenses become less volatile over time as [Riskified] scale[s]"; and that "diversity significantly reduces the likelihood of material unexpected chargeback expenses." (¶¶ 133, 136, 138, 142.)  These statements are not alleged to be inaccurate.

Rather, Plaintiffs contend that, because with hindsight, Riskified experienced a single-quarter decline in gross profit margins in 3Q21, these statements falsely represented Riskified's ability to manage chargeback expenses.  But simply speaking on the topic of chargeback exposure did not create a duty for Riskified to disclose more: "a company does not owe a permanent duty to disclose all facts related to a topic merely because it speaks once on that topic." *In re Ferrellgas Partners LP Sec. Litig.*, 2018 WL 2081859, at *14 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).  In any given quarter, chargebacks are impacted by several factors, and Riskified warned that this metric could fluctuate due to merchant mix, risk-adjusted pricing, and seasonality (among others).  *Supra* 6–8.  As such, these alleged misstatements are not misleading.

**Impact of COVID-19**.    Plaintiffs challenge two statements regarding the impact of COVID-19 on Riskified's business.  *First*, Plaintiffs challenge Riskified's statement that "there are certain sectors, including travel and ticketing, from which we have historically derived significant revenues, that continue to be negatively impacted by COVID-19 related measures and restrictions," and that "[t]here continues to be significant uncertainty regarding . . . the timeframe for recovery of negatively affected sectors, in particular travel and ticketing." (¶ 144.)  But

---

[12]  *See RLX*, 2022 WL 4632323, at *24 (applying bespeaks caution doctrine and rejecting argument that statements were "insufficiently specific about the contours of potential future regulations" given cautionary statements)

Plaintiffs do *not* allege that the travel and ticketing industries did not generate significant revenues for Riskified historically, or that such revenues were not negatively impacted by COVID-19. To the contrary, Plaintiffs concede that there was an uptick in travel following the easing of COVID-19 restrictions, generating significant revenues, but complain that travel clients also experienced higher chargebacks in 3Q21. While Plaintiffs allege that Defendants "gave a false impression that the easing of COVID-19-related restrictions on travel would only have a positive impact on the Company's revenues" (¶ 145), the challenged statement says no such thing.

*Second*, Plaintiffs take issue with Riskified's statement that "[v]olatility in global travel and events reopening may lead to fluctuations in revenue from merchants in these industries in the near-term, but we believe we are well positioned to continue to benefit from the macroeconomic shift to eCommerce that COVID-19 has accelerated" (¶ 146), because it purportedly "omitted that the travel industry historically saw higher chargebacks and lower margins." (¶ 147.) But this statement is entirely unrelated to the purportedly undisclosed information: it is an unchallenged observation that COVID-19 precipitated a macro-level shift to online commerce, which benefitted Riskified's business and is likely to continue to do so. (*See* Ex. 3 at 87–88.) This has nothing whatsoever to do with chargeback rates from the travel industry.

**Statements of Opinion**. Five challenged statements are also opinions, including "[w]e *believe* this diversity [of client industries] significantly reduces the likelihood of material unexpected chargeback expenses" (¶ 138); "[w]e *expect* our gross profit will increase in absolute dollars while our gross profit margin may fluctuate from period to period" (¶ 140); and "[w]e *believe* we are well-positioned to continue to benefit from the macroeconomic shift to eCommerce that COVID-19 has accelerated" (¶ 146); as well as future projections, including that "chargeback expenses become less volatile over time as we scale" (¶ 136); and that "[t]here continues to be

24

significant uncertainty regarding future developments . . . and the timeframe for recovery of negatively affected sectors, in particular travel and ticketing" (¶ 144).  Under the Supreme Court's decision in *Omnicare, Inc.* v. *Laborers Dist. Council Const. Industry Pension Fund*, these can be false only if "the speaker did not hold the belief she professed" or "the supporting fact she supplied were untrue." 575 U.S. 175, 185–86 (2015); *see Martin* v. *Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("[P]rojections about the future are quintessential opinion statements.").  Because the facts in these statements are not alleged to be false, *supra* 21–24, Plaintiffs must plead that Defendants subjectively disbelieved the statements at the time they were made.  Plaintiffs fail to do so.  The Complaint lacks any facts concerning what any Defendant knew at the time of the IPO, much less what any Defendant believed about the future based on that knowledge.  *Supra* 20.

### III.    Plaintiffs Fail to Plead a Control Person Claim Under Section 15

To state a claim under Section 15, Plaintiffs must allege: "(1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person." *Penn. Pub. Sch. Emps.' Ret. Sys.* v. *Bank of Am. Corp.*, 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012).  Because Plaintiffs fail to allege any primary violation, their Section 15 claim fails.  *Id.*  Plaintiffs also fail to plead any facts establishing culpable participation by any Defendant, which requires "a showing of both fraudulent conduct and a culpable state of mind." *Id.* at 389; *Wandel*, 590 F. Supp. 3d at 647.  Defendants acknowledge that there is a split of authority within this District regarding whether culpable participation is an element of a Section 15 claim, *see Fed. Housing Fin. Agency* v. *Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 573 (S.D.N.Y. 2015) (Cote, J.), and respectfully submit that it is an element and is not pleaded here.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  January 20, 2023
        New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By:  */s/ Audra J. Soloway*
     Audra J. Soloway
     Daniel Sinnreich
     1285 Avenue of the Americas
     New York, NY 10019-6064
     Telephone: (212) 373-3000
     Email: asoloway@paulweiss.com
     Email: dsinnreich@paulweiss.com

     *Counsel for Defendants Riskified Ltd.,*
     *Eido Gal, Assaf Feldman, Aglika*
     *Dotcheva, Erez Shachar, Eyal Kishon,*
     *Aaron Mankovski, Tanzeen Syed, and*
     *Jennifer Ceran*

SIMPSON THACHER & BARTLETT LLP

By:  */s/ Jonathan K. Youngwood*
     Jonathan K. Youngwood
     Craig Scott Waldman
     425 Lexington Avenue
     New York, NY 10017
     Telephone: (212) 455-2000
     Email: jyoungwood@stblaw.com
     Email: cwaldman@stblaw.com

     *Counsel for Defendants Goldman Sachs*
     *& Co. LLC, J.P. Morgan Securities LLC,*
     *Barclays Capital Inc., Credit Suisse*
     *Securities (USA) LLC, Keybanc Capital*
     *Markets Inc., Piper Sandler & Co., Truist*
     *Securities, Inc., William Blair &*
     *Company, L.L.C., Loop Capital Markets*
     *LLC, Samuel A. Ramirez & Company,*
     *Inc., Siebert Williams Shank & Co., LLC,*
     *and Stern Brothers & Co.*

26