UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RISKIFIED LTD. SECURITIES LITIGATION | Case No. 1:22-cv-03545-DLC <br><br> <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
**<u>DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................ 3

        A.    Riskified's Core Product – The Chargeback Guarantee ........................................... 3

        B.    At the Time of the IPO, Riskified Was Increasing its Exposure to Riskier Clients
              with Higher Chargebacks and Lower Margins .......................................................... 3

        C.    Defendants Revealed the Impact of the Undisclosed Trend After the IPO .............. 6

III.    ARGUMENT ................................................................................................................ 8

        A.    Plaintiffs Face a Minimal Pleading Burden under the Securities Act ....................... 8

        B.    Item 5 of Form 20-F Required Defendants to Disclose the Known Material Trend
              That Was Likely to Impact Riskified's Gross Profit Margin .................................. 10

              1.    The Undisclosed Trend Was Known at the Time of the IPO. ...................... 110

              2.    The Undisclosed Trend Was Reasonably Likely to Have a Material, Adverse
                    Impact on the Company's Financial Results. .............................................. 108

              3.    The Undisclosed Trend and Its Impact Were Material. ............................... 109

        C.    The Registration Statement Did Not Adequately Disclose the Known Trend ........ 20

        D.    Defendants' Omissions Rendered the Registration Statement Misleading ............. 23

        E.    The Complaint Adequately Alleges Control Person Liability ................................. 25

IV.     CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)................................................................................. 24

*Arfa v. Mecox Lane Ltd.*,
  No. 10 CIV. 9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ............................ 16

*Asay v. Pinduoduo Inc.*,
  No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ...................................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................... 9

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  No. 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)........................... 12

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................... 20

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*,
  No. 99 Civ. 12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) .......................... 21

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008)................................................................... 21

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).............................................................................................. 25

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
  902 F. Supp. 2d 476 (S.D.N.Y. 2012).................................................................... 9

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015).................................................................... 25

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................. 19

*Gutman v. Lizhi Inc.*,
  21-CV-317 (LDH) (PK), 2022 WL 4646471 ....................................................... 20

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).............................................................................................. 8

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)..................................................................................... 8

*In re Agria Corp. Sec. Litig.*,
  672 F. Supp. 2d 520 (S.D.N.Y. 2009).................................................................... 15

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010).................................................................... 21

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................................... 25

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................... 21

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................. 17

*In re CPI Card Grp. Inc. Sec. Litig.*,
  No. 16-CV-4531 (LAK), 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) .......................... passim

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)......................................................... 16, 20, 21

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010)................................................................ 19, 22

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021).................................................................... 22

*In re Honest Co. Sec. Litig.*,
  No. 221CV07405MCSPLA, 2022 WL 2856024 (C.D. Cal. July 18, 2022) ..................... 15

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017).................................................................... 21

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011)................................................................................... 25

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)....................................................................... 9

*In re Proshares Trust II Sec. Litig.*,
  No. 19cv0886 (DLC), 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ............................... 22

*In re Qudian Inc. Sec. Litig.*,
  No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ....................... 17

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................................ 9

*In re Toronto-Dominion Bank Sec. Litig.*,
    No. CV 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ................................... 17

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001) ........................................................................ 11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)................................................................................. 23

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)................................................................................. 11

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)....................................................................... 8, 10, 19

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)................................................................................. 23

*Moab Partners, L.P. v. Macquarie Infrastructure Co.*,
    No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 10, 2022)................................... 15, 18

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ............................................................................ 20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................................. 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).......................................................................................... 24

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)................................................................................. 23

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)................................................................................. 10

*Panther Partners Inc. v Jianpu Tech. Inc.*,
    18 Civ. 9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sep. 27, 2020) ............................. passim

*Rombach v. Chang*,
    No. 00 Civ. 0958, 2002 WL 1396986 (E.D.N.Y. June 7, 2002) .............................................. 9

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................................. 9

iv

*Schoenhaut v. Am. Sensors, Inc.*,
    986 F. Supp. 785 (S.D.N.Y. 1997) ....................................................................................... 22

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)........................................................................................... 16, 19

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)................................................................................................ 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)............................................................................................................ 9

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)............................................................................................... 24

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)................................................................................ 16

**Statutes**

15 U.S.C. § 77k.................................................................................................................... 8

15 U.S.C. § 77o.................................................................................................................... 25

**Rules**

Fed. R. Civ. P. 8(a) .............................................................................................................. 8

Fed. R. Civ. P. 9(b) ......................................................................................................... 9, 11

Rule 8 ................................................................................................................................... 9

**Regulations**

17 C.F.R. § 229.105 ............................................................................................................ 20

17 C.F.R. § 229.303 ............................................................................................................ 10

17 C.F.R. § 229.303(a)........................................................................................................ 10

**Other Authorities**

*Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of
    Financial Condition and Results of Operations*,
    SEC Release Nos. 33-8350; 34-38960; FR-72 ......................................................... 10

Lead Plaintiff Craig Black and named Plaintiff Diva Joshi ("Plaintiffs") submit this memorandum in opposition to the motion (Dkt. No. 78) by Defendants Riskified Ltd. ("Riskified" or the "Company"), Eido Gal, Assaf Feldman, Aglika Dotcheva, Erez Shachar, Eyal Kishon, Aaron Mankovski, Tanzeen Syed, Jennifer Ceran, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, KeyBanc Capital Markets Inc., Piper Sandler & Co., Truist Securities, Inc., William Blair & Company L.L.C., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc., Siebert Williams Shank & Co., LLC, and Stern Brothers & Co. (collectively, "Defendants") to dismiss Plaintiffs' Second Amended Class Action Complaint (Dkt. No. 77, "Complaint").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs' Complaint adequately alleges each of the elements of the claims brought therein against Defendants for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"). Section 11 imposes strict liability if a registration statement misleadingly omits material facts or known trends, including for violations of affirmative legal disclosure obligations. Plaintiffs allege in the Complaint that Defendants made misleading material omissions in Riskified's Registration Statement (including documents incorporated therein) in connection with the Company's July 2021 initial public offering ("IPO"), which generated over $422 million.

