**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RISKIFIED LTD. SECURITIES LITIGATION | Case No. 1:22-cv-03545-DLC |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Defendants Riskified Ltd., Eido
Gal, Assaf Feldman, Aglika Dotcheva, Erez
Shachar, Eyal Kishon, Aaron Mankovski,
Tanzeen Syed, and Jennifer Ceran*

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000

*Counsel for Defendants Goldman Sachs &
Co. LLC, J.P. Morgan Securities LLC,
Barclays Capital Inc., Credit Suisse Securities
(USA) LLC, Keybanc Capital Markets Inc.,
Piper Sandler & Co., Truist Securities, Inc.,
William Blair & Company, L.L.C., Loop
Capital Markets LLC, Samuel A. Ramirez &
Company, Inc., Siebert Williams Shank &
Co., LLC, and Stern Brothers & Co.*

**TABLE OF CONTENTS**

I.      Plaintiffs Fail to State a Claim for an Actionable Omission Under Section 11.................. 1

    A.      A Four-Week Period Cannot Establish a Trend as a Matter of Law ...................... 1

    B.      Plaintiffs Concede That Defendants Had No Duty to Disclose Intra-Quarter Financials or Predict Future Fluctuations in Profit Margins .................... 2

    C.      Plaintiffs Plead No Facts Demonstrating That the Purported Trend Had Occurred or Was Known at the Time of the IPO..................................................... 4

    D.      The Purportedly Undisclosed Risks Were Adequately Disclosed......................... 8

II.     The Purported Omissions Did Not Render the Registration Statement Misleading........... 9

III.    Plaintiffs Fail to Plead a Control Person Claim Under Section 15 .................................. 10

CONCLUSION.............................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................................10

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. Aug. 18, 2020)......................................................................3

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007).............................................................................................................1

*Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................................................................1, 5

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)..................................................................2, 3, 7

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)....................................................................................7

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283, 301, 303 (S.D.N.Y. 2021)..................................................................4, 9

*In re Honest Co. Sec. Litig.*,
2022 WL 2856024 (C.D. Cal. July 18, 2022).........................................................................7

*Moab Partners, L.P.* v. *Macquarie Infrastructure Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022)..........................................................................7

*Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................................4

*Panther Partners Inc.* v *Jianpu Technology Inc.*,
2020 WL 5757628 (S.D.N.Y. Sep. 27, 2020)......................................................................5, 7

*Ret. Sys.* v. *Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)..................................................................................10

*Schoenhaut* v. *American Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997).........................................................................................4

*Stadnick* v. *Vivint Solar Inc.*,
861 F.3d 31 (2d Cir. 2017).....................................................................................................3

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)...................................................................................................5

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...............................................................................................10

**Other Authorities**

Discussion & Analysis of Fin. Condition & Results of Ops., Exchange Act
    Release No. 6835, 1989 WL 1092885 (May 18, 1989)..........................................................5

Fed. R. Civ. P. 8 .....................................................................................................................1

**I.      Plaintiffs Fail to State a Claim for an Actionable Omission Under Section 11[1]**

Plaintiffs argue that the Registration Statement contained actionable omissions because it failed to disclose a known, material trend pursuant to Item 5 of Form 20-F and the Company's "most significant risk factors" under Item 3(d).  (Opp. 10–22.)[2]  Plaintiffs' omission theory fails because (a) the purported shift in merchant mix is too short to be a "trend" as a matter of law; (b) Plaintiffs identify no actionable material omission about merchant mix, apart from the financial impact which they concede is not actionable; (c) Plaintiffs fail to allege that the purported trend had occurred or was known at time of IPO; and (d) the risks at issue were adequately disclosed.

**A.      A Four-Week Period Cannot Establish a Trend as a Matter of Law**

Plaintiffs' Item 5 theory fails because their allegations concern, at most, a four-week period that cannot constitute a "trend."  "As a matter of law, a two month period of time [or less] does not establish a 'trend' for purposes of the disclosures required by Item [5]." *Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010); (Br. 19–20 (collecting cases)).  Plaintiffs merely respond in a footnote that whether an occurrence is "sufficiently lengthy" should not be resolved at the motion to dismiss stage.  (Opp. 16 n.10.)  But Plaintiffs do not distinguish *Blackmoss* or Defendants' numerous cases to the contrary.  (Br. 19–20.)  And the *only* case Plaintiffs cite on this point considered this very argument and held that plaintiffs pleaded a "trend" under Item 303 *specifically* because they "allege[d] that the trend . . .

