UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------- X
                                        :      22cv3545 (DLC)
 IN RE RISKIFIED LTD. SECURITIES        :
 LITIGATION                             :      OPINION AND
                                        :          ORDER
--------------------------------------- X
```

APPEARANCES:

For plaintiffs Craig Black and Diva Joshi:
The Rosen Law Firm
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Ave., 40th Floor
New York, NY 10016

For defendants Riskified Ltd., Eido Gal, Assaf Feldman, Aglika
Dotcheva, Erez Shachar, Eyal Kishon, Aaron Mankovski, Tanzeen
Syed, and Jennifer Ceran:
Audra J. Soloway
Daniel Sinnreich
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

For defendants Goldman Sachs & Co. LLC; J.P. Morgan Securities
LLC; Barclays Capital Inc.; Credit Suisse Securities (USA) LLC;
Keybanc Capital Markets Inc.; Piper Sandler & Co.; Truist
Securities, Inc.; William Blair & Company, L.L.C.; Loop Capital
Markets LLC; Samuel A. Ramirez & Company, Inc.; Siebert Williams
Shank & Co., LLC; and Stern Brothers & Co.:
Jonathan K. Youngwood
Craig Scott Waldman
Simpson Thacher & Bartlett LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

    The plaintiffs bring this putative securities class action

against Riskified Ltd. ("Riskified"), its officers and

directors, and several underwriters, based on purported

omissions and misleading statements in the registration statement issued in connection with Riskified's July 2021 initial public offering ("IPO").  The defendants have moved to dismiss the action on the grounds that the plaintiffs have failed to state a claim under the securities laws.  For the following reasons, the defendants' motion to dismiss is granted.

## Background

The following facts are taken from the second amended complaint ("SAC").  The factual allegations are taken as true, and all reasonable inferences are drawn in the plaintiffs' favor.  This background section summarizes the relevant aspects of Riskified's business, describes the registration statement at issue in the case, and outlines pertinent events that occurred after Riskified's IPO.  It then describes the procedural history of the case.

I.   Riskified's Business

A.   Background on Riskified

Riskified is a technology company that offers fraud detection services to its merchant clients to help them minimize certain costs associated with fraudulent online transactions. Any time a sale is made online using a credit card, merchants face a choice either to accept the transaction and recognize the sale, or reject the transaction as fraudulent.  Sometimes a

merchant unintentionally rejects a legitimate transaction because it appears fraudulent, which costs the merchant revenue. Likewise, merchants may mistakenly accept a fraudulent transaction.  If a cardholder disputes a mistakenly accepted transaction with their bank and the bank rules in the cardholder's favor, the merchant loses the revenue associated with the transaction.  This forced payment reversal is called a "chargeback."  Merchants want to maximize their approvals of legitimate transactions (and thus their revenues), while minimizing chargebacks.

Riskified's core product, the Chargeback Guarantee, aims to assist with these goals.  The Chargeback Guarantee uses machine learning to identify the individual behind an online transaction and evaluate that individual's fraud risk.  Based on that evaluation, the Chargeback Guarantee automatically approves or rejects an online order.

Riskified charges each client an agreed-upon percentage of the client's gross merchandise value ("GMV") for each transaction that Riskified approves, but charges nothing for rejected transactions.  If Riskified mistakenly approves a transaction that ultimately results in a chargeback, Riskified reimburses the merchant for the cost of the chargeback.  When this happens, Riskified records a chargeback guarantee expense

in its cost of revenue.  Chargeback guarantee expenses account
for most of Riskified's cost of revenue, representing over 80%
of the total cost of revenue in 2019, 2020, and 2021.  This case
turns heavily on Riskified's chargeback guarantee expenses and
the impact of those expenses on Riskified's gross profit
margins.

    B.   Chargeback Risk

    Certain of Riskified's clients carry greater risk of
chargebacks and thus greater risk of chargeback expenses for
Riskified.  According to certain former employees, Riskified
tracks clients' particularized risk levels internally.  Former
employees explained that certain types of clients, such as
retail clients, are generally less risky, while clients in other
industries such as travel, gift cards, and cryptocurrency, are
riskier.  They also recalled that Riskified develops its
understanding of a new client's chargeback risk through an
extended onboarding process, and that clients in industries new
to Riskified tend to present a greater chargeback risk.