At the time of its IPO, Riskified was a one-product company offering fraud protection service to its merchant-clients. Riskified used a machine-learning based platform to assess a client's historical transaction data and identify fraudulent transactions in real time, helping the client to minimize "chargeback expenses" incurred when consumers dispute fraudulent charges

---

[1] References to "Def. Br." are to Defendants' memorandum in support of their motion to dismiss the Complaint (Dkt. No. 79). References to "¶__" are to paragraphs of the Complaint. Internal citations and quotations are omitted and emphasis is added unless otherwise noted.

through their credit card bank. In exchange for receiving a percentage of the gross revenue that Riskified reviews, Riskified reimburses its clients for any chargebacks incurred on transactions that it approves. Accurately estimating chargeback expenses was key to the Company's bottom line, specifically to its gross profit margin. Gross profit margin was one of the Company's "key performance indicators" and was closely watched by securities analysts following the Company.

At the time of the IPO the Company was aware of, but failed to disclose, a material trend in the Company's "merchant mix"—the proportion of revenues coming from various clients. At that time, the Company was, or had completed, onboarding several major new clients in industries that were new to Riskified, and the Company's well-established travel sector clients were recovering from the impacts of the COVID-19 pandemic. These clients operated in industries that had high chargeback rates and lower margins, it was "customary" for new clients in new industries to have high chargeback rates and lower margins, and Riskified used the months-long onboarding process for all new clients to review at least six-months of historical transaction data as well as running a "shadow period" to assess additional real-time data on a client's chargeback expenses. Thus, the trend in Riskified's merchant mix at the time of the IPO was reasonably likely to materially impact the Company's gross profit margin. Defendants' omission of this known trend violated the disclosure requirements of Items 3 and 5 of Form 20-F, and rendered the Registration Statement materially misleading.

In the months following the IPO the Company's stock price fell as it announced a series of disappointing quarterly and annual financial results, with gross profit margins that fell well-short of expectations. As Riskified's officers revealed, the margin shortfalls were caused in part by the previously undisclosed trend in Riskified's merchant mix. The Court should deny Defendants' motion because the Complaint adequately alleges its Securities Act claims.

## II.    STATEMENT OF FACTS

### A.    Riskified's Core Product – The Chargeback Guarantee

Riskified offers fraud-protection service to its merchant clients through its self-described "core product," the Chargeback Guarantee. ¶66. At the time of the IPO, the Chargeback Guarantee accounted for approximately 99% of the Company's annual revenue. ¶66.

When online merchants receive orders from customers, they must decide whether to approve or reject the transaction. If an order is approved but the customer successfully disputes the charge as fraudulent, the merchant suffers a loss equal to the amount received by the consumer. This is called a "chargeback." ¶¶60-61. Chargebacks can help consumers to combat fraudulent transactions, but they are also a risk borne by merchants who want to minimize chargebacks expenses by rooting out fraudulent transactions before approving them. ¶¶61-63.

With the Chargeback Guarantee, Riskified reviews a merchant's pending transactions and uses Riskified's proprietary, machine learning-based platform to determine which transactions to approve or reject. ¶66. Merchants pay Riskified a percentage of the gross merchandise value ("GMV") of transactions that Riskified approves. ¶67. In turn, Riskified reimburses the merchants for any transactions that it approves which result in chargebacks. ¶68.

When Riskified reimburses a merchant for a chargeback, it records a chargeback expense in its cost of revenue. ¶68. These chargeback expenses accounted for between 82-84% of the Company's total cost of revenues in 2019, 2020, and 2021. ¶69. Accordingly, factors affecting chargeback expenses have a significant impact on the Company's gross profit margin. ¶6.

### B.    At the Time of the IPO, Riskified Was Increasing its Exposure to Riskier Clients with Higher Chargebacks and Lower Margins

In the months leading up to the IPO, the Company was pushing to maximize its top-line revenue numbers (*i.e.*, GMV) by expanding the Company's exposure to "riskier" clients. ¶7.

Riskified's client base covered a wide swath of industries. ¶78. Certain of these industries were riskier than others, meaning they had higher chargeback rates and Riskified earned lower profit margins on transaction volume from those clients. *Id.*

Internally, Riskified stratified its clients into different tiers of fraud risk level, based on the risk of the Company incurring chargeback expenses. ¶80. Clients in the travel, gift card, or cryptocurrency industries fell into the higher risk tiers. ¶82. Given the importance of chargeback expenses to the Company's profit margin, the Company paid close attention to chargeback metrics on many levels, setting internal targets for chargeback rates and margins for each industry at the beginning of each year. ¶81.

Clients in the travel industry in particular had higher chargeback rates and lower margins. ¶¶83-90. At the time of the IPO, the higher rate of chargebacks for travel industry clients was well-established and widely known within the Company. ¶¶87-90. By the time of the IPO the Company already had years of data from working with its major travel industry clients, which were among the Company's largest clients. *Id.* The travel industry was important to the Company's business, accounting for over 20% of the Company's total billings.[2] ¶84. Management paid close attention to chargeback rates in the travel industry. ¶¶86-90. Clients in the cryptocurrency and payments industries were also widely known within Riskified to have high chargeback rates and lower margins, even higher than travel industry clients. ¶¶91-92. New clients in industries that were new to Riskified also had high chargeback rates and lower margins. ¶91. When Riskified was onboarding new clients in a new industry it saw higher chargeback rates for those clients as its machine-learning platform was still learning how to accurately detect fraud for those clients. ¶93.