---

[1]   Plaintiffs contend that they need meet only a "minimal" pleading standard because the Complaint "contains no fraud allegations."  (Opp. 8.)  But Plaintiffs' substantive allegations are that Defendants "*misled investors* due to the omission of material facts *known to Defendants*."  (Opp. 23.)  Allegations that Defendants deceived investors by concealing known information are allegations of *fraud* subject to heightened pleading rules—regardless of the labels Plaintiffs use.  (*See* Br. 9–10.)  Plaintiffs even amended the Complaint after Defendants first moved to dismiss and removed certain language classically associated with fraud *without* altering the substance of their claims.  (*See* First Am. Compl. ¶¶ 53, 109, 188, 196, 203.)  But even if Rule 8 applies, the Complaint fails to state a claim that is "plausible on its face."  *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

[2]   "Br. __ " refers to Defendants' moving brief (ECF No. 79);  "Opp. __ " refers to Plaintiffs' opposition brief (ECF No. 82); all other capitalized terms have the meaning ascribed to them in Defendants' moving brief.

[was] much longer than two months." *See In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *3 n.38 (S.D.N.Y. Oct. 30, 2017).

Plaintiffs' own allegations make clear that the omitted trend cannot have lasted more than 28 days. Plaintiffs' theory is that Riskified was required to disclose the specific changes in merchant mix at the time of the IPO that negatively impacted profit margins. But Plaintiffs *concede* that Riskified had *record high* profit margins of 60% in 2Q21, which ended on June 30, 2021—only 28 days before the IPO.[3] Plaintiffs also cite an uptick in revenue from "risky" travel customers during summer 2021 (Opp. 14–15), but the summer travel revenues also necessarily post-date 2Q21. Similarly, the addition of a single crypto company (Binance) and some unspecified "payments" customers in 2Q21 (Opp. 14) plainly cannot constitute a pre-IPO "trend" since Riskified's 2Q21 margins were a record high. The short duration of the alleged "trend" is thus dispositive of Plaintiffs' omissions claim under Item 5.

## B. Plaintiffs Concede That Defendants Had No Duty to Disclose Intra-Quarter Financials or Predict Future Fluctuations in Profit Margins

Plaintiffs also struggle to define the omitted "trend." Plaintiffs' Complaint and opposition focus principally on Riskified's post-IPO fluctuations in gross profit margin. (*See, e.g.*, ¶¶ 9, 123–24, 140; Opp. 2, 6–7, 15, 18–19). Indeed, Plaintiffs seek to recover investment losses that they purportedly suffered due to Riskified's "disappointing . . . gross profit margins" in 3Q21 and 4Q21. (Opp. 2.) But Plaintiffs concede that they "do not allege that Defendants knew what the Company's third and fourth quarter profit margins were going to be, or that they needed to disclose the preliminary results from the second quarter or interim results from the partially completed third

---

[3]   Plaintiffs' allegations of a "trend" are also undermined by the undisputed fact that the 3Q21 decline in profit margins to 46% was short-lived as profit margins rebounded to 53% in 4Q21. (Br. 8.) Plaintiffs also do not dispute that the 3Q21 and 4Q21 margins were squarely within reported historical ranges, which had fluctuated between 45% and 58% since 1Q19. (*See* Br. 12-13 & Ex. 1.)

quarter." (Opp. 16.)  Plaintiffs also do not purport to have satisfied *Stadnick* v. *Vivint Solar Inc.,* 861 F.3d 31, 39 (2d Cir. 2017), the controlling case on interim disclosures. (Br. 12–13.)

Plaintiffs insist that the undisclosed trend was a shift "in Riskified's merchant mix toward lower-margin clients, which was likely to drag down the Company's gross profit margin."  (Opp. 16, 21–22.)  Plaintiffs thus attempt to create daylight between the disclosure of profit margins (which they concede are not actionable) and the disclosure of merchant revenue mix (which allegedly *caused* a short-term effect on profit margins).  This is a distinction without a difference. The only explanation for Plaintiffs' interest in merchant mix is its impact on gross profit margins. (*See* Opp. 2, 5, 10–11, 15, 18–19.)  Further, Plaintiffs concede that the duty to disclose under Item 5 is specifically tied to "the registrant's financial condition."  (Opp. 10.)[4]