    Three former employees reported that Riskified began taking
on riskier clients to develop its business, differentiate
itself, and beat out competitors.  One of those employees,
referred to as FE6 in the complaint, was a data integration
engineer who worked at Riskified in 2020 and 2021.  According to

4

FE6, Riskified began taking on new and riskier clients at a
higher than usual rate leading up to Riskified's IPO.  FE6
identified one client that was onboarded in the months leading
up to the IPO -- Binance, a cryptocurrency exchange.  There is
no specific client, other than Binance, identified in the
complaint as having been onboarded in the months leading up to
the IPO.[1]

II.  The Registration Statement

On July 1, 2021, Riskified filed with the SEC a
registration statement for its IPO on Form F-1, which, after
several amendments, was declared effective on July 28, 2021 (the
"Registration Statement").[2]  The crux of the plaintiffs' claims
in the SAC is that the Registration Statement did not adequately
disclose a trend that was likely to impact Riskified's financial
prospects adversely.  This trend was that Riskified's overall
client portfolio, or "merchant mix," began to include a greater
proportion of riskier clients, which increased the company's
chargeback expenses and hampered its gross profit margins.

---

[1] Another client, a "global money remittance and payments
company" was onboarded at some time in 2021, but it is not clear
from the complaint whether this client was onboarded before or
after the IPO.

[2] On July 30, 2021, Riskified filed with the SEC a final
prospectus for the IPO on Form 424B4, which was incorporated
into and formed part of the Registration Statement.

Certain pertinent material from the Registration Statement is quoted below.  Statements that the plaintiffs identify in the complaint as misleading are highlighted in bold.[3]  Any underlining is added in this Opinion for emphasis.

The Registration Statement begins with a summary that highlights certain key information contained elsewhere in the statement.  The summary section explains chargebacks and describes how the Chargeback Guarantee product helps clients, including by "assuming the cost of fraud associated with each transaction [Riskified] approve[s]."  The section also briefly overviews Riskified's risk management with respect to chargeback expenses:

> Risk management is at the very heart of our business. We have **established strict processes that allow us to manage our overall chargeback exposure and control realized chargeback expenses within predetermined budget levels.**  In addition, **we constantly adjust our merchants' approval and chargeback rates to rebalance our exposure and our expected expenses during any given period.**

Following the summary section is a section that explains in detail the company's risk factors.  This section begins with a

---

[3] When essentially the same statement is repeated within the Registration Statement, the statement is recited only once in this section.  Additionally, not all of the statements identified by the plaintiffs as misleading are quoted in this background section.  Statements relied on by the plaintiffs that are not quoted in this section are quoted in the discussion section that follows.

warning that the section includes forward-looking statements and that Riskified's "actual results could differ materially from those described in these forward-looking statements as a result of certain factors, including the risks and uncertainties faced by us described" in the Registration Statement.

The risk factors section elaborates on several risks faced by the company.  It notes, for example, that Riskified's

> limited operating history and our rapid growth make it difficult to evaluate our future prospects and the risks and challenges we may encounter.  These <u>risks and challenges include our ability to</u>: . . .
>
> - <u>successfully expand our business in existing markets, and enter new markets and geographies</u>; . . .
> - <u>accurately predict project chargeback expenses</u>, especially if new fraud patterns develop more quickly than our ability to detect and block new fraud patterns . . . .

Later, the section explains that Riskified's products may be inaccurate and warns investors of risks of these inaccuracies.  It discloses, for example, that if Riskified's "machine learning models fail to accurately detect fraud, or any of the other components of our automated decisioning process fail, we may experience higher than forecasted chargebacks."