---

[2] Although Riskified's revenues from the travel industry had dropped in 2020 due to the COVID-19 pandemic, they were rebounding at the time of the IPO and had "more than double[d]" from 2020 levels by the end of 2021. ¶¶84, 179.

Metrics tied to chargeback rates, like the chargeback-to-billing ratio ("CTB Ratio") and gross profit margin, were among Riskified's "key performance indicators," and thus closely followed by management. ¶¶70, 77. Multiple former employees corroborated that chargeback rates and the CTB Ratio were among the metrics most commonly discussed by management. ¶¶74-76.

The Company also analyzed "tons of data" on new clients as part of its onboarding process. ¶97. Riskified employed a thorough due diligence process that it conducted while onboarding any new client. ¶¶98, 101. In this process, Riskified conducted back-tests of at least six months of a new client's historical transaction data, including its chargeback rates. ¶¶98-101. Riskified also ran a "shadow period" in which Riskified served as the backup fraud detection system in order to gather even more real-time data from clients. ¶103. Riskified used these back-tests and shadow periods to help set management's expectations for chargeback rates for each client. ¶104. The Company's data team reported their findings from the back-tests and shadow periods to management, who also had direct access to the data, so that management would understand the relative riskiness of a new client prior to and while onboarding the client. ¶¶97, 102, 105.

Leading into the IPO, the Company was onboarding new, riskier clients at a higher rate than usual in order to showcase its topline growth in the IPO. ¶¶106-108. These additions shifted the Company's merchant mix toward riskier clients with lower margins. Six months before the IPO, Riskified had begun onboarding a major cryptocurrency client, Binance, which generated roughly $20 billion in revenues in 2021. ¶94. The Company also began onboarding a "global money movement remittance and payments company with more than $5 billion in annual revenues" before the IPO. ¶179.

In July 2021, Defendants used the Registration Statement to sell over 20 million shares in the IPO, generating over $422 million in gross proceeds. ¶109.

5

#### C.    Defendants Revealed the Impact of the Undisclosed Trend After the IPO

In the months after Riskified's IPO, the Company's stock price fell as it announced a series of disappointing financial results, with margins that fell well-short of expectations. ¶148. The Company's margin shortfalls and the explanations Defendants provided were highlighted by securities analysts, demonstrating the importance of those issues to investors. ¶149. Indeed, when initiating coverage of Riskified's common stock several analysts highlighted the importance of the Company's gross profit margin to the valuation of the Company and its stock. ¶¶151-154.

On September 9, 2021, Riskified announced its financial results for the second quarter (the quarter that ended prior to the IPO). Defendant Dotcheva revealed that while the Company had a strong gross profit margin in the second quarter of 2021, "we do not expect to maintain the same level of gross profit margin in the back half [of 2021], and this is primarily the result of merchant mix and seasonality." ¶155. As Dotcheva disclosed, "as is customary, we tend to experience higher chargebacks when we first enter a new industry," and while the Company expected travel industry volume to increase due to normal seasonal trends, that volume was "higher risk profile." *Id.* Defendant Gal added that Riskified had "started reviewing orders for several new large merchants, who completed the platform onboarding process during the [second] quarter," which ended four weeks before the IPO, and that "several of these merchants also operate in online payment categories that Riskified has not previously served, including cryptocurrency." ¶156.

Analysts highlighted the newly revealed facts. ¶¶159-161. On the heels of the earnings disclosures and analyst reports, the Company's share price fell nearly $11, over 30%. ¶162.

On November 16, 2021, the Company announced its financial results for the third quarter (the quarter during which the IPO was conducted). Riskified's gross profit margin plummeted to just 46% during the quarter, a significant decrease both from the prior two quarters ***and year-over-year*** from the third quarter of 2020, as Riskified's cost of revenue jumped 44% year-over-year.

6

¶163. During an earnings call, Dotcheva attributed the decreased margins and increased cost of revenue to increased impact from "higher risk volumes" in the travel industry, and to the Company onboarding multiple large new clients in industries that were new to Riskified, including the payments industry. ¶164. Dotcheva stated that the increased chargeback expenses were "expected" and "definitely aligned to our expectations," and expected to "continue to affect us in the future." ¶165. Gal also noted that the Company incurred higher chargeback expenses during the quarter because "[Riskified] had a much higher prevalence of travel and ticketing merchants relative to last year…[and] a more pronounced impact from new categories like remittance and crypto." ¶168. Gal explained that these factors were responsible for "a lower gross margin quarter." ¶168.

Analysts again took heed of these disclosures and several lowered their ratings or price targets. ¶¶169-175. The Company's stock price fell once again by $6.70, nearly 38%. ¶176.

On February 23, 2022, Riskified announced the Company's fourth quarter and year-end financial results for 2021. Riskified's gross profit margin fell once again year-over-year, both for the fourth quarter and for the full year, despite increases in revenues, driven by significant year-over-year increases in the cost of revenues. ¶178. During an earnings call that same day, Dotcheva disclosed that "travel recovered and more than double compared to prior year," and that the Company had added several new clients in the payments and cryptocurrency industries, which were new to Riskified in 2021. ¶179. Dotcheva explained that the year-over-year decline in gross profit margin during the fourth quarter "was driven primarily by [Riskified's] expansion into new industries and regions, increase of the tickets in travel industry as a percentage of total billings as well as the onboarding of new merchants." ¶180. Dotcheva also revealed that the Company's expected gross margin for 2022 would be significantly lower than the two preceding years, due to "an increase in lower-margin industries such as tickets and travel." ¶181.

Analysts once again took note of these disappointing revelations, further lowering their price targets. ¶¶183-187. The next day, the Company's share price fell $0.62, or 9.3%. ¶188.