Moreover, Plaintiffs do not dispute that Riskified *expressly disclosed* that changes in merchant mix, entry into new geographies and industries, and seasonal trends would cause fluctuations in gross profit margins.  (Ex. 3 at 92, 103; Br. 3, 6.)  Plaintiffs argue that these risk disclosures were not adequate because they did not provide a tiered assessment of relative chargeback risk levels of customers in different industries, or sufficiently explain how a short-term increase in revenue from merchants in specific industries (such as travel) would impact the results of the quarter in progress.  (Opp. 12–14.)  But, again, this purported omission is relevant only to the extent it impacts intra-quarter financials, which Defendants had no duty to disclose.  *Stadnick*, 861 F.3d at 39.  Indeed, courts have rejected similar arguments seeking to require disclosure of granular information relating to sales, apart from the resulting financial impact.  *See In re*

---

[4]  Plaintiffs rely heavily on *CPI*, but that case is factually inapposite.  In *CPI,* a credit card manufacturer *utterly failed* to warn investors about a substantial and anomalous "over-inventory" trend that caused a sharp decline in sales when customers switched from "swipe" credit cards to "chip" credit cards.  2017 WL 4941597, *4–5. Here, by contrast, Plaintiffs were warned about the very factors that cause profit margins to fluctuate, but complain about transient, quarterly fluctuations in merchant revenue mix and related profit margins.

3

*AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 525–26, 529 (S.D.N.Y. Aug. 18, 2020), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan* v. *AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (no duty to disclose intra-quarter customer churn and low engagement in real time, in addition to quarter-end results impacted by those factors); *see also Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008), *aff'd* 347 F. App'x 617 (2d Cir. 2009) (no duty to disclose product defect where plaintiffs failed to plead that the impacts of the defect— such as the volume of affected products or resulting return rate—were known as of the IPO).

Courts also have rejected the argument that risk disclosures must contain the type of granular, customer-specific information that Plaintiffs seek to require here.  In *In re HEXO Corp. Securities Litigation*, the Court found no duty to disclose the increased risk that the issuer's largest customer would not fulfill its purchase obligations, given warnings that "revenues could fluctuate materially in the future and could be materially and disproportionately impacted by [customers'] purchasing decisions."  524 F. Supp. 3d 283, 301, 303 (S.D.N.Y. 2021).[5]  Similarly, in *Schoenhaut* v. *American Sensors, Inc.*, the defendant's failure to disclose declining sales to its largest client for several months before the IPO was not a material omission because the defendant warned generally that the company's largest customer "may vary from period to period" and that the loss of a large customer could materially affect the company.  986 F. Supp. 785, 793 (S.D.N.Y. 1997).  The same logic applies here to short-term fluctuations in merchant mix.

### C.    Plaintiffs Plead No Facts Demonstrating That the Purported Trend Had Occurred or Was Known at the Time of the IPO

Plaintiffs concede that they must plead "actual knowledge" of a trend, but argue that they

---

[5]    Plaintiffs' assertion that this case is distinguishable from *In re HEXO* because the plaintiffs there "did **not** allege that the actual trend of those customers' lowered demand was already known at the time of the IPO" is incorrect. (Opp. 22.)  The plaintiffs in that case *did* argue that the defendants "must have known at the time of the IPO that HEXO would not sell the Purchase Obligation to" its largest customer, but the court rejected this argument because plaintiffs did not allege such knowledge with particularity.  524 F. Supp. 3d at 303.

4

need not plead facts about the knowledge of any Individual Defendant.  (Opp. 11–12.)  But corporations can only have "knowledge" through their executives, and therefore "[a] disclosure duty exists where a trend . . . [is] presently known *to management*"—*i.e.*, the Individual Defendants here.  Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Ops., Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) (emphasis added); *accord Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).[6]  Here, Plaintiffs fail to plead pre-IPO actual knowledge of any merchant mix "trend" by management:

*First*, Plaintiffs do not dispute that none of the FEs in the Complaint are part of senior management or involved in strategic discussions, that many were not employed at the time of the IPO, and that the Complaint fails to allege that any FE had access to information about company-wide trends or direct contact with senior management.  (Br. 16–18.)  Even crediting the FEs' recollections, and even assuming their knowledge can be imputed to Riskified or any other defendant, none discusses *any* undisclosed "trend" at the time of the IPO.  The FEs recall that (i) Riskified groups its customers in tiers according to their risk levels for purposes of setting internal targets; (ii) management was focused on chargeback rates and gross profit margin given their importance; (iii) management monitored macroeconomic trends with an eye toward their impact on customer industries; and (iv) management knew that chargebacks were higher when entering a new industry.  (Opp. 12–17.)  But these allegations are entirely consistent with the disclosures made in the Registration Statement, which explained that chargeback rates and gross profit