The risk factors section also describes certain risks associated with COVID-19.  For example, in explaining the risks

created by Riskified's limited operating history, the section
states:

> Although, to date, the accelerated migration towards
> eCommerce as a result of the COVID-19 pandemic has had
> a generally positive impact on our growth and
> business, **there are certain sectors, including travel**
> **and ticketing, from which we have historically derived**
> **significant revenues, that continue to be negatively**
> **impacted by COVID-19 related measures and**
> **restrictions.** Further, increased levels of eCommerce
> have been accompanied by more sophisticated fraud
> organizations and schemes, which may be more difficult
> for our products to detect. **There continues to be**
> **significant uncertainty regarding** future developments
> and whether the increased eCommerce adoption resulting
> from the COVID-19 pandemic will be maintained or
> continue to increase following easing of restrictions,
> and **the timeframe for recovery of negatively affected**
> **sectors, in particular travel and ticketing.**

The Registration Statement also includes a section
describing Riskified's financial condition and results of
operations.  This section notes that

> **[u]sing our proprietary eCommerce risk management**
> **platform, data assets, and scaled merchant network, we**
> **are able to control the chargeback expenses we incur**
> and have been able to reduce chargebacks as a
> percentage of our Billings from 42% in 2019 to 37% in
> 2020 which has helped drive gross profit margin
> expansion. . . .  Our CTB Ratio represents the total
> amount of chargeback expenses incurred during the
> period indicated divided by the total amount of
> Billings to all of our merchants over the same
> period. . . .
>
> We use the CTB Ratio to evaluate the performance of
> our business operations and the effectiveness of our
> model.  Our CTB Ratio may fluctuate in future periods
> due to a number of factors, including changes in the
> mix of our merchant industry base, the risk profile of

orders approved in the period, and technological improvements in the performance of our models.

The financial results section also describes the components that make up the results of Riskified's operations.  With respect to gross profit and gross profit margin, for example, the section explains

**As our business continues to grow, we expect our gross profit will increase in absolute dollars while our gross profit margin may fluctuate from period to period.**  Our gross profit margin is highly dependent on our risk-based pricing model which determines the fee we charge our merchants, our approval rate thresholds, the merchant mix of our revenue, and new geographies and industries into which we may enter. **We control the decision to approve a particular transaction and continuously monitor our approval rate thresholds to ensure we are not exposed to higher amounts of chargeback risk, and we structure our pricing in a way to mitigate this risk.**

Finally, the section lays out the results of operations for several quarters ranging from the three months ended March 31, 2019 to the three months ended March 31, 2021.  When describing quarterly trends from the first quarter of 2019 ("1Q19") to the first quarter of 2021 ("1Q21"), the Registration Statement states

Throughout the quarterly periods, our revenues have increased at a faster rate than our cost of revenues which generally drove improvements in our gross profit margin over time.  While our gross profit margin may fluctuate within a year, the strong performances we have seen in the fourth quarter typically outweigh lower gross profit margin quarters.  Our quarterly gross profit margin fluctuated between 45% and 58% during the periods presented.  The general increase is

> the result of improvements in our models at
> identifying fraud as well as changes in the merchant
> mix and industry composition of our revenues.

Similarly, a chart showing quarterly results during this period indicates that Riskified's cost of revenue fluctuated significantly from 1Q19 to 1Q21, ranging from 43% for the three months ended March 31, 2019 to 55% for the three months ended September 30, 2019.

III. IPO and Subsequent Events

During its July 2021 IPO, Riskified sold over 20 million shares and generated over $422 million in gross proceeds. Subsequently, on September 9, 2021, Riskified announced its financial results for the second quarter of 2021 ("2Q21"). The 2Q21 results showed year-over-year growth in several metrics including 65% growth in gross profits, 47% growth in revenue, and 55% growth in GMV.

In an earnings call to discuss the 2Q21 results, Riskified's Chief Financial Officer, Aglika Dotcheva, noted that the company's gross profit margins for 2Q21 were 60%, which was higher than the margins reported on the Registration Statement for any quarter from 1Q19 to 1Q21. On the call, Dotcheva explained that gross profit margin "is best analyzed on an annual basis as individual quarters can experience variability due to seasonality, the industry mix shift of our revenues and

changes in the risk profile of transactions approved."  She
continued:

> we do not expect to maintain the same level of gross
> profit margin in the back half [of 2021], and this is
> primarily the result of merchant mix and seasonality.
> More specifically and as is customary, we tend to
> experience higher chargebacks when we first enter a
> new industry.  These levels trend lower over time as
> our platform learns from more industry-specific
> performance data.  In addition we expect a pick-up in
> higher risk profile travel industry-related volume due
> to summer and holiday related seasonality.

Riskified's CEO, Eido Gal, also stated on the call that, during
2Q21, Riskified had "started reviewing orders for several new
large merchants, who completed the platform onboarding process
during the quarter" and that several of those new clients
"operate in online payment categories that Riskified has not
previously served, including cryptocurrency brokerage."  After
the call, analyst reports issued on the same day mentioned the
points made on the call about chargebacks and Riskified's
onboarding of new clients in new industries.