## III.   ARGUMENT

### A.   Plaintiffs Face a Minimal Pleading Burden under the Securities Act

Section 11 of the Securities Act imposes liability if any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k. Section 11 places "a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability." *Id.* at 381–82.

To state a § 11 claim, a plaintiff need only establish *one* of the following: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011). In contrast to securities fraud claims under the Securities Exchange Act of 1934, "plaintiffs alleging violations of Sections 11 and 12(a)(2) [do] not need [to] plead scienter, reliance, or loss causation," *id.*, such that "[l]iability against the issuer of a security is *virtually absolute*, even for innocent misstatements." *Huddleston*, 459 U.S. at 382.

Allegations of non-fraudulent misconduct, including claims under §§ 11 and 15 of the Securities Act, must satisfy only the notice pleading standards of Rule 8, which requires a "short and plain statement" of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). There is absolutely no support for Defendants' argument, Def. Br. at 9, that Plaintiffs' claims "sound in fraud," and that the Complaint must therefore meet the heightened pleading requirements of Rule 9(b) and the Private

Securities Litigation Reform Act of 1995 ("PSLRA"). The Complaint contains no fraud allegations whatsoever. It plainly alleges that the Registration Statement was "negligently prepared," and that Defendants are "strictly liable." ¶¶113, 202. This case is nothing like *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (finding that some of the § 11 claims against certain defendants sounded in negligence, not fraud).[3] In *Rombach*, unlike here, some of the plaintiffs' § 11 claims incorporated the allegations supporting their § 10(b) fraud claims and "[did] not assert any claim of negligence on the part of the Individual Defendants, nor [did] they specify any basis for such a claim." *Rombach v. Chang*, No. 00 Civ. 0958, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002).[4]

Plaintiffs' burden is to plead facts from which the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiffs' favor, and determine whether, under any reasonable reading of the complaint, the plaintiffs may be entitled to relief. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320–22 & n.4 (2007).

---

[3] "It is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (citing *Rombach*, 355 F.3d at 178). Under *Rombach*, Rule 9(b) only applies to Section 11 claims where they are "premised on allegations of fraud," and "the wording and imputations of the complaint are classically associated with fraud." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405 (S.D.N.Y. 2013) (quoting *Rombach*, 355 F.3d at 171–72, and finding that "phrases like 'materially false and misleading' simply track the language of the [Section 11] statute and do not necessarily sound in fraud"). *See also Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 484 n.10 (S.D.N.Y. 2012) (Cote, J.) (applying Rule 8 standard to Section 11 claims).

[4] Even if Rule 9(b) applies, its plain text states that "knowledge[] and other conditions of a person's state of mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiffs still need not allege scienter. In any event, Defendants fail to cite a single instance where the Complaint fails to "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading." Def. Br. at 9.

### B.     Item 5 of Form 20-F Required Defendants to Disclose the Known Material Trend That Was Likely to Impact Riskified's Gross Profit Margin

Defendants' failure to disclose a known, material trend violated their duty under Item 5(D) of Form 20-F ("Item 5"). Defendants concede that Item 5 requires the same disclosure as Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"). Def. Br. at 19. Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).[5] Instruction 3 to Item 303 requires that the Company "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.* (quoting 17 C.F.R. § 229.303(a), instruction 3). The SEC also instructs the Company to "identify and discuss key performance indicators…that their management uses to manage the business and that would be material to investors."[6]

The mandatory nature of Item 303 disclosures means "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of [such] known trends or uncertainties." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015). Accordingly, "failing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." *Id.* at 101 (citing *Panther Partners*, 681 F.3d at 120 and *Litwin*, 634 F.3d at 716).

---

[5] Plaintiffs refer to the undisclosed shift in merchant mix as a trend, but to the extent the shift is more aptly characterized as an "event" or "uncertainty," the analysis under Item 303 is unchanged.

[6] *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-38960; FR-72, *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

The Complaint alleges that Riskified's Registration Statement failed to disclose a known, material trend in violation of its duty under Item 5. Specifically, the Registration Statement failed to disclose that, at the time of the IPO, the Company's clients in the travel, payments/remittance, and cryptocurrency industries had higher chargeback rates and produced lower profit margins for Riskified, as did new clients in industries that were new to Riskified, and these lower-margin industries represented an increasing share of Riskified's business at the time of the IPO. ¶123. This created an undisclosed trend in the Company's merchant mix to include more lower-margin clients. The "merchant mix," per the Registration Statement, refers to the relative proportions of Riskified's revenues coming from different clients. ¶132. This trend meant more of the Company's revenues were coming from lower-margin clients. The Complaint also alleges that this trend was reasonably likely to have material adverse impacts on the Company's gross profit margin and overall financial results. ¶124.

### 1. The Undisclosed Trend Was Known at the Time of the IPO

Item 5 requires disclosure of "any known trends or uncertainties" that are material, but as courts in this District have clarified, "plaintiffs need not plead defendants' knowledge, as there is no scienter requirement in Section 11." *Panther Partners Inc. v Jianpu Tech. Inc.*, 18 Civ. 9848 (PGG), 2020 WL 5757628, at *10 (S.D.N.Y. Sep. 27, 2020) (quoting *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001)). Plaintiffs must allege the registrant's "actual knowledge" of the undisclosed trends, *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("Item 303 requires the *registrant* to disclose only those trends, events, or uncertainties that *it* actually knows of") (emphasis added), but that does ***not*** mean that the specific knowledge of individual Defendants must be alleged, and certainly not with the particularity required under the PSLRA and Fed. R. Civ. P. 9(b), which do not apply to Plaintiffs' Securities Act claims. That is precisely why the court in *Jianpu Tech.* rejected the defendants'

11

argument, based on *SAIC*, that Item 303's knowledge element requires plaintiffs to plead with particularity facts establishing the actual knowledge of any individual defendant. 2020 WL 5757628, at *10 (reasoning that "[t]he issue is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent").