---

[6]  Plaintiffs cite *Panther Partners Inc.* v *Jianpu Technology Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sep. 27, 2020), for the proposition that "plaintiffs need not plead defendants' knowledge" under Item 303.  (Opp. 11.) That argument is inconsistent with the regulation's plain text (referring to a "known trend") and the overwhelming weight of authority including a controlling decision from the Second Circuit.  *See Stratte-McClure*, 776 F.3d at 101; *Blackmoss*, 2010 WL 148617, at *9–10 (collecting cases and rejecting argument that Item 303 does not "require scienter-like allegations"); (Br. 20.)  In any event, although the court in *Jianpu* held that Item 303 does not require showing that defendants "acted with fraudulent intent," Plaintiffs' Item 303 theory is deficient not because of a failure to plead *intent*, but because the Complaint alleges no facts demonstrating *knowledge* of the allegedly omitted trend.  *See infra* 6–8.

margins would fluctuate based on Riskified's "merchant mix," "new geographies and industries into which [it] may enter," and the accuracy of its "risk-based pricing"; and that seasonality and macroeconomic trends, including from the COVID-19 pandemic, would impact its business. (Ex. 3 at 36, 92.) Nine of the FEs do not recall *any* specific customers that were onboarded around the time of the IPO, and FE6—a data engineer—states that Binance became a new customer, but does not recall that Binance had a negative impact on chargebacks or margins. Revealingly, Plaintiffs' brief does not cite *any* particular FE or *any* particular FE recollection. (*See* Opp. 12, 17.)

*Second*, Plaintiffs argue that "years of transaction data" from travel industry customers "was enough to make the trend in merchant mix known at the time of the IPO," but cite no factual allegations to support that contention. (Opp. 13.) No FE anecdotes or pleaded facts provide insight into what Riskified knew with respect to anticipated travel merchant revenue for the quarter of the IPO, much less the specific impact that travel clients would have on quarterly profit margins.

Rather, Plaintiffs ask the Court to infer that, because Riskified had access to historical data on travel clients, Defendants must have known how 3Q21 would play out. (Opp. 13–14.) But historical chargeback rates would not tell Defendants how Riskified's profit margins would be impacted for that particular quarter. At the time of the IPO—28 days into 3Q21—Defendants did not know what the quarterly revenue from travel would be, nor the percentage of travel customers in the quarterly merchant mix. The uncertainty was particularly high because, as Riskified *warned* (Ex. 3 at 34), the quarter in question occurred in the middle of the COVID-19 pandemic. Travel revenues in the prior year (2020) had been aberrant due to COVID-19 restrictions and were a poor point of comparison. This is precisely why Riskified warned that seasonality, merchant mix, and macro-level economic trends would cause fluctuations in profit margin (*e.g.*, Ex. 3 at 36, 39, 92), and that *historic* profit margins had fluctuated quarterly between 45% and 58% (Ex. 3 at 101).

6

Plaintiffs also ignore that the Company's risk-based pricing already incorporates historical chargeback rates in order to improve margins.  (Br. 5.)

Plaintiffs' reliance on the CFO's statement in November 2021 about the Company's "expectations" regarding 3Q21 (Opp. 7) is also misplaced.  Plaintiffs ignore that this statement clearly harkened back to the CFO's statement from September 2021—*after the IPO*—that the Company anticipated higher chargebacks and lower profit margins in the second half of 2021, and shows nothing about what the CFO knew or expected at the time of the IPO.  (Br. 7.)