Riskified's share price fell in the days following the
announcement of its 2Q21 results and the earnings call to
discuss those results.  Specifically, from September 8 (the day
before the 2Q21 results were published) to September 11,
Riskified's share price fell from $35.73 to $24.90.

On November 16, 2021, Riskified announced its financial
results for the third quarter of 2021 ("3Q21").  These results

11

again showed year-over-year growth in certain metrics including 26% growth in revenue, 28% growth in GMV, and 10% growth in gross profit.  Gross profit margins, however, declined to 46%, representing a decrease from the prior two quarters, as well as a year-over-year decrease.  Additionally, cost of revenues increased 44% year-over-year.

The 3Q21 results were discussed in an earnings call, in which Dotcheva explained that the decline in gross profit margin was primarily due to "the shift in our vertical contribution to the overall industry portfolio mix."  She stated:

> Q3 naturally carries higher risk volumes due to big travel trends and summer vacations.  This dynamic was, of course, less pronounced due to COVID and is much more significant now due to ongoing easing of COVID-related restrictions and general travel recovery.  Second, we have onboarded several new large merchants as well as merchants from industries new to us, such as payments, which changed our merchant portfolio mix and overall risk levels.  Some of the increase attributable to those new merchants and industries should naturally decrease over time as our machine learning model gather[s] more data on the unique patterns.

Dotcheva also noted on the call that the increased chargeback expenses were "expected" and "aligned to [Riskified's] expectations."  Analyst reports issued in the following days mentioned the information about gross margins discussed on the call.  Riskified's share price fell on November 16 and again on November 17.

On February 23, 2022, Riskfied announced its financial results for the fourth quarter of 2021 ("4Q21") and its year-end results for fiscal year 2021 ("FY21").  Certain metrics again showed year-over-year growth, including 22% growth in revenue.  Gross profit margins for both 4Q21 and FY21 showed a year-over-year decrease.

In the earnings call explaining the 4Q21 and FY21 results, Dotcheva remarked that the year-over-year decline in gross profit margin "was driven primarily by [Riskified's] expansion into new industries and regions, increase of the tickets in travel industry as a percentage of total billings as well as the onboarding of new merchants."  Analyst reports again noted the decline in gross profit margins and Dotcheva's stated explanations for this decline.

On February 23, Riskified's share price fell again.  By May 2, 2022, the price of Riskified's Class A ordinary shares had fallen more than 70% below the IPO price.

IV.  Procedural History

This action was filed on May 2, 2022 as a putative class action.  On August 17, the case was reassigned to this Court. That same day, Craig Black was appointed as lead plaintiff in the case.  Also on that day, a schedule was set for filing amended pleadings.

The lead plaintiff filed his first amended complaint on September 15.  On October 28, the defendants moved to dismiss the first amended complaint.  Instead of opposing the motion to dismiss the first amended complaint, lead plaintiff filed the SAC on November 28.[4]  The SAC alleges violations of § 11 of the Securities Act of 1933 against Riskified, certain of its officers and directors, and several underwriters.  It also alleges violations of § 15 of the Securities Act against the officers and directors.

Defendants moved to dismiss the SAC on January 20, 2023. The motion to dismiss the SAC was fully submitted on March 16. In letters of May 2, 3, 9, and 15, the parties alerted the Court to supplemental authorities relevant to the motion.

## Discussion

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face."  Green v. Dep't of Educ. of New York, 16 F.4th 1070, 1076–77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In securities actions, a court may also consider "any written

---

[4] The lead plaintiff was warned on August 17, 2022 that, after filing the SAC, he would likely not have a further opportunity to amend his complaint.

instrument attached to the complaint, statements or documents
incorporated into the complaint by reference, legally required
public disclosure documents filed with the SEC, and documents
possessed by or known to the plaintiff upon which it relied in
bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d
Cir. 2016) (citation omitted). Defendants argue that the
heightened pleading requirements of Rule 9(b), Fed. R. Civ. P.,
apply to plaintiffs' claims because the claims are "grounded in
fraud." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). It
is unnecessary to decide whether the Rule 9(b) standard applies,
however, because the claims fail regardless of which standard
applies.