Defendants' identical argument fails for the same reason. Plaintiffs have adequately alleged "specific facts that, at least when taken as a whole, raise a plausible inference that [the Company] knew of the trend before the IPO." *In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-CV-4531 (LAK), 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) (finding the plaintiffs adequately alleged claims under Sections 11 and 15 based on allegations of undisclosed Item 303 trends).[7]

The Complaint alleges that on an organizational level, Riskified split its clients into tiers and set internal targets for chargeback rates and margins for each industry and client, with clients in the travel, payments, or cryptocurrency industries falling into the higher risk tiers along with new clients in industries new to Riskified. ¶¶80-82, 91-93. Several former employees ("FEs") reported that the Company's management paid close attention to chargeback rates in the travel industry in particular. ¶¶86-90. The FEs also reported that management closely followed trends affecting CTB Ratio and gross profit margin—two of Riskified's key performance indicators— and that chargeback rates were one of the metrics most important to, and most commonly discussed by, management. ¶¶70, 74, 76-77. Dotcheva described the fact that "we tend to experience higher chargebacks when we first enter a new industry," as "customary." ¶155.

---

[7] Contrary to Defendants' argument, Def. Br. at 20, *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 CIV. 10528, 2010 WL 148617, at *9–10 (S.D.N.Y. Jan. 14, 2010), holds no different, requiring only that actual knowledge of the alleged trend is required, not that allegations of each individual defendants' knowledge be alleged with particularity for a Securities Act claim.

By the time of the IPO, the Company already had years of transaction data from its major travel industry clients, and at least six months of data from the lengthy onboarding process (both back-testing and the shadow period) for all new clients. ¶¶87-90, 94, 97-103, 179. Indeed, the Complaint alleges that Riskified used this wealth of data to help the Company's management set their expectations for chargeback rates for a given client. ¶104. The Company's data team reported their findings to Riskified's management, who also had direct access to the data. ¶¶97, 105. This data gave Riskified's management a strong grasp of the chargeback rates to expect for new clients prior to and while onboarding the client. ¶¶102, 105. A new client's historical chargeback data was a point of discussions with management, especially for riskier industries. ¶96.

Defendants' argument that "access to historical information plainly does not give Riskified access to future transaction data," Def. Br. at 15, is ironic, as using a wealth of historical data to help predict future transaction data is *precisely* what Riskified's data-driven machine-learning platform purports to do. *E.g.,* ¶64.[8] The Complaint need not allege that Riskified knew "the precise level of chargeback risk" for future periods. Def. Br. at 15. Riskified used "tons" of historical data to set internal targets for individual and industry chargeback rates, ¶¶80-81, 97, 104-105, which was enough to make the trend in merchant mix known at the time of the IPO. In *CPI Card*, 2017 WL 4941597, at *4, the court found that the CEO's statement "that CPI had 'reasonably good visibility' into the buying practices of large issuers … further supports the inference that CPI knew that large issuers were accumulating card backlogs," and that CPI "was able to know these sorts of things." The court also found that CPI's touting of its "deep process and technology integration" with its key customers, and the fact that CPI used "enterprise resource planning" software, further

---

[8] Defendants' claim that "it can take months after a merchant goes live for Riskified to receive actionable chargeback data," Def. Br. at 15, misses the point. The reason Riskified runs back-tests and shadow periods is so it can carefully estimate chargeback rates *before* the client goes live.

"support an inference that CPI had pre-IPO knowledge of the trend by demonstrating CPI had resources that would have alerted it to the trend." *Id.* Here, the wealth of data that Riskified collected from its clients strongly support an inference that Riskified knew or "was able to know" of, and "had resources that would have alerted it to," the trend in Riskified's merchant mix. *Id.*

The Complaint also adequately alleges that the fact that the Company was, or had completed, onboarding multiple major new clients from riskier industries at the time of the IPO was known at the time of the IPO. FEs, management, and securities analysts, all recognized that Binance and the "global money movement remittance and payments company" were major new clients. ¶¶94, 179, 185-187. The Company had begun onboarding Binance six months prior to the IPO and completed the process in the quarter before the IPO. ¶¶94, 156. As Defendant Gal admitted after the IPO, Riskified had "started reviewing orders for several new large merchants, who completed the platform onboarding process during the [second] quarter," which ended prior to the IPO, and that "several of these merchants also operate in online payment categories that Riskified has not previously served." ¶156. Dotcheva's later disclosure that "we have onboarded…merchants from new industries to us, such as Payments, which changed our merchant portfolio mix and overall risk levels," ¶164, either confirms the impact from the same new clients or refers to additional new clients that were already engaged in the onboarding process by the time of the IPO. Thus their impending addition to the merchant mix was already known.

Dotcheva also explained that management was "constantly monitoring macro trends such as the COVID involvement on travel," and that the impact of the pandemic had not differed significantly from "where we thought it will be." ¶157. By July 2021 the travel industry had begun to rebound from its nadir in 2020, and in 2021 the impact from Riskified's travel clients was "more than double" the prior year. ¶¶84, 179. These allegations support a reasonable inference that by

14

the time of the IPO, Riskified's transaction volume from travel industry clients was increasing significantly as consumers continued to get vaccinated and countries continued to ease travel restrictions. As the Second Circuit recently held in *Moab Partners, L.P. v. Macquarie Infrastructure Co.*, No. 21-2524, 2022 WL 17815767, at *3 (2d Cir. Dec. 10, 2022), "even if Defendants could not determine with certainty that [a trend would occur], they were required to evaluate [the trend's] consequences on the assumption that it would come to fruition and to disclose its potential impact unless Defendants determined that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur." Here, even if the travel industry's continuing rebound in 2021 was not a "certainty" at the time of the IPO, Defendants still were required to evaluate the consequences of the trend on the assumption that it would occur and disclose its potential impact.