Plaintiffs' cases are inapposite; each addresses factual allegations beyond mere access to historical data to support defendants' actual knowledge of the alleged undisclosed trend.  In *Moab Partners, L.P.* v. *Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *3 (2d Cir. Dec. 20, 2022), for example, the Second Circuit held that a petroleum storage company was required to disclose the likely impact of a forthcoming ban on a major petroleum product when the regulation had already been adopted and was scheduled to take effect shortly after the offering.[7]

*Third*, Plaintiffs contend that Riskified's access to onboarding data for new clients somehow equates to "actual knowledge" of the impact those clients would have on its financial results.  (Opp. 14.)   But Plaintiffs admit that Riskified used this information to "***estimate*** chargeback rates before the client goes live" (Opp. 13 n.8), and by definition, an "estimate" of chargeback rates is not "actual knowledge" of the full impact on margins.  Additionally, Plaintiffs plead no facts about what Riskified supposedly knew at the time of the IPO about Riskified's

---

[7]   *See also In re Honest Co. Sec. Litig.*, 2022 WL 2856024, at *4 (C.D. Cal. July 18, 2022) (defendant's pre-IPO press release citing growth stagnation, coupled with its internal daily inventory reporting and monthly inventory trend tracking, supported defendants' actual knowledge of decreased sales prior to the IPO); *CPI*, 2017 WL 4941597, at *4 (slowdown in defendants' sales resulted in the accumulation of significant excess inventory prior to IPO, and caused a drop-off in sales shortly after); *Jianpu*, 2020 WL 5757628, at *10 (knowledge alleged based on "multiple public reports" about new regulations that caused the purportedly omitted trend); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 510–11 (S.D.N.Y. 2013) (company had actual pre-IPO knowledge of increase in non-revenue-generating mobile user base where it decreased its internal revenue projections in the week prior to the IPO due to this trend).

7

expectations for 3Q21 revenue from the single crypto client, Binance, and the unspecified "online payment" customers.  The Complaint also contains no facts or FE anecdotes describing what impact, if any, these clients had on Riskified's 3Q21 performance.

### D.        The Purportedly Undisclosed Risks Were Adequately Disclosed

Plaintiffs argue that Defendants failed to disclose the "known trend in Riskified's merchant mix toward lower-margin clients, which was likely to drag down the Company's gross profit margin."  (Opp. 21–22.)[8]  As discussed in Defendants' opening brief (Br. 6–7, 12–13, 21), and *supra* 3, 6, this theory fails because the allegedly concealed risks were adequately disclosed. *Plaintiffs themselves* rely on disclosures from the Registration Statement to argue that it was "clear[]" that "a shift in the Company's merchant mix was reasonably likely to, and historically did, impact Riskified's CTB Ratio and gross profit margin."  (Opp. 18.)  Plaintiffs' admission shows that these disclosures were adequate.

Plaintiffs argue that Defendants' risk disclosures were "generic" because they warned of risks—such as fluctuations in gross profit margin—that had already negatively materialized. (Opp. 21 & n.14 (collecting cases).)  But unlike Plaintiffs' cases, the Complaint here does not identify any significant risk or trend that had materialized or was known at the time of the IPO. *See supra* 1–3.  Indeed, rather than being "drag[ged] down," profit margins *peaked* in the quarter that ended a mere four weeks before the IPO.  *Supra* 2.  Moreover, Plaintiffs' sole complaint about the risk disclosures is that they were not granular enough because they did not predict precisely how the risks would impact 3Q21 margins, but the law does not require issuers to provide the level of customer-specific detail or impact that Plaintiffs insist was omitted.  *See supra* 4.

---

[8]    Although Item 3(d) does not require a "trend," Plaintiffs explicitly argue that the risk factor Defendants failed to disclose pursuant to Item 3(d) was the purported "trend" in the merchant mix.  (Opp. 21.)

**II.    The Purported Omissions Did Not Render the Registration Statement Misleading**

Plaintiffs separately argue that the omission of the purported trend in merchant mix rendered certain statements in the Registration Statement misleading.  (Opp. 23–25.)  None of the challenged statements is sufficiently pleaded to be false.  (Br. 21–25.)

Plaintiffs argue that Riskified's disclosures that CTB Ratio and gross profit margin may fluctuate were "inadequate and misleading because they omitted the trend in merchant mix that Defendants knew was *likely*, not merely *possible*, to materially impact" those metrics.  (Opp. 23.)  As explained *supra* 2, Plaintiffs have not alleged that the purported trend had occurred pre-IPO.  In any event, profit margin results *did* fluctuate each quarter exactly as warned, and remained squarely within the reported historical range of 45% to 58%.  (*See* Br. 22.)