Section 11 imposes "absolute liability" on an issuer of a
registration statement if:

> (1) the statement contained an untrue statement of a
> material fact, (2) the statement omitted to state a
> material fact required to be stated therein, or (3)
> the omitted information was necessary to make the
> statements therein not misleading.

Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 84 (2d Cir.
2021) (citation omitted).[5] "[A] plaintiff bringing a claim under
Section 11 need not allege scienter, reliance, or loss
causation." Set Cap. LLC, 996 F.3d at 84 (citation omitted).

---

[5] For underwriters, § 11 imposes negligence liability. See FHFA
v. Nomura Holding Am., Inc., 873 F.3d 85, 99, 130 (2d Cir.
2017).

"Section 15, in turn, creates liability for individuals or entities that control any person liable" under § 11.  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citation omitted).  "[T]he success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to demonstrate primary liability" under § 11.  Id.

A statement or omission "is material if a reasonable investor would view it as significantly altering the total mix of information made available."  Set Cap. LLC, 996 F.3d at 84 (citation omitted).  This is an "objective, totality-of-the-circumstances inquiry."  FHFA v. Nomura Holding Am., Inc., 873 F.3d 85, 146 (2d Cir. 2017).  Courts must read registration statements "cover-to-cover" and "consider whether the disclosures and representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) (citation omitted).  The context "includes, for example, all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs."  Nomura Holding Am., Inc., 873 F.3d at 151.

"[W]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a

matter of law." In re Proshares, 728 F.3d at 102 (citation omitted). "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach, 355 F.3d at 173 (2d Cir. 2004) (citation omitted).

Plaintiffs allege two bases of § 11 liability: (1) that defendants omitted material information that they were required to disclose, and (2) that the Registration Statement contained materially misleading statements. Neither basis has merit.

A.   Omissions

Plaintiffs contend that the defendants omitted from the Registration Statement material information that they were required to disclose under Item 3(D) ("Item 3") and Item 5(D) ("Item 5") of SEC Form 20-F. Item 5 is addressed first.

1.   Item 5

Item 5 requires a registrant to disclose

for at least the current financial year, any known
trends, uncertainties, demands, commitments or events
that are reasonably likely to have a material effect
on the company's net sales or revenues, income from
continuing operations, profitability, liquidity or
capital resources, or that would cause reported
financial information not necessarily to be indicative
of future operating results or financial condition.

SEC Form 20-F, Item 5(D).  The parties agree that Item 5

requires the same disclosure as Item 303 of SEC Regulation S-K,

17 C.F.R. § 229.303 ("Item 303").  See Commission Guidance

Regarding Management's Discussion and Analysis of Financial

Condition and Results of Operations, SEC Release Nos. 33-8350,

34-38960; 81 SEC Docket 2905, 2003 WL 22996757 (Dec. 19, 2003).

Item 303 requires in pertinent part "the disclosure of any

known trends the registrant reasonably expects will have a

material impact on" a registrant's financial results.  Stadnick

v. Vivint Solar Inc., 861 F.3d 31, 39 (2d Cir. 2017) (citation

omitted).  "Disclosure is required where the trend is both (1)

known to management and (2) reasonably likely to have material

effects on the registrant's financial condition or results of

operations."  Id. (citation omitted).  "[F]ailing to comply with

Item 303 by omitting known trends or uncertainties from a

registration statement or prospectus is actionable under" § 11.

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir.

2015).

Plaintiffs contend that Riskified failed to disclose a

known trend at the time of the IPO, namely, that certain of

Riskified's clients had higher chargeback rates and that

Riskified's merchant mix had begun to include a greater

proportion of those riskier clients.  The plaintiffs, however,

have not plausibly pled that, at the time of the IPO, any trend
existed of shifting Riskified's overall merchant mix to include
a greater proportion of risky clients.[6]

Notably, the complaint identifies only one client that was
onboarded in the months leading up to the IPO, Binance, a
cryptocurrency exchange.  Although there are other allegations
that clients in the cryptocurrency industry pose a greater risk
of chargebacks, the SAC does not plausibly plead that the
addition of a single client in that industry constituted a trend
that needed to be disclosed under Item 5.