In addition, "the timing of the IPO and the trend's manifestation supports an inference of pre-IPO knowledge." *CPI Card*, 2017 WL 4941597 at *4 (finding "that CPI admitted its awareness of the trend so soon after the IPO" supported the inference of pre-IPO knowledge) (citing *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 528 (S.D.N.Y. 2009)). In *CPI Card*, the company announced a slowdown of sales (the manifestation of the trend) just four months after the IPO and attributed the slowdown to prior overstocking of card inventory, precisely the trend alleged by the plaintiffs. The Complaint here alleges the exact same fact pattern, where Defendants revealed their lowered gross profit margin expectations for the back half of 2021, attributed to the trend in merchant mix, just over two months after the IPO. ¶155. Similarly, in *In re Honest Co. Sec. Litig.*, No. 221CV07405MCSPLA, 2022 WL 2856024, at *4 (C.D. Cal. July 18, 2022), the court found that knowledge was sufficiently alleged for Securities Act claims based on Item 303 where the complaint raised a plausible inference that adverse facts were "observable at the time of the

15

offering," including allegations that Defendants attributed product stock-up (the alleged trend) "in the prior year period" to explain post-IPO losses and stagnating growth in the second quarter of 2021, and that the company had robust data from "inventory reporting and … trend tracking."

Contrary to Defendants' attempts to misconstrue the Complaint, Plaintiffs do not allege that Defendants knew what the Company's third and fourth quarter profit margins were going to be, or that they needed to disclose the preliminary results from the second quarter or interim results from the partially completed third quarter. *See* Def. Br. at 10-12, 15, 19.[9] The undisclosed trend was the shift in Riskfied's merchant mix, which had transpired by the time of the IPO, not the subsequent declines in gross profit margin resulting from the trend as the Company incorporated volume from their new clients in the back half of 2021.[10] *CPI Card*, 2017 WL 4941597, at *3 (rejecting defendants' argument that the adverse impact of an alleged trend must materialize prior to an offering); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) (finding that "under Item 303, Defendants were required to disclose the issues even though it arose intra-quarter").

---

[9] Defendants' cases on this point are inapposite. Def. Br. at 12. Unlike here, in *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017), the relevant omission was the preliminary financial *results* of a recent quarter, and in any event the court found that "there was never a trend," as alleged by the plaintiffs. The allegations in *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021), also concerned the omission of preliminary financial results, and the court found that the allegedly omitted trend itself was "clearly disclosed." In *Arfa v. Mecox Lane Ltd.*, No. 10 CIV. 9053, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), the court also found that, unlike here, each of the alleged trends were adequately disclosed, and the allegations regarding interim results were alleged in the context of deficient internal controls, not Item 303 trends. Likewise, Plaintiffs do not allege that "Defendants were required to report [mid-quarter] fluctuations in [relevant metrics] in real time," Def. Br. at 20, as was the case in *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609 (S.D.N.Y. 2021).

[10] Defendants' cases regarding the length of the trend (Def. Br. at 19) are inapposite, as the trend Plaintiffs allege is not the interim margin results from the pre-IPO weeks of the third quarter, but the shift in merchant mix from new clients being onboarded at the time of the IPO. In any event, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *CPI Card*, 2017 WL 4941597, at *3.

The Complaint also adequately describes the ten FEs whose accounts help corroborate Plaintiffs' allegations of a known trend, and each FE is described with sufficient detail to "support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The Complaint need not allege the knowledge of each individual Defendant with particularity, *Jianpu Tech.*, 2020 WL 5757628, at *10, thus Defendants are wrong that the FEs must describe personal interactions with specific officers to a more granular extent than alleged in the Complaint. Def. Br. at 16-18. Unlike *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019), here the FEs' allegations are paired with "facts that might corroborate" their allegations, such as Defendants' own admissions that the CTB Ratio and gross profit margin were "key performance indicators" closely watched by management, ¶¶70, 77, that travel industry clients were riskier, and that new clients in new industries had higher chargeback rates "as is customary," ¶¶155, 165. Defendants admitted that travel industry volume "more than double[d]" in 2021 and that the Company had added several major new clients with billions in revenues (including Binance) in the payments and cryptocurrency industries, which were new to Riskified. ¶179. Notably, Defendants do not contest that the FEs are adequately described to support their knowledge of Riskfied's comprehensive onboarding process, or that the Company's management used new clients' data to set internal targets for chargeback rates.[11]

---

[11] The fact that ten former employees from across the Company provided consistent accounts of the Company's business also supports the reliability of their allegations. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058–59 (C.D. Cal. 2008) (allegations from 14 former employees were sufficient to allege nationwide practices, noting that the consistency of the witnesses' statements was particularly persuasive); *In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *1, *7 (D.N.J. Dec. 6, 2018) (consistent allegations from 19 confidential witnesses supported falsity).

### 2. The Undisclosed Trend Was Reasonably Likely to Have a Material, Adverse Impact on the Company's Financial Results

The Complaint also alleges that the trend in the Company's merchant mix was reasonably likely to materially impact the Company's gross profit margin. "Reasonably likely" does not mean "certain." Defendants need not have determined "with certainty" whether, and to what exact extent, the shift in merchant mix would impact the Company. *See Moab Partners*, 2022 WL 17815767, at \*3. Even if the precise merchant mix or exact levels of chargebacks and margins for the new clients was not known with "certainty," disclosure was required unless it was "objectively reasonable for Defendants to determine that [the trend] would not likely have a material effect" on Riskified's financial results. *Id.* That was not the case here, so disclosure was required.