Plaintiffs next argue that Riskified's disclosures about its chargeback exposure were misleading because they "implied" that Riskified could "strictly control its chargeback expenses."  (Opp. 23.)  But what Riskified *actually* said was that it had established "strict processes" that allowed it to "constantly adjust [its] merchants' approval and chargeback rates to rebalance exposure and [its] expected expenses" and that it "monitor[s] [its] approval rate thresholds" so that it can "structure [its] pricing in a way to mitigate" chargeback risk.  (¶¶ 134, 142.)  There is no allegation that such processes or monitoring were not followed.  And no reasonable investor could have understood Riskified's statement to imply that it could "strictly control" its chargeback expenses in light of the Company's disclosure that profits margins, which are driven by chargeback expenses, had historically fluctuated between 45% and 58% and would continue to fluctuate going forward.  (*See* ¶¶ 6, 131.)  Plaintiffs also contend that Riskified "implied" that its chargeback expenses "would decrease and become less volatile as Riskified expanded and diversified its customer base."  (Opp. 24.)  But Riskified *never* stated that its chargeback expenses "would decrease;" to the contrary, Riskified warned that chargeback rates could "fluctuate" due to a variety

9

of factors, including merchant mix.  (Br. 6–8, 23.)  Riskified also said chargeback expenses would become less volatile as the Company "scale[s]" and that diversity across industries would "reduce[] the likelihood of material *unexpected* chargeback expenses."  (¶¶ 136, 138 (emphasis added).)  Plaintiffs do not allege that these statements are false.

Plaintiffs also challenge the Company's disclosure that travel and ticketing customers had historically driven "significant revenues" but "continue[d] to be negatively impacted by COVID-19."  (¶ 144.)  Plaintiffs argue that this statement gave "the false impression that the pandemic's impact on the Company's travel clients had only negatively affected the Company."  (Opp. 24.)  That is simply not what the challenged statement said.  (Br. 23–24.)[9]

Finally, Plaintiffs concede that most of the alleged misstatements are forward-looking and opinion statements, (Br. 24–25), but argue that the opinion statements are actionable as omissions, (Opp. 24–25). This argument fails for the reasons above, and also because, as Plaintiffs' own cases make clear, opinions often rest on a weighing of competing facts and there is no obligation to disclose every fact tending to cut against an opinion statement.  *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020); *see Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

## III.    Plaintiffs Fail to Plead a Control Person Claim Under Section 15

Absent a primary violation and culpable participation, Plaintiffs cannot establish control person liability under Section 15.  *Penn. Pub. Sch. Emps.' Ret. Sys.* v. *Bank of Am. Corp.*, 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012).  Plaintiff fail to plead both elements here.

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[9]    Plaintiffs make the illogical argument that increased business from travel clients was bad because those clients have "high chargebacks and lower margins."  (Opp. 24.)  But an uptick in travel business obviously generates *revenue* and *profit* and other overall *benefits* for the Company, notwithstanding lower margins.  And Plaintiffs do not dispute Riskified's year-over-year *growth* in revenue and gross profit in 2Q21, 3Q21, and 4Q21.  (Br. 7–8.)

Dated:  March 16, 2023
       New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP

By:  */s/ Audra J. Soloway*
     Audra J. Soloway
     Daniel Sinnreich
     1285 Avenue of the Americas
     New York, NY 10019-6064
     Telephone: (212) 373-3000
     Email: asoloway@paulweiss.com
     Email: dsinnreich@paulweiss.com

     *Counsel for Defendants Riskified Ltd.,*
     *Eido Gal, Assaf Feldman, Aglika*
     *Dotcheva, Erez Shachar, Eyal Kishon,*
     *Aaron Mankovski, Tanzeen Syed, and*
     *Jennifer Ceran*

SIMPSON THACHER & BARTLETT LLP

By:  */s/ Jonathan K. Youngwood*
     Jonathan K. Youngwood
     Craig Scott Waldman
     425 Lexington Avenue
     New York, NY 10017
     Telephone: (212) 455-2000
     Email: jyoungwood@stblaw.com
     Email: cwaldman@stblaw.com

     *Counsel for Defendants Goldman Sachs*
     *& Co. LLC, J.P. Morgan Securities LLC,*
     *Barclays Capital Inc., Credit Suisse*
     *Securities (USA) LLC, Keybanc Capital*
     *Markets Inc., Piper Sandler & Co., Truist*
     *Securities, Inc., William Blair &*
     *Company, L.L.C., Loop Capital Markets*
     *LLC, Samuel A. Ramirez & Company,*
     *Inc., Siebert Williams Shank & Co., LLC,*
     *and Stern Brothers & Co.*