Other paragraphs in the SAC allege that Riskified onboarded
other (unspecified) clients in riskier industries during 2021,
but these paragraphs do not indicate whether the clients were
brought on before or after the IPO.  The complaint refers, for
example, to a "global money movement remittance and payments
company" and other clients that Riskified's CFO Aglika Dotcheva
mentioned on a February 23, 2022 call discussing the company's
4Q21 and FY21 financial results.  There is no indication,

---

[6] To the extent that the plaintiffs intend to present a theory
that Riskified did not disclose a separate trend of certain
clients posing a greater risk of chargebacks, this theory also
fails.  As explained in the following section of this Opinion,
the Registration Statement adequately disclosed that certain
kinds of clients were more likely to incur chargebacks.

however, that any of these companies were onboarded prior to the IPO in July of 2021.[7]

Moreover, even assuming that some of these "riskier" clients were onboarded prior to the IPO, courts have held that events occurring over a period of only a few months cannot constitute a "trend" for the purposes of Item 303 (and thus Item 5). See, e.g., Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc., No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (collecting cases). Riskified reported record-high gross profit margins in 2Q21, and the negative impact on the gross profit margins allegedly caused by the shift in merchant mix did not occur until later. This suggests that any change in merchant mix large enough to impact materially the company's risk of chargeback expenses could not have been established for long enough to constitute a "trend" at the time of the IPO.

In arguing that the SAC adequately pleads a known trend requiring disclosure, plaintiffs note that Riskified's CEO Eido Gal commented in an earnings call that Riskified had begun

---

[7] Likewise, Dotcheva's comment on an earnings call that Riskified "onboarded several new large merchants as well as merchants from new industries to us, such as Payments, which changed our merchant portfolio mix and overall risk levels" does not remedy the problem faced by the plaintiffs. This comment was made in November 2021 when Dotcheva discussed the financial results from 3Q21 and therefore does not indicate that there was an established trend towards riskier clients at the time of the IPO in July of 2021.

reviewing orders from "several" new clients in new industries in
2Q21.  The complaint also references a comment from the CFO on
the same call that Riskified typically experiences higher
chargebacks when it brings on clients in new industries.  These
allegations, too, are insufficient to plausibly plead a trend
towards riskier clients leading up to the IPO.  A statement that
Riskified had, in 2Q21, brought on new clients that may have
posed greater risk does not plausibly plead that Riskified's
overall merchant mix was shifting towards riskier clients at the
time of the IPO, much less that it was shifting on a scale that
triggered a disclosure duty under Item 5.

The plaintiffs also argue that Riskified's transaction
volume from the travel industry increased leading up to the IPO,
which shifted its overall risk levels.  But the cited paragraphs
of the complaint refer to an uptick in travel transactions
throughout 2021 in general.  Thus, like the other comments
discussed above about changes in 2021 generally, they do not
plausibly plead a known trend at the time of the IPO in July of
2021.

Finally, it is worth noting that Riskified's disclosures as
relevant to the issue were robust.  The Registration Statement
disclosed that Riskified intended to attract new merchants and
that its gross profit margins and CTB Ratio could fluctuate

based on its merchant mix, as well as new industries and geographies that it may enter.  Thus, a reasonable investor could not have been surprised that, in the months following the IPO, Riskified incurred greater chargeback expenses from clients in new industries and geographies and reported lower gross profit margins.  This is particularly so given that, as explained further below, the allegedly disappointing margins cited in the complaint fell squarely within the historical financial results reported in the Registration Statement.[8]

2.   Item 3

Item 3 requires a registrant to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."  SEC Form 20-F, Item 3(D).  The SEC's instructions for Item 3 also explain that "[r]isk factors should be concise and explain clearly how the risk affects the issuer or the securities."  Id.  The parties agree that Item 3 requires essentially the same

---

[8] In a footnote, the plaintiffs suggest that the alleged shift in merchant mix may be considered an "event" or "uncertainty" that required disclosure under Item 5.  But they concede that the analysis under Item 5 is "unchanged" whether the alleged shift is thought of as a trend, an event, or an uncertainty.  Thus, for the same reasons, the SAC does not plausibly plead that Riskified failed to disclose an event or uncertainty required to be disclosed under Item 5.

disclosure as Item 105 of SEC Regulation S-K, 17 C.F.R.
§ 229.105 ("Item 105").