The Registration Statement acknowledged that the year-over-year decreases in CTB Ratio in the first quarter of 2021 and year-end 2020 were caused in part by "a shift in the merchant mix of our revenues." ¶73. It also touted that as the Company had grown and scaled its gross profit margin had increased due to improvements in the CTB Ratio. ¶129. The Registration Statement further stated that for the second quarter of 2021, "[w]e expect our gross profit margin to improve due to improvements in our… CTB Ratio, due to a shift in the merchant mix," ¶130, and that the Company's ability to reduce its CTB Ratio in 2020 "helped drive gross profit margin expansion." ¶131. Thus, Defendants were clearly aware that a shift in the Company's merchant mix was reasonably likely to, and historically did, impact Riskified's CTB Ratio and gross profit margin.

Indeed, when Riskified's executives explained the Company's post-IPO margin shortfalls in earnings calls, they confirmed that shifts in the Company's merchant mix could and had in fact impacted the Company's overall gross profit margin. *E.g.,* ¶155 ("we do not expect to maintain the same level of gross profit margin in the back half [of 2021], and this is primarily the result of merchant mix…"); ¶164 (attributing decreased margins to "shifts in our verticals' contribution to

18

the overall industry portfolio mix"); ¶166 (attributing increase in chargeback expenses to shifts in merchant mix); ¶181 (explaining that the Company expected its gross margin for 2022 to decrease due in part to "an industry mix shift from an increase in lower-margin industries").

### 3.    The Undisclosed Trend and Its Impact Were Material

To the extent Defendants attempt to argue that the undisclosed trend was immaterial as a matter of law, their arguments fail. "Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower" than the "relatively minimal burden" applicable to other elements of their claims under Rule 8(a). *Litwin*, 634 F.3d at 718. A "complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

The cases cited by Defendants offer no support for their position that the undisclosed trend was immaterial as a matter of law. Def. Br. at 14. The court in *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 542–43 (S.D.N.Y. 2010), applied the "extreme departure" test for materiality that the Second Circuit has since held "is not the operative test in this Circuit." *Stadnick*, 861 F.3d at 37. Moreover, in finding that the alleged decline in profit margin was not an "extreme departure" from the range of anticipated results, the *Focus Media* court found that, unlike here, the alleged decline merely "continued a trend observed in the Company's financial results for the previous two quarters." 701 F. Supp. 2d at 542. Similarly, unlike here, the court found "there was never a trend" in the two metrics highlighted by the *Stadnick* plaintiffs, and those metrics were not among the "key operating metrics" identified by the company. *Stadnick*, 861 F.3d at 39.

Here, in contrast, Defendants do not claim the trend in merchant mix was disclosed or did not exist, and Defendants themselves recognized the trend was reasonably likely to materially

19

impact the Company's CTB Ratio and gross profit margin, which the Riskified expressly identified as two of its "key performance indicators." ¶¶70, 77. *See Facebook*, 986 F. Supp. 2d at 519 (where registration statement highlighted the significance of a financial metric, changes in that metric driven by an omitted trend supported a finding that materiality was adequately pled).[12]

The reactions of securities analysts when the trend was finally revealed (¶¶151-154, 159-161, 169-175, 183-187) also support materiality. *See, e.g., City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012). So too does the market's sharply negative reaction to the disclosures revealing the trend (¶¶162, 176-177, 188). *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (allegations of a "precipitous decrease in share price" following disclosures support an inference of materiality at the pleading stage); *Facebook*, 986 F. Supp. 2d at 520 n.31; *Pontiac*, 875 F. Supp. 2d at 368.

## C.    The Registration Statement Did Not Adequately Disclose the Known Trend

Item 3(D) of SEC Form 20-F ("Item 3") requires that the registrant "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk." The SEC's Instructions to Item 3 clarify that these risk factor disclosures should "explain clearly how the risk affects the issuer or the securities." These requirements mirror those in Item 105 of SEC Regulation S-K (17 C.F.R. § 229.105). *Accord*, Def. Br. at 21. "Item 105 does not require a plaintiff to plead actual knowledge [of individual defendants, but] it does require the presence of a significant risk." *Gutman v. Lizhi Inc.*, 21-CV-317 (LDH) (PK), 2022 WL 4646471,

---

[12] Defendants' arguments (Def. Br. at 14) that the Company's gross profit margins were "'strong' in 2Q21," "increased again in 4Q21," and "were at the high end of their recent annual totals" are irrelevant, as the impact from the shift in merchant mix had not materialized yet in the second quarter as the new clients were still completing the onboarding process. Moreover, the Complaint alleges that the fourth quarter and year-end margins decreased *year-over-year*, ¶178, which properly accounts for seasonality and "iron[s] out quarterly fluctuations," as Defendants themselves suggest. Def. Br. at 14.

at * (S.D.N.Y. Oct. 1, 2022) (citing *Jianpu Tech.*, 2020 WL 5757628 at *10). Defendants' failure to adequately disclose the trend in the Company's merchant mix and the associated risk to the Company's gross profit margin violated Item 3's disclosure requirement.

Defendants assert that the risk disclosures in Riskified's Registration Statement concerning the Company's profit margins "contained ample warnings and disclosures" that were "more than adequate," Def. Br. at 11 and 13, but the generic statements they point to fail to adequately disclose the risks from the known trend that Plaintiffs allege was omitted. The Registration Statement says only that gross profit margin "***may fluctuate*** from period to period," ¶140, and that the metric "is highly dependent on…the merchant mix of our revenue, and new geographies and industries into which we may enter," among other factors. *See* Dkt. No. 80-3 (Def. Ex. 3) at 92.[13] This sort of generic risk disclosure "do[es] not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (finding plaintiffs "adequately pleaded that the various general disclosures … were insufficient to fulfill Defendants' disclosure obligations") (quoting *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)).[14] Here, the statement that merchant mix is one factor that *may* affect profit margins, which *may fluctuate*, is insufficient to apprise investors of the

---

[13] Similarly, the Registration Statement stated that the Company's "CTB Ratio ***may fluctuate*** in future periods due to … changes in the mix of our merchant industry base." ¶127.