The plaintiffs contend that the Registration Statement
omitted information required by Item 3 because it did not
adequately disclose the alleged trend in Riskified's merchant
mix, or the associated risk to the company's gross profit
margins.  As explained above, plaintiffs have not plausibly pled
that any such trend existed at the time of the IPO.  Moreover,
contrary to the plaintiffs' contentions, the Registration
Statement accurately and adequately explained the risks
associated with chargeback expenses and fluctuations in gross
profit margins.

The Registration Statement clearly outlined that
reimbursing Riskified's clients for chargeback expenses was part
of the company's business model.  It also disclosed that the
risk of chargebacks varied based on each client's overall risk
levels.  Specifically, the Registration Statement provided that
the CTB Ratio could fluctuate based on "a number of factors,
including changes in the mix of our merchant industry base, the
risk profile of orders approved in the period, and technological
improvements in the performance of our models."  Likewise, it
disclosed that Riskified's gross profit margins could fluctuate

based on factors including "the merchant mix of our revenue, and new geographies and industries into which we may enter."

In addition, the Registration Statement warned investors that, while the company's pricing model was intended to mitigate the risk, the pricing model could be flawed.  It noted, for example, that Riskified's profitability depended in part on Riskified's "ability to effectively manage and decrease our chargeback expenses, which is dependent on our ability to improve the accuracy of our products."  It also warned that "our machine learning models may prove to be less accurate than we expect, or than they have been in the past, for a variety of reasons" and that if Riskified's products failed to detect fraud accurately, "we may experience higher than forecasted chargebacks."

Riskified also disclosed in the Registration Statement that part of the company's overall business strategy involved seeking out new clients in new industries and geographies.  Given these disclosures, coupled with the Registration Statement's explanation that its gross profits could change based on Riskified's merchant mix and "new geographies and industries we may enter," a reasonable investor would have understood that Riskified could bring on clients in a new industry or region and

that those clients could impact the company's chargeback expenses.

Finally, the relevance of chargeback risk boils down to Riskified's gross profit margins.  As noted above, Riskified disclosed that its gross profit margins could fluctuate based on its merchant mix and the industries and geographies it served. And indeed, the fluctuations that are the predicates for the plaintiffs' complaints were within the historical fluctuations of gross profit margins that were disclosed in the financial section of the Registration Statement.

Plaintiffs, focusing on the disclosure that gross profit margins "may fluctuate" based on Riskified's merchant mix and other factors, argue that the disclosures in the Registration Statement were too generic.  But placing this statement in isolation inappropriately ignores the extensive disclosures made throughout the Registration Statement.  Reading the Registration Statement cover to cover, it is clear that chargeback expenses can vary based on merchants, that Riskified planned to seek out merchants in new areas and industries, and that, despite its best efforts, Riskified could fail to account adequately for chargeback risks in its pricing models.  This was sufficient to satisfy the company's disclosure obligations.

B.   Misleading Statements

Separate from their omission theories, plaintiffs also contend that eight statements in the Registration Statement are materially misleading.  The allegedly misleading statements can be grouped into three categories -- statements about possible fluctuations in Riskified's CTB Ratio and gross profit margins, statements about Riskified's efforts to control its exposure to chargeback expenses, and statements about the impact of COVID-19 on Riskified's business.  The plaintiffs' arguments that these statements were misleading fail.

1.   Fluctuations in CTB Ratio and Gross Profit Margins

The Registration Statement explains that, as Riskified's business continues to grow, "we expect our gross profit will increase in absolute dollars while our gross profit margin may fluctuate from period to period."  According to the plaintiffs, this statement was misleading because it "grossly understated" the risk that the margins would decrease due to the alleged shift in Riskified's merchant mix.