[14] *See also In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 831 (S.D.N.Y. 2017) (generalized disclosures of potential risks were "insufficient to shield Defendants from their obligation to disclose known risks that had already materialized by the time of the IPO"); *Facebook*, 986 F. Supp. 2d at 516; *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.")). "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).

known trend in Riskified's merchant mix toward lower-margin clients, which was *likely* to drag down the Company's gross profit margin.

Plaintiffs do not assert that Defendants had a duty to disclose "granular" detail on the riskiness of specific industries or clients. Def. Br. at 11. Plaintiffs claim only that Defendants had a duty to disclose the known trend in the Company's overall merchant mix that was reasonably likely to impact the Company's gross profit margin. This case is unlike *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 (S.D.N.Y. 2021), in which the prospectus disclosed that the company's "revenues … could be materially and disproportionately impacted by the purchasing decisions of [three specific major customers]," but the plaintiffs did ***not*** allege that the actual trend of those customers' lowered demand was already known at the time of the IPO. Here, in contrast, Plaintiffs allege that the trend was already known, not hypothetical, at the time of the IPO.[15]

The other cases Defendants cite contain dissimilar allegations. Unlike here, the plaintiffs in *Focus Media*, alleged that the company's quarterly guidance in a mid-quarter press release (to which Item 303 does not apply) was false and misleading because of the defendants' "failure to disclose financial information about the third quarter before that quarter had concluded." 701 F. Supp. 2d at 539. Here, in contrast, Plaintiffs do not assert that Defendants should have disclosed interim gross margin *results*. In *In re Proshares Trust II Sec. Litig.*, No. 19cv0886 (DLC), 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020), the alleged trend was that a fund's own rebalancing needs could drive up the price and illiquidity of the market for VIX futures contracts, a possible *future* event that this Court found was fully disclosed in the registration statement. Whereas the

---

[15] This case also does not resemble *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997), in which the plaintiffs did not allege violations of Item 5 or Item 303. In *Schoenhaut*, the court found only that the failure to disclose decreasing sales to one client was not a material omission where the prospectus did not discuss current or future sales to that client.

risks that the *Focus Media* and *Proshares* defendants warned of *later* materialized, Plaintiffs here allege the trend was known at the time of the IPO, and thus the risk disclosures were inadequate.

**D.    Defendants' Omissions Rendered the Registration Statement Misleading**

The same omissions of material fact discussed above rendered certain statements in the Registration Statement misleading and serve as an additional basis for § 11 liability. "Once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

As explained above, the Registration Statement's warnings that CTB Ratio and gross profit margin "may fluctuate," ¶¶127, 140, were inadequate and misleading because they omitted the trend in merchant mix that Defendants knew was *likely*, not merely *possible*, to materially impact the Company's CTB Ratio and gross profit margin. ¶¶128, 132, 141. "The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173.

The Complaint alleges that the statements concerning Riskified's chargeback exposure (¶¶134, 136, 138, 142) misled investors due to the omission of material facts known to Defendants about the chargeback rates of Riskified's clients at the time of the IPO. Those statements misleadingly implied: (1) that the Company could strictly control its chargeback expenses (¶¶134, 142), while in truth, certain clients had higher chargeback expenses that the Company was not able to "rebalance" or "mitigate," ¶135, which Defendants knew was likely to result in depressed gross profit margin as the merchant mix shifted to include more of those clients, ¶143; and (2) that

23

chargeback expenses would decrease and become less volatile as Riskified expanded and diversified its client base (¶¶136, 138) when in fact it was "customary" for new clients in new industries to have higher chargeback rates, ¶155, and the Company was experiencing that trend at the time of the IPO as it added major new clients in new industries, ¶¶137, 139.

The Complaint also alleges that the statements concerning the impact of COVID-19 on Riskified's business (¶¶144, 146) were misleading because they gave investors the false impression that the pandemic's impact on the Company's travel clients had only negatively affected the Company, and that the sector's ongoing recovery would thus have a positive impact on Riskified's business. In truth, travel industry clients had high chargebacks and lower margins, such that as the travel industry continued to recover in the latter half of 2021 it would continue to shift the Company's merchant mix and depress the Company's gross profit margin. ¶¶145, 147.

Finally, the statements which Defendants claim were couched as opinions or projections, Def. Br. at 24-25, are nonetheless actionable. Defendants may be liable "when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (discussing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)). "[O]pinions, although sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 188-89). A reasonable investor expects that a statement of opinion "fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. As explained above, the Complaint alleges that Defendants failed to disclose

24

known material facts whose omission either implied the absence of contrary facts or did not fairly align with the information in Defendants' possession at the time.

### E.      The Complaint Adequately Alleges Control Person Liability

Section 15 of the Securities Act extends joint and several liability to controlling persons. 15 U.S.C. § 77o. "To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011). The Complaint satisfies both requirements.

The "primary violation" element of § 15 is satisfied because Plaintiffs have adequately alleged the Company's violation of § 11, as detailed above. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 234 (S.D.N.Y. 2004). Defendants do not assert that the Complaint fails to allege control, thus conceding the second requirement for § 15 liability. As this Court has previously held, "[g]iven the statutory language and the Supreme Court's acknowledgment, … that the claim imposes a negligence standard only, … Section 15 is not read to include a 'culpable participation' requirement." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 573 (S.D.N.Y. 2015) (Cote, J.), (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208–09 & n.27 (1976)). The Complaint thus adequately alleges control person liability against the individual Defendants.

## IV.      CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss the Complaint.

Dated: February 21, 2023                          **THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Laurence M. Rosen
Phillip Kim
Joshua Baker

275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 21st day of February, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/Joshua Baker*

27