In context, the statement is not misleading.  First, as explained above, plaintiffs have not plausibly pled that a relevant shift in merchant mix existed at the time of the IPO.  Further, the Registration Statement did not merely disclose that Riskified's gross profit margins "may fluctuate" from period to

26

period.  It also disclosed reasons that the margins could
fluctuate, including changes in the merchant mix.  In addition,
it disclosed that Riskified intended to expand its portfolio of
clients to new industries and geographies.  Thus, the
Registration Statement sufficiently explained to investors the
risks associated with fluctuations in gross profit margins.[9]

> 2.  Riskified's Control of Exposure to Chargeback
>     Expenses

Several statements in the Registration Statement indicate
that Riskified works to control its exposure to chargeback
expenses.  The Registration Statement explains, for example,
that Riskified has "established strict processes" that allow it
to manage its "overall chargeback exposure and control realized
chargeback expenses within predetermined budget levels," that
Riskified is "able to control the chargeback expense" it incurs,
and that Riskified continuously monitors its approval rate
thresholds to ensure it is "not exposed to higher amounts of
chargeback risk."  The plaintiffs contend that these statements
were misleading because they suggested that Riskified could

---

[9] In its memorandum of law in opposition to the motion to
dismiss, the plaintiffs also cite a similar statement that
Riskified's CTB Ratio "may fluctuate."  This statement is not
included in the section of the complaint identifying purportedly
misleading statements in the Registration Statement.  To the
extent that plaintiffs intend this statement to serve as an
additional basis for liability, this theory fails for the same
reasons.

strictly control its chargeback expenses when, in reality, certain kinds of clients carried higher risk of chargebacks for which Riskified could not fully account.

In the context of the entire Registration Statement, these statements are not misleading.  No reasonable investor could conclude from reading the Registration Statement that Riskified's control of its chargeback exposure was a perfect science.  Indeed, the Registration Statement is replete with disclosures that Riskified's models could underestimate chargeback expenses and that the company's chargebacks-to-billings ratio could fluctuate depending on factors including its merchant mix and new industries and geographies it may enter.  Context makes clear that these statements about Riskified's control of its chargeback expenses were statements about the company continually aiming to improve the accuracy of its product and minimize its chargeback expenses, not about a foolproof method for doing so.

Another statement identified by the plaintiffs -- that "chargeback expenses become less volatile over time" as Riskified scales -- is, for similar reasons, not misleading. Viewed in context, the statement does not suggest that chargeback expenses would consistently become less volatile over

time.  To the contrary, the Registration Statement identified several reasons that the expenses could change.

Finally, the statement that Riskified believes that diversification across industries and clients "significantly reduces the likelihood of material unexpected chargeback expenses" is also not misleading.  Even though this statement indicates that diversity can, in general, help mitigate chargeback exposure, it does not suggest that changes in Riskified's merchant mix are unlikely to result in increased chargebacks.  To the contrary, the Registration Statement repeatedly explains that changes in merchant mix could impact the CTB Ratio.

### 3.   Impact of COVID-19

The last statements that plaintiffs identify discuss the impact of COVID-19 on Riskified's financial results.  The Registration Statement notes that, despite the growth opportunity caused by the shift to eCommerce brought on by COVID-19, certain sectors, including travel, from which Riskified had traditionally derived significant revenue, had been hurt by the pandemic, and the recovery of those sectors was uncertain.  It similarly states that "[v]olatility in global travel and events reopening may lead to fluctuations in revenue from merchants in these industries in the near-term, but we

29

believe we are well-positioned to continue to benefit from the
macroeconomic shift to eCommerce that COVID-19 has accelerated."
According to the plaintiffs, these statements were misleading
because they suggested that the recovery of Riskified's travel
clients from COVID-19-related restrictions would have only a
positive impact on Riskified's business, when, in reality, the
increased travel transactions would cause greater chargeback
expenses for Riskified and thus lower margins.

As with the other statements above, when read in context, a
reasonable investor would not have interpreted the statements
about COVID-19 in the Registration Statement to imply that
easing COVID-19 restrictions would have only a positive impact
on Riskified's business.  At the outset, the focus of the cited
statements is largely on "the accelerated migration towards
eCommerce as a result of the COVID-19 pandemic," rather than the
muted performance of the travel sector during the pandemic.
Moreover, the disclosures about COVID-19 indicate that there
"continues to be significant uncertainty regarding" the future
economic impacts of the pandemic.  Thus, the only reasonable
conclusions to draw from the Registration Statement's
disclosures about the pandemic are that (1) Riskified has
generally benefitted from a shift to eCommerce, caused in part

by the pandemic and (2) the future impact of the pandemic on

Riskified's performance was uncertain.

### Conclusion

The defendants' January 20, 2023 motion to dismiss the

complaint is granted.  The Clerk of Court is directed to enter

judgment for the defendants and close this case.

Dated:    New York, New York
          June 2, 2023

                                    _____
                                       DENISE COTE
                                  United States District Judge